UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
EVERCARE CHOICE, INC.,

                      Plaintiff,

            -against-                        **COMPLAINT**

PKF O'CONNOR DAVIES, LLP; O'CONNOR DAVIES,     Civil Case No.:
LLP, O'CONNOR DAVIES MUNNS & DOBBINS, LLP;
and Individuals THOMAS P. KENNEDY; CHRISTOPHER    Date Filed:
J. McCARTHY; MICHAEL J. SUAREZ**;** GARRETT M.
HIGGINS; DOROTHEA RUSSO, AND JOHN DOES 1-10.

                   Defendants.
------------------------------------------------------------------------X

Plaintiff, EverCare Choice, Inc., ("EverCare"), by and through its attorneys, Moritt Hock & Hamroff LLP, as and for its Complaint against Defendants PKF O'Connor Davies, LLP; O'Connor Davies, LLP; O'Connor Davies Munns & Dobbins, LLP; (collectively, the "PKF Entities"); Thomas P. Kennedy ("Kennedy"); Christopher J. McCarthy ("McCarthy"); Michael J. Suarez ("Suarez")**;** Garrett M. Higgins ("Higgins"); and Dorothea Russo ("Russo") (Kennedy, McCarthy, Suarez, Higgins and Russo  shall be referred to herein collectively as the "Individual Auditor Defendants," and the Individual Auditor Defendants, together with the PKF Entities shall be referred to herein collectively as the "PKF Defendants," "PKF" or, alternatively, "Defendants"), states and alleges as follows:

## NATURE OF THE ACTION

1.      EverCare brings this action against the PKF Defendants to recover, *inter alia,* actual damages reasonably believed to be in excess of $25 million, as a result of Defendants' multiple acts of fraud, aiding and abetting fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and auditor malpractice, as well as statutory treble damages, reasonable attorneys' fees and costs pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

2.      EverCare is a New York not-for-profit managed long-term care plan (an "MLTCP" or, alternatively, a "Plan") that provides healthcare services to Medicaid recipients throughout Orange, Rockland, and Dutchess Counties, New York.

3.      Defendants are certified public accountants, financial consultants, tax advisors and auditors, who, from in or about May 1, 2010, through and including in or about May 1, 2016 (the "Relevant Period"), simultaneously served as the certified public accountants, tax advisors and consultants for EverCare, EverCare's former parent company, Elant, Inc. ("Elant"), and certain affiliates of Elant of which Elant was the sole member and active parent, including, but not limited to, The Elant Foundation, Inc. ("Foundation"), Elant At Brandywine, Inc. ("Brandywine"), Elant At Goshen, Inc. ("Goshen"), Elant At Newburgh, Inc. d/b/a Elant At Newburgh ("Newburgh"), Elant At Fishkill, Inc. ("Fishkill"),[1] Glen Arden, Inc. ("Glen Arden") (collectively the "Elant Entities").[2]

---

[1] References to Fishkill include both Elant at Fishkill and Elant at Wappingers Falls, except where specific references are made to the skilled nursing facility ("SNF") in Wappingers Falls, which shall be referred to hereinafter as "Wappingers Falls." Brandywine, Goshen, Newburgh, and Fishkill, all of which are SNFs, collectively are referred to herein as the "Elant SNFs." Goshen and Newburgh shall be referred to collectively herein as the "Obligated Group."

[2] On or about April 19, 2016, EverCare commenced an action in New York State Supreme Court, Orange County, captioned *Elant Choice, Inc. d/b/a EverCare v. Elant, Inc., et al.,* Index No. EF002597-2016 (Sup. Ct., Orange Co., April 19, 2016) (Hon. Elaine Slobod, J.S.C) (the "Elant Action"), by filing a Summons and Verified Complaint against each of the Elant Entities and certain directors and officers of Elant, including Elant Board Chair Donna Cornell ("Cornell"), its then Chief Executive Officer Todd Whitney ("Whitney") and Chief Financial Officer Deborah Zambito ("Zambito") (collectively, Cornell, Whitney and Zambito shall be referred to herein as the "Individual Elant Parties" and, together with the Elant Entities, the "Elant Group." *Id.* ECF Docket No. 1. Thereafter, on or about May 26, 2016, Justice Slobod entered an Order of Attachment, freezing approximately $2.5 million of assets of the Elant Entities. *Id.* ECF Docket No. 39 (the "Order of Attachment"). The Order of Attachment was thereafter amended and modified by stipulation and Order, freezing an additional sum of approximately $8.5 million for an aggregate asset freeze of approximately $11 million. *Id.* ECF No. 72. On or about August 1, 2017, EverCare served and filed an amended and supplemental complaint, together with twenty (20) exhibits referred to therein, in the Elant Action against the Elant Group (the "Amended Elant Complaint"). *Id.* ECF Nos. 78-98. The Amended Elant Complaint, together with the twenty (20) exhibits annexed thereto, is annexed hereto as Exhibit 1 and each is incorporated by reference as if set forth at length herein. Except as otherwise defined herein, all defined terms as used herein shall have the meaning ascribed to them in the Amended Elant Complaint.

4.      As EverCare's auditors, financial consultants and tax advisors, Defendants were, *inter alia,* responsible for auditing, certifying and reporting EverCare's Medicaid related financial, tax and cost reports to one or more governmental agencies of the  State of New York ("NYS" or, alternatively, the "State") – including respectively its CHAR500 and Form 990, EverCare's state and federal income tax returns ("Tax Returns"), Monthly Encounter Data ("MED"), quarterly Medicaid Managed Care Operating Reports ("MMCOR"), and yearly Audited Financial Statements ("AFS") (collectively, the Tax Returns, MED, MMCOR and AFS shall be referred to collectively herein as the "State Cost Reports") – each of which was based, *inter alia,* on cost and service data concerning various administrative and medical services and expenses incurred by or on behalf of EverCare for each encounter or contact ("Encounter") that EverCare had with each Plan member under its care during the MLTCP's relevant reporting periods ("Encounter Data").

**The Enterprise**

5.      Until on or about December 31, 2014 (the "Separation Date"), Elant served as EverCare's sole member and active parent, and in that capacity, Elant constituted an "enterprise" within the meaning of Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact (the "enterprise").  Each member of the Elant Group, each of the PKF Defendants and, from time-to-time throughout the Relevant Period, certain other third parties comprised the members of the association-in-fact that made up the enterprise.

6.      The enterprise constituted an ongoing organization whose members functioned as a continuing unit throughout the Relevant Period, seeking to achieve a common purpose and jointly and severally co-conspired to opportunistically capitalize upon and achieve the common objectives of the enterprise.

3

7.     Members of the enterprise, including, but not limited to the PKF Defendants, transacted business, functioned and had office locations in, and their activities affected, interstate and foreign commerce.

8.     At all times during the Relevant Period, PKF, by, together with and through certain PKF parent, subsidiary and affiliated organizations, conducted its public accounting and business operations for the benefit of its clients like the Elant Group and EverCare throughout the New York, New Jersey and Connecticut tri-state area.  Moreover, at all relevant times, the PKF Entities overtly marketed that they are member firms of the PKF International Limited network of legally independent firms having offices across the globe.

9.     Each of the PKF Defendants, including, but not limited to,  the Individual Auditor Defendants, identified in written communications to EverCare's board of directors and senior management during the Relevant Period that PKF has principal places of business located at, *inter alia,* the following locations:

   a.  **McCarthy**

        665 Fifth Avenue
        New York, New York 10022

        20 Commerce Drive, Suite 301
        Cranford, New Jersey 07016

        555 Hudson Valley Avenue, Suite 106
        New Windsor, New York 12553

   b.  **Kennedy**

        500 Mamaroneck Avenue
        Harrison, New York 10528

        Dorothy B. Kraft Building
        15 Essex Road
        Paramus, New Jersey  07652

   c. **Suarez**

      3001 Summer Street
      Stamford, Connecticut  06905

      100 Great Meadow Road
      Wethersfield, Connecticut  06109

      7272 Wisconsin Avenue
      Bethesda, Maryland  20814

   d. **Higgins**

      555 Hudson Valley Avenue, Suite 106
      New Windsor, New York 12553

   e. **Russo**

      500 Mamaroneck Avenue
      Harrison, New York 10528

   f. **PKF O'Connor Davies, LLP**

      500 Mamaroneck Avenue
      Harrison, New York 10528

      665 Fifth Avenue
      New York, New York 10022

**Methods and Means of the Enterprise**

    10.    The principal purpose of the Elant enterprise was to generate money for its members, including the Elant Group and PKF, by perpetrating schemes to defraud and by filing false records with governmental agencies, as well as failing to file proper tax returns.  The Defendants and their co-conspirators also took steps to conceal their activities from law enforcement, including through the witting or unwitting use of proxies and/or nominees, fraudulent and inflated requests for payment and false financial records.  This purpose was implemented by members of the enterprise through various criminal activities, including, but not limited to, Medicaid fraud, wire fraud, mail fraud, tax fraud, public records fraud, and money-

laundering.  The members of the enterprise engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of those activities.

**The Elant Scheme**

11.    Throughout the Relevant Period up to and including the Separation Date, Elant and PKF caused EverCare to severely under-report to NYS the Encounters between EverCare's Plan enrollees and health care providers, causing EverCare to appear to have a surplus of cash when in actuality it was drowning in incurred but not reconciled liabilities related to unreported Encounters.

**The Elant FHA Mortgage Fraud Scheme**

12.    Elant, together with the PKF Defendants, then took advantage of EverCare's false liquidity, by, *inter alia,* (1) siphoning millions of dollars in cash out of EverCare's reserves and into the accounts of one or more of the Elant Entities (the "Inter-Company Transfers"); (2) improperly transferring debts and expenses from Goshen and placing them onto EverCare's books and ledgers (the "Loss Transfers"); (3) artificially inflating the cost of certain administrative services Elant provided to EverCare pursuant to a series of administrative services agreements in amounts grossly in excess of what was permissible pursuant to applicable NYS and federal laws, rules and regulations; (4) entering into a sham lease with Fishkill that straddled EverCare with significant financial obligations that were not properly or lawfully disclosed to, or approved by, the NYS Department of Health (the "DOH"), the NYS Department of Financial Services ("DFS"), the Office of the New York Medicaid Inspector General ("OMIG") and the Office of the Attorney General of NYS (the "NYAG") (collectively, DOH, DFS, OMIG, the NYAG and any and all other State governmental agencies having jurisdiction to monitor, control, regulate or enforce any and all laws, rules and regulations governing EverCare's licensure as a MLTCP shall be referred to collectively herein as the "State Agencies"); and (5)

by utilizing various other deceptive accounting practices that misled EverCare and the State Agencies into believing that EverCare was financially solvent when it really was not.

13.     The enterprise's massive fraudulent scheme of public corruption enabled the Elant Entities to give the false appearance of solvency when they were actually drowning in debt.  This sham would not have been possible but for the PKF Defendants' deliberate and intentionally false certifications of the State Cost Reports that PKF caused to be filed with one or more State Agencies throughout the Relevant Period.

14.     Elant and one or more of the Elant SNFs, including, but not limited to Goshen and Newburgh (the "Obligated Group") either conspired with PKF to defraud, among others, EverCare, together with federal, state and local government actors, including, but not limited to, Wells Fargo, N.A. ("Wells Fargo") and the Federal Housing Authority ("FHA") of the United States Department of Housing and Urban Development ("HUD") (the "Elant  FHA Mortgage Fraud").

15.     Upon information and belief, Elant – with the knowledge and substantial participation of PKF – caused the Loss Transfers and Inter-Company Transfers to occur in order to divert millions of dollars in cash from EverCare, for among other reasons, to make the Obligated Group appear solvent – when in fact it really was not.  By doing so, these co-conspirators enabled the Obligated Group to qualify for a $23.2 million mortgage refinancing issued by Wells Fargo and insured by the FHA and HUD, in or about December 2013, which it never should have received (the "FHA Mortgage").

16.     By manipulating the Obligated Group's – and EverCare's – State Cost Reports including its financial data, AFSs and MMCORs through improperly casting the Inter-Company Transfers as "current" assets and liabilities on the Obligated Group and EverCare's respective

AFS, Elant and PKF intentionally caused and enabled the Obligated Group to avoid the acceleration of massive debt obligations.

17.    The FHA Mortgage was issued by Wells Fargo to the Obligated Group and secured by the real property owned by the Obligated Group for the purpose of refinancing prior debt.

18.    As of the closing date of the FHA Mortgage, Wells Fargo issued to the Obligated Group collectively a new, governmentally insured, "take-out" mortgage loan in the principal amount of approximately $23.2 million payable over a term of 17.5 years and containing features that included approximately $343,000 for repairs and $900,000 for replacements of certain reserve funds.  The interest rate on the FHA Mortgage was 4.1%.

19.    Upon information and belief, the Obligated Group obtained and remained eligible for the FHA Mortgage solely and exclusively because it, together with PKF, unlawfully manipulated key financial information.  Specifically, members of the Obligated Group, together with PKF, filed numerous materially false and misleading AFSs prepared by PKF for Elant and the Obligated Group with the FHA and/or Wells Fargo during the Relevant Period.

20.    PKF knew but willfully disregarded that those publicly filed documents deceptively categorized the unlawful Inter-Company Transfers and Loss Transfers as "current" assets or obligations of EverCare and/or as loans that EverCare and/or other Elant affiliates had advanced to the Obligated Group and were improperly deemed by PKF to be repayable or forgiven within twelve months, in whole or in part during the Relevant Period.  The PKF auditors knew that, with respect to each of the affiliated company transactions between members of the Elant Group and EverCare, the conclusions they reached and opinions that they held, as set forth in each of the applicable AFSs, were not true.  More specifically, PKF actually knew those representations and omissions of material fact were false at the time they submitted or caused

them to be submitted to the governmental agencies and intended that the public and EverCare would and should rely on them despite their falsity.

21.     Accordingly, members of the Obligated Group, Elant and PKF not only defrauded EverCare, they also defrauded the FHA.  Each actively participated in a fraudulent corruption scheme whereby it caused to be filed publicly financial debt instruments and supporting documentation that presented and portrayed, on a recurring basis, a false financial picture of both members of the Obligated Group, deceptively depicting them as qualified for the FHA Mortgage and, on a recurring and continuous basis, as satisfying their FHA Mortgage covenants – when in reality they were not.

22.     Accordingly, at the time the Elant Group obtained the FHA Mortgage, absent the repeated and material aid and assistance of the PKF Defendants in falsifying the applicable AFSs and other relevant State Cost Reports of members of the Elant Group and EverCare, the Obligated Group could not have satisfied the financial obligations contained in the FHA Mortgage instruments or application.  But for the Defendants' preparation, certification and distribution of the materially false State Cost Reports, the Elant Group would never have qualified for the FHA Mortgage.

23.     Consequently, if the truth had been timely and properly disclosed by PKF in the FHA Mortgage instruments, only one plausible outcome would have been likely -- the financial collapse and illiquidity of each of the Elant Entities.

**The Town of Ramapo PKF Financial Statement Fraud**

24.     This was not the first time that PKF engaged in this kind of financial statement fraud in order to enable its audit clients to perpetrate a massive fraudulent scheme.  In fact, PKF auditors from the very same Harrison, New York office (the "PKF Harrison Office") out of which the Individual Auditor Defendants principally operated, were recently charged with co-

conspiring and perpetrating another audit fraud that occurred at the exact same time as the Elant FHA Mortgage Fraud in this case.

25.     In or about October 2016, the Securities and Exchange Commission ("SEC"), the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation found that PKF knowingly and intentionally issued fraudulent audit reports in connection with the sale of certain other municipal IDA bonds that were sold by the Town of Ramapo, New York (the "Town of Ramapo") during the Relevant Period.

26.     Based on factual admissions and findings contained in a Consent Order entered into by PKF in connection with the SEC's Town of Ramapo investigation, a copy of which is annexed hereto as Exhibit 2 and incorporated as if set forth at length herein, it appears that at the same time that the Elant fraud was ongoing, auditors in the PKF Harrison Office were engaged in a fraudulent public accounting scheme targeted at stakeholders of the Town of Ramapo and its local development corporation (the "Town of Ramapo Financial Statement Fraud") that was virtually identical to the scam that PKF perpetrated against Wells Fargo here. In particular the SEC's Consent Order finds that "PKF [] allowed the [Town] to record a $3.08 million receivable in [the Town's] general fund for [the sale of a minor league baseball stadium] that [the auditors] knew had not occurred. . . ." and booked that receivable as a "current" asset of the Town of Ramapo when in fact the transaction never closed. *See* https://www.sec.gov/news/pressrelease/2016-229.html.

27.     According to an SEC press release, dated October 31, 2016, PKF "also ignored red flags and relied upon what turned out to be false representations by Town officials about certain other receivables, interfund transfers, and liabilities." *See SEC Press Release No. 2016-229* (the "SEC Press Release"), a copy of which is annexed hereto as Exhibit 3 and incorporated as if set forth at length herein. The SEC Press Release further states that PKF "failed to take

appropriate measures to mitigate the risk of material misstatements even after senior management became aware that [the Town's] financial statements were the subject of multiple law enforcement investigations and [the PKF auditors] received complaints about possible fraud." *Id.* The Town and certain of its officials were charged with fraud by federal authorities and accused of hiding a deteriorating financial situation from municipal bond investors. The Director of the SEC's New York Regional Office concluded in the SEC Press Release that "When audit reports are used to sell municipal bonds, investors expect those reports to be accurate. [PKF] failed to exercise professional skepticism [by issuing] false unmodified audit reports [that] left investors without an accurate picture of the [T]own's finances and its ability to repay bondholders." *Id.*

**The Fraudulent Medicaid Scheme**

28.    In addition to permitting the Individual Elant Parties to defalcate EverCare's funds and obtain the FHA Mortgage, a result of the inaccurate State Cost Reports Defendants certified to the State Agencies severely underreported the number and cost of Encounters, EverCare's sole source of revenue, its Medicaid per-member per-month capitation reimbursement payment ("PMPM"), was reduced by the State to a level insufficient to cover and pay the contractual costs that EverCare owed to the service providers it employed to care for the approximately 850 home-bound elderly and chronically infirm Medicaid patients in its Plan.

29.    Despite Defendants' actual knowledge of significant and material deficiencies in the information technology systems used by EverCare to collect and report Encounter Data for use in the State Cost Reports and Defendants' direct knowledge of the other improper transfers and accounting improprieties by which the Elant Entities defalcated EverCare, Defendants nonetheless repeatedly certified or issued material false and misleading unqualified State Cost Reports that did not conform to the standards of the accounting profession as contained in the

Code of Professional Conduct and pronouncements of the American Institute of Certified Public Accountants ("AICPA"), and the Rules of Professional Conduct of the New York State Board of Public Accountancy, as well as other applicable federal and state laws, rules and standards, including, but not limited to Generally Accepted Accounting Practices ("GAAP") and Generally Accepted Auditing Standards ("GAAS").

30.     Defendants' knowing certification of these materially false State Cost Reports was part of a massive criminal enterprise and pattern and practice of racketeering that included, but was not limited to, Medicaid, bank, securities, mail, tax and wire fraud – perpetrated by Defendants in concert with certain of Elant's present and former officers and directors, including, but not limited to, Whitney, Cornell, and Zambito.

31.     Ultimately, the Individual Elant Group in tandem with the PKF Defendants devised this fraudulent enterprise to abuse and mismanage their respective positions and status of trust and confidence at the helm of Elant and the other Elant Entities to enrich themselves and mask their gross and illegal actions by dominating and controlling the passive, volunteer-only board of directors that sat at the helm of Elant and the other Elant Entities.  This RICO enterprise enriched and benefited the PKF Defendants, among others, through a blatant and continuous scheme to defraud EverCare, as well as the State Agencies and other stakeholders who were harmed by this long standing pattern and practice of racketeering.

## PARTIES

32.     EverCare is a not-for-profit corporation approved by the DOH and organized under the laws of the State of New York.

33.     EverCare maintains its principal place of business at 31 Cerone Place, Newburgh, New York 12550.

34.     PKF O'Connor Davies, LLP,[3] formerly known as PKF LLP, is a New York Limited Liability Partnership, and a Public Company Accounting Oversight Board ("PCAOB") registered public accounting firm with its headquarters in New York, New York.

35.     O'Connor Davies, LLP is a New York Limited Liability Partnership, and a PCAOB registered public accounting firm with its headquarters in New York, New York.

36.     O'Connor Davies Munns & Dobbins, LLP is a New York Limited Liability Partnership and a PCAOB registered public accounting firm with its headquarters in New York, New York.

37.     Upon information and belief PKF O'Connor Davies LLP, O'Connor Davies LLP, and O'Connor Davies Munns & Dobbins, LLP conduct business under the name PKF.

38.     Upon information and belief, the PKF Entities operate out of and have offices in New York, New Jersey, Connecticut, Maryland, and Rhode Island.

39.     Upon information and belief, Defendant Kennedy is, and at all times relevant hereto was, an individual who resides in the State of New York.

40.     At all times relevant to the allegations set forth herein, Kennedy, a CPA, was a partner at the PKF Entities working primarily out of the PKF Harrison Office.

41.     Upon information and belief, Defendant McCarthy is, and at all times relevant hereto was, an individual who resides in the State of New York.

42.     At all times relevant to the allegations set forth herein, McCarthy, a CPA, was a partner at the PKF Entities working primarily out of the PKF Harrison Office.

---

[3] Upon information and belief, during the Relevant Period, PKF O'Connor Davies, had been referred to as PKF O'Connor Davies a division of O'Connor Davies, LLP, but has since ceased operating as a separate division, and now only operates under one name, PKF O'Connor Davies, LLP.

43.     Upon information and belief, Defendant Suarez is, and at all times relevant hereto was, an individual who resides in the State of New York.

44.     At all times relevant to the allegations set forth herein, Suarez, a CPA, was a manager at the PKF Entities working primarily out of the PKF Harrison Office.

45.     Upon information and belief, Defendant Russo is, and at all times relevant hereto was, an individual who resides in the State of New York.

46.     Upon information and belief, at times relevant to the allegations set forth herein, Russo, a CPA, was a partner at the PKF Entities primarily working out of the PKF Harrison Office.

47.     Upon information and belief, Defendant Higgins is, and at all times relevant hereto was, an individual who resides in the State of New York.

48.     At all times relevant to the allegations set forth herein, Higgins, was a partner at the PKF Entities primarily working out of the PKF Harrison Office.

49.     At all times relevant to the allegations set forth herein, PKF conducted, supervised, prepared and was otherwise responsible for EverCare's and the Elant Entities' State Cost Reports.

## JURISDICTION AND VENUE

50.     This Court has jurisdiction over the parties pursuant to 28 U.S.C. §§ 1331 and 1367.

51.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965.

## FACTS COMMON TO ALL CLAIMS

### The Administrative Services Agreements

52.     During the Relevant Period, Elant entered into one or more administrative services agreements with EverCare (the "ASAs").

53.     Pursuant to those ASAs and as a result of Elant's status as EverCare's sole member and active parent throughout the Relevant Period, Elant undertook fiduciary duties and accepted the wholesale authority and responsibility to serve, among other things, as EverCare's contractual manager and agreed to provide virtually all of EverCare's administrative, financial, compliance, managerial, systems and controls, and operational functions, practices and procedures.

54.     During the Relevant Period, the managerial and executive operations and services provided by Elant on behalf of EverCare included, but were not limited to, the following: (i) Elant provided all executive management functions for EverCare; (ii) Elant administered all of EverCare's employee benefits programs; (iii) Elant implemented and maintained all of EverCare's accounting systems and activities; (iv) Elant performed all of EverCare's cost-reporting functions, including, but not limited to, ensuring that EverCare complied with all applicable regulatory reporting functions and requirements; (v) Elant oversaw and administered EverCare's billing and collections; (vi) Elant oversaw and administered EverCare's accounts payable and receivable functions; (vii) Elant oversaw and administered EverCare's payroll; (viii) Elant established, oversaw and administered all of EverCare's budget and cash flow projections; (ix) Elant had sole and exclusive signatory control over and the management of EverCare's bank accounts and working capital; (x) Elant oversaw and administered the submission of EverCare's rate and fee schedules; (xi) Elant oversaw and administered property leasing on behalf of EverCare; (xii) Elant oversaw and administered EverCare's insurance policies and procedures;

(xiii) Elant oversaw and administered the negotiation and drafting of service provider contracts on behalf of EverCare, including, but not limited to, the negotiation, drafting and execution of EverCare's contractual agreements with professional firms, such as PKF; (xiv) Elant oversaw and administered the implementation and maintenance of EverCare's entire management information systems ("MIS"); (xv) Elant oversaw and administered EverCare's marketing, communications and development departments; (xvi) Elant provided all human resources functions on behalf of EverCare (including the advertising for and hiring of employees); (xvii) Elant oversaw, administered and provided advice, consultation and assistance concerning the placement of residents within EverCare's MLTCP; and (xviii) Elant established policies, procedures systems and controls to ensure that EverCare complied with all applicable laws, rules and regulations and adopted programs, systems and procedures to ensure compliance with the same (collectively, the foregoing shall be referred to as the "Administrative Services").

55.     During the Relevant Period, upon information and belief, Elant provided all or substantially all of those same Administrative Services for and on behalf of each of the other Elant Entities.

**PKF Willfully Certifies False State Cost Reports**

56.     In furtherance of Elant's duties under the ASAs, Elant, among other things, engaged PKF during the Relevant Period on behalf of EverCare to oversee and audit EverCare's Medicaid-related financial reporting obligations to the State Agencies that govern and administer the State Medicaid program and ensure compliance with all applicable laws, rules and regulations governing MLTCPs.

57.     Those reporting obligations included, but were not limited to, the submission by EverCare of truthful, accurate and comprehensive State Cost Reports.

58.     PKF had actual knowledge of (and/or willfully disregarded) deficiencies in EverCare's Encounter Data caused by EverCare's wholly insufficient and unreliable MIS, as well as the wholly unreliable MEDS and EMR generated by EverCare's MIS during the Relevant Period .

59.     PKF had further actual knowledge of (and/or willfully disregarded) the fact that Elant had failed to hire or properly train an adequate number of competent staff to operate EverCare's MIS on behalf of EverCare during the Relevant Period.

60.     PKF had further knowledge that one or more of the Elant Entities had orchestrated certain improper monetary transfers out of EverCare's cash reserves and transferred certain debts and liabilities onto EverCare's balance sheets during the Relevant Period.

61.     PKF nonetheless repeatedly certified or issued unqualified and unconditional CHAR500s, MEDS, EMRs, AFSs and MMCORs ignoring material facts in violation of state and federal law, as well as GAAP and GAAS.

62.     Due to PKF's intentional and/or reckless actions, Elant, on behalf of EverCare, made substantive errors and/or omissions of material fact in filings to applicable State Agencies during the Relevant Period, resulting in EverCare's severely underreporting Encounter Data regarding interactions between its enrollees and its health care providers throughout the Relevant Period.

63.     In particular, throughout the Relevant Period, as a direct and proximate result of PKF's willful misconduct, EverCare erroneously appeared to have a surplus of cash during certain critical periods when, in actuality, PKF knew or reasonably should have known that EverCare was experiencing millions of dollars in cash deficits concerning incurred but not reported liabilities ("IBNR"), which should have appeared on its applicable State Cost Reports, including, but not limited to the EMR, MEDS and MMCOR and other cost-reports (and which

17

derivatively should have been reflected in its annual CHAR500s and AFSs), but which were not reflected in the State Cost Reports until well after EverCare legally separated from Elant.

64.    The foregoing IBNR errors and omissions evidenced unreported liabilities arising from Encounters that EverCare's contractual service providers had with its Medicaid recipients enrolled in its MLTCP.  IBNR expenses constitute a material metric by which an MLTCP's cost-reports reflect the non-final liabilities that the plan accrues as part of the daily services it provides on behalf of plan members.

65.    Throughout the Relevant Period, Elant, in concert with PKF, intentionally failed to implement adequate MIS and controls to account for EverCare's true IBNR, thereby artificially decreasing the costs and liabilities that Elant captured during the Relevant Period on EverCare's cost-reports and balance sheets.  These gross errors then enabled the Elant Entities, with the substantial and deliberate assistance and participation of PKF, to exploit EverCare's artificially enhanced financial statements and State Cost Reports throughout the Relevant Period, giving EverCare the false appearance of having a cash surplus on its relevant AFSs when in fact it was hemorrhaging cash from its reserves at an unsustainable rate.

66.    Elant's Board and its senior management, as the Administrative Services provider and manager for EverCare (the "Elant Management") pursuant to the applicable terms and conditions of the ASAs, received formal notices from the State in the form of Statements of Deficiency ("SODs") that EverCare was in violation of applicable rules and regulations throughout this period.

67.    According to meeting minutes of the Elant Board Finance Committee (the "Elant Finance Committee Meeting Minutes"), in or about March 2013 and throughout the Relevant Period, rather than curing these SODs, Whitney, Elant's then Chief Executive Officer, together with other members of the Elant Management, at the behest of the Individual Auditor

18

Defendants, including, but not limited to, McCarthy and Suarez, concocted an intentionally false plan of correction, seeking retroactive approval from the State of the deficiencies, which the State regulators immediately rejected.

68.     PKF knew that the State rejected outright Whitney's purported pretext for the violations identified in the applicable SODs, which could have resulted in severe fines and penalties to EverCare by the State and/or forfeiture of its MLTCP authorization and licensure, yet PKF made no mention of the uncured deficiencies or Whitney's deceptive explanation for them in any subsequent AFS that it caused to be filed with the State on behalf of EverCare.

69.     In its dual capacity as the auditors, tax professionals and financial consultant of each of the Elant Entities, and EverCare throughout the Relevant Period, PKF had irreconcilable conflicts-of-interest and wrongfully favored Elant and the other Elant Entities against EverCare, because, upon information and belief, in the aggregate the professional fees PKF received from the Elant Entities were far in excess of those it received from EverCare.

70.     As a direct and proximate result of PKF's conflicted position and its lack of understanding or competence concerning the applicable laws, rules and regulations that apply to NYS MLTC plans, throughout the Relevant Period, PKF intentionally, deliberately and wrongfully enabled Elant to siphon cash out of EverCare's reserves without proper authorization by the State and to unlawfully transfer debts, liabilities and expenses from one or more of EverCare's former affiliated SNFs onto EverCare's books and records.

71.     Upon information and belief, the objective of this unlawful scheme was to enable one or more of those SNFs to cover its/their operating expenses and/or obtain debt financing under false pretenses to the detriment of EverCare.

72.     PKF substantially and knowingly participated in, aided, abetted and fraudulently conspired with the Elant Entities to execute this scheme of deception to commit ongoing acts of

wire fraud by causing numerous fraudulent State Cost Reports to be filed by one or more of the Elant Group on behalf of EverCare throughout the Relevant Period.

73.     In particular, PKF knew or reasonably should have known that, among other things, representatives of Elant unlawfully wire transferred into EverCare's accounts and onto its trial balances, books and ledgers (as well as into certain State Cost Reports that PKF certified and/or caused to be entered onto EverCare's State Cost Reports that were then filed electronically with NYS) approximately $1 million in uncollectible accounts receivable, as well as significant liabilities owed to various third parties by certain Elant SNFs, namely EverCare's former affiliates, Goshen and Newburgh.

74.     Upon information and belief, during the Relevant Period, Elant and PKF caused the deceptive and unlawful Loss Transfers, including, but not limited to transfers of bad debt and uncollectible receivables of one or more of the Elant SNFs, to occur by burying them within line items of EverCare's MEDs, EMR and/or MMCOR, which were then filed electronically with the applicable State Agencies.

75.     Upon further information and belief, the Elant Entities and PKF caused the Loss Transfers to occur for the purpose of giving the false and misleading appearance that the Loss Transfers were incurred by EverCare (when they were actually incurred by Goshen and/or Newburgh in the ordinary course of Goshen and/or Newburgh's business).

76.     Concurrently, and as a direct and proximate result of the Loss Transfers associated with the flawed and inaccurate Encounter Data and other financial data that PKF caused EverCare to electronically file with one or more NYS regulatory agencies throughout the Relevant Period, EverCare's Medicaid capitated reimbursement rate for the managed care services that EverCare contracted to provide to its MLTCP members each month during the

Relevant Period was reduced by applicable State Agencies to an amount less than EverCare's actual monthly cost for providing those same services to its Plan members.

77.     Specifically, the PMPM capitation amount EverCare received from NYS each month was set too low.

78.     This PMPM reimbursement rate is an amount that is established by the State based on, among other things, a comparative benchmarking of the AFS, MEDs, EMR and MMCOR information that EverCare (and each of its competitors) is required to submit regularly to NYS regulators in connection with the goods and services that EverCare authorizes its contractors to provide to the Medicaid recipients enrolled in its MLTCP.

79.     The foregoing facts and circumstances ultimately coalesced in EverCare's post-separation discovery in or about 2016 that it had a total net worth deficiency in excess of $5,000,000 due to the fraudulent and corrupt acts and practices of the Individual Elant Parties and the PKF Defendants.

80.     As a direct and proximate result of this net worth deficiency, the DOH issued to EverCare a series of additional net worth deficiency SODs.

81.     By no later than April 2016, the Individual Auditor Defendants knew that EverCare's pre-separation AFSs had to be materially restated and revised due to the issuance of the net worth deficiency and other SODs and further due to their knowledge of material deficiencies in EverCare's MIS, IBNR, and general cost-reporting systems and controls.

82.     As a direct and proximate result of the new information and data that became available to the Individual Auditor Defendants (information which they knew or reasonably should have known existed earlier), when EverCare reconstituted and recreated its MIS, EMR and MEDs systems and controls, the Individual Auditor Defendants knew or reasonably should have known that certain key information contained in the prior EverCare AFSs was materially

21

false and misleading -- particularly since those same auditors, namely Defendants McCarthy, Kennedy and Suarez, were also simultaneously auditing the books and records of EverCare's former parent, Elant, and one or more of the Elant Entities, including, but not limited to, members of the Obligated Group.

83.     Further, just as the Individual Auditor Defendants knew that EverCare's pre-separation State Cost Reports, including, but not limited to, its AFSs and MMCORs, were distorted, so too should they have known that the applicable AFSs and other State Cost Reports that they prepared for the Obligated Group, contained untrue statements of material fact.

84.     By way of illustration, during the Relevant Period immediately prior to the EverCare-Elant separation on or about December 31, 2014 (the "Pre-Separation Period"), PKF knew but deliberately disregarded that EverCare's pre-separation IBNR and cost-reporting data was materially false, misleading and/or inaccurate and its AFSs needed to be materially restated due to the abject deficiencies that Elant had caused to exist in connection with EverCare's MIS, MEDS and EMR systems.

85.      The Individual Auditor Defendants knew but deliberately disregarded that the personnel that Elant hired to perform MIS data-processing and inputting during the Pre-Separation Period were not qualified or properly trained to perform that work.

86.     Defendants McCarthy, Kennedy and/or Suarez attended one or more Elant Board or Finance Committee meetings during the Pre-Separation Period at which Elant's insufficient capital investment in EverCare's MIS systems and personnel was discussed and they recommended that these deficiencies be corrected.

87.     Notwithstanding the Individual Auditor Defendants' recognition of the foregoing material errors and omissions in EverCare's pre-separation MIS and corresponding State Cost Reports based on the Encounter Data generated by the pre-separation MIS,  and notwithstanding

the Individual Auditor Defendants' knowledge of EverCare's significant capital investment in an entirely new MIS platform, after its legal separation from Elant, that for the first time was compatible with the State's MLTCP EMR and MEDS software solution and that enabled EverCare and PKF to accurately and comprehensively capture EverCare's Encounter Data and related cost factors, PKF nonetheless resisted, failed and refused to amend and restate the post-separation EverCare AFSs on a wholesale basis for the fiscal year ending December 31, 2014 (the "FY2014 Liabilities").

88.     Instead, in EverCare's AFS for the fiscal year ended December 31, 2015 (the "2015 AFS"), PKF deceptively chose to re-label the FY2014 Liabilities deep within the body of the AFS, which were based for the first time on EverCare's refined post-separation, EMR and MEDS cost-reporting MIS solution and data as a minor "reconciliation" of the FY2014 Liabilities (the "Reconciled AFS").

89.     Notwithstanding EverCare's vastly improved MIS solution for capturing the Plan's MEDS and EMR, PKF nonetheless knew but willfully disregarded that EverCare's reconstituted MIS, MEDS and EMR systems and controls now could properly interface with the State's applicable information technology software and solutions.

90.     Moreover, with respect to the Reconciled AFSs, PKF had actual knowledge of certain Inter-Company Transfers, including, but not limited to, unauthorized cash transfers from EverCare's reserves to Elant and one or more of the other Elant Defendants during the Pre-Separation Period without the prior written consent of the NYS Commissioner of Health (the "DOH Commissioner") in violation of applicable laws, rules and regulations, including the 5% rule.

91.     In connection with earlier AFSs covering prior audit years during the Pre-Separation Period during which PKF had previously characterized those Inter-Company

23

Transfers as "current assets," Defendants McCarthy, Kennedy and Suarez, on behalf of PKF, suddenly and without any prior notice or disclosure to EverCare representatives, determined shortly after EverCare had separated from Elant and its former affiliates that those very same Inter-Company Transfers should be characterized as "non-current assets" for the FY2015 AFS, notwithstanding that from EverCare's perspective nothing had changed other than its implementation of a new MIS, MEDS and EMR system.

92.    By casting the Inter-Company Transfers as, "non-current assets," the PKF Defendants determined that these cash transactions constituted advances by EverCare of debt to its former affiliates, which EverCare was not reasonably likely to collect from the affiliates within the next twelve months.  This change in terminology was not ministerial, particularly since PKF knew that by misappropriating the Inter-Company Transfers from EverCare and depositing those funds in the coffers of one or more of the Elant Entities without any prior written authorization by the DOH Commissioner, those transfers violated applicable laws, rules and regulations governing cash exchanges between affiliated managed care organizations.

93.    Prior to EverCare's creation of and capital investment in its post-separation MIS, EMR and MEDs solutions, EverCare's Encounter Data had been in part manually uploaded to the State's systems by a low-skilled Elant employee who was not properly trained to process this information and when the flawed and grossly inaccurate, manual process could no longer be sustained due to regulatory changed in the monthly reporting of the data dictionary, it was not reported at all for an entire year (June 2012-July 2013).  External consulting firms that Elant had hired during the Pre-Separation Period to identify and evaluate those systemic inadequacies recommended that Elant, on behalf of EverCare, should reinvest in an entirely new MIS solution that could properly interface with the State's database and that it should also hire competently trained and skilled staff to run those systems.

24

94.     According to contemporaneous Elant Finance Committee Meeting Minutes during the Pre-Separation Period, McCarthy, Kennedy and/or Suarez attended those meetings in person on behalf of PKF, reviewed the outside consultants' reports and recommendations and had actual and clear knowledge of the material deficiencies in EverCare's MIS, EMR and MEDS databases.

95.     The Elant Finance Committee Meeting Minutes further disclose that McCarthy, Kennedy and/or Suarez recommended to the Elant Board that it should implement corrective measures on behalf of EverCare to cure these issues, which the auditors identified would otherwise likely have a material adverse impact on EverCare's financial condition. Notwithstanding PKF's on-the-record recognition of these gross systemic problems, in blatant disregard of GAAS and GAAP, PKF persisted in its failure to note any of these material errors or omissions in any of their audit opinions or in the notes to the financial statements that accompanied the AFSs that PKF issued during the fiscal year periods subsequent to EverCare's receipt of the Inter-Company Transfer SODs.

96.     Subsequent to EverCare's separation from Elant, EverCare's senior management, in consultation with representatives from the DOH, effectuated a plan of correction to cure the post-separation Net Worth Deficiency SODs.

97.     In addition to the Net Worth Deficiency SODs that stemmed from the wholesale pre-separation failures of EverCare's MIS, EMR and MEDs caused by Elant, the Individual Elant Parties, together with PKF, also directly and proximately caused EverCare to receive from the State other SODs caused by the Elant Defendants' misappropriation of millions of dollars from EverCare's cash reserves due to the unlawful Inter-Company Transfers (the "Inter-Company Transfer SODs").

98.     During the Pre-Separation Period when the Elant Defendants siphoned the Inter-Company Transfers out of EverCare for their own illegitimate and unlawful purposes with the

substantial aid and assistance of PKF, they also engaged in other deceptive and wrongful conduct in violation of applicable laws, rules and regulations, such as charging EverCare exorbitant rates for Administrative Services, which were supposed to be contractually fixed in accordance with the applicable ASAs and governing laws and regulations and which they knew EverCare could never recapture from NYS through the PMPM capitated Medicaid reimbursement rates that the State paid to EverCare (the "Administrative Service Rate Transfers").

99.     The Defendants, together with the Elant Entities and others perpetrated the Administrative Service Rate Transfers by knowingly and intentionally causing and conspiring to cause EverCare to pay millions of dollars in artificially inflated PMPM rates to Elant and one or more of the Elant SNFs during the Pre-Separation Period and then disguised those transactions to hide their nature and origin from EverCare and NYS regulators.

100.    Given that the most basic audit testing of the escalations in the rates that Elant and the Elant Defendants charged EverCare throughout the Pre-Separation Period in connection with the Administrative Service Rate Transfers would have revealed that the Administrative Service Rate Transfers compounded EverCare's financial distress and were being employed by Elant as an illicit means for laundering money out of EverCare and justifying expenses that were actually illegitimate. EverCare should never have been charged in connection with its day-to-day oversight and control of the Elant SNFs.  It is clear that PKF's representatives, including, but not limited to, McCarthy Kennedy and Suarez, knew or reasonably should have known of the ongoing defalcations and money laundering violations and/or willfully and intentionally participated in and concealed the same by certifying and causing to be filed electronically and or by mail or private courier false and misleading AFSs and other State Cost Reports covering the same periods.

26

101.    The Individual Auditor Defendants' failure to identify or note these unlawful inter-company transactions had the egregious effect of threatening EverCare's continued existence at a time when EverCare had no means of protecting itself because the ASAs and Elant's status as EverCare's sole member and active parent enabled Elant to completely dominate and control EverCare.

102.    Once EverCare gained its independence from Elant, as part of its ultimate plan of correction and at the behest of the State Agencies, EverCare later commenced the Elant Action against Elant and the Elant Group.

103.    While the Elant Action was pending and subsequent to EverCare's discovery of the true magnitude of the financial fraud perpetrated against it by the Elant Group, EverCare filed the Amended Elant Complaint, which among other things, sought to recover an amount in excess of $25 million in damages against the Elant Group as a result of, *inter alia*, fraud and breach of fiduciary duties.

104.    In addition to the $25 million in damages, the Amended Complaint further asserted that the damages that the Elant Group inflicted upon it were ongoing and continuous. At the time EverCare filed the Amended Elant Complaint its total damages exceeded $35 million.

105.    To that end, on November 27, 2017, EverCare settled the Elant Action by entering into a stipulated settlement agreement with each of the Elant Entities (the "Elant Settlement Agreement"), which the Court "So Ordered."  In pertinent part, in accordance with the Elant Settlement, EverCare agreed to receive a total settlement amount equal to approximately $11.2 million, payable over a three year period.

106.    Based on facts uncovered in connection with the Elant Action, it now appears that Elant's defalcation of EverCare was motivated by more than simple theft, common law fraud,

waste and/or abuse.  Elant and one or more of the Elant Defendants conspired corruptly with PKF to defraud, among others, EverCare, together with federal, state and local government actors, including, but not limited to, Wells Fargo.

107.   By wrongfully causing and enabling millions of dollars to be infused into the Obligated Group and by causing the Obligated Group to be released of substantial and material liabilities associated with the Loss Transfers that it otherwise would have had to carry on its accounting ledgers, in or about December 2013, the PKF Defendants substantially aided, assisted and co-conspired with the Obligated Group and one or more of the other Elant Entities, so that the Obligated Group could seemingly qualify for a $23.2 million mortgage refinancing issued by Wells Fargo to the Obligated Group that was insured by the FHA  through the Section 232 Lean Program administered by HUD.   Upon information and belief the proceeds of the FHA Mortgages were sent by one or more inter-state wire transfers to the Obligated Group by or through interstate commerce.

108.   The Obligated Group obtained and remained eligible for the FHA Mortgage solely and exclusively because Elant Management in cooperation with PKF unlawfully manipulated key financial information that it was required to file publicly and update publicly on a continuing and ongoing basis.

109.   Specifically, based on the FHA Mortgage instruments and documents publicly filed by or on behalf of the Obligated Group with the FHA and/or Wells Fargo during the Relevant Period, PKF filed or caused to be filed numerous materially false and misleading AFSs prepared and certified by PKF for and on behalf of Elant and the Obligated Group.  PKF knew or reasonably should have known that those publicly filed AFSs and other compliance related documents deceptively categorized the unlawful Inter-Company Transfers and Loss Transfers as obligations of EverCare and/or as loans that EverCare and/or other Elant affiliates had advanced

28

to the Obligated Group and subsequently forgave in whole or in part during the Relevant Period. The Individual Auditor Defendants knew that, with respect to each of the affiliated company transactions, the conclusions they reached and opinions that they held, as set forth in each of the applicable AFSs publicly filed with the FHA and/or Wells Fargo that PKF prepared and/or certified contained materially false and misleading errors and omissions.  More to the point, PKF actually knew those representations of material fact were false at the time they caused them to be submitted, electronically or by mail or private interstate carrier, to the FHA and/or Wells Fargo and intended that the public and EverCare would and should rely on them despite their falsity.

110.    Accordingly, based on all of the foregoing, members of the Obligated Group, Elant and PKF not only colluded and conspired to deceive and defraud EverCare and its Plan members, they also engaged in a continuous and ongoing racketeering and public corruption scheme having the intended effect of and actually defrauding public regulatory agencies in connection with the FHA refinancing.  Each member of this racketeering scheme, including but not limited to each of the PKF Defendants, actively participated in a fraudulent scheme whereby, he, she and/or it caused to be filed publicly numerous financial debt instruments and supporting documentation that presented and portrayed on a recurring basis a false financial picture of both members of the Obligated Group, deceptively depicting them as qualified for the FHA Mortgage on a recurring and continuous basis.  To the contrary, based upon information and belief and the documentary evidence uncovered in the Elant Action, nothing could have been further from the truth.  The relevant evidence suggests that throughout the Relevant Period, with the actual knowledge and participation of the PKF Defendants, each of the Elant Entities were financially mismanaged, losing money, and were the subject of a State investigation concerning certain financial improprieties concerning unrelated bogus census data that the Elant Entities (and, upon information and belief, with the active and substantial aid and participation of the PKF

29

Defendants) had dummied to bolster the false perception and appearance they were attempting to portray that they were financially healthy and solvent (the "Elant Census Fraud"). The Obligated Group, together with one or more of the other Elant Entities (the "Elant Census Fraud Settlement Participants"), ultimately entered into a settlement agreement and separate corporate integrity agreement with NYS (collectively, the "Census Fraud Settlement Agreement").

111.    The PKF Defendants downplayed the significance of the Census Fraud Settlement Agreement in the relevant AFSs that they caused to be filed on behalf of the Obligated Group (and one or more of the other Elant Census Fraud Settlement Participants) and did not disclose that, as a result of that settlement, Whitney was forced to forfeit his NYS Nursing Home Administrator's ("NHA") license and to step down as Chief Executive Officer of Elant and the Elant SNFs or risk having that NHA license involuntarily revoked.

112.    PKF further omitted from the relevant AFSs a disclosure that, as a condition precedent to the State even considering a settlement, the Elant Census Fraud Participants had to acknowledge and admit within the body of the Census Fraud Settlement Agreement itself to serious adverse findings of fact related to their falsifying census data at one or more of the Elant SNFs that were signatories to the Census Fraud Settlement Agreement (as well as the FHA and Wells Fargo loan instruments).

113.    Those admissions-against-interest are material and unequivocally acknowledge in pertinent part that in some instances representatives of the Obligated Group unnecessarily delayed the release of certain patients from their SNFs, invented patients out of whole cloth who did not exist, and/or failed to dis-enroll patients that became ineligible for long-term care for the sole purpose of obtaining Medicaid reimbursement payments from the State under false and fraudulent pretenses (the "Census Fraud Admissions").

114.    Notwithstanding, the Census Fraud Settlement Participants, including, but not limited to the Obligated Group, admitted that they exploited the privilege bestowed upon them by NYS to serve the medically disabled and disadvantaged patients entrusted to their care by the State, thereafter Elant's Board made the unconscionable and unjustifiable decision to reward Mr. Whitney for his despicable actions by giving him a package of "retirement benefits" worth nearly $500,000.

115.    Upon information and belief, the money to pay for Mr. Whitney's "golden parachute" was electronically wired by means and devices affecting or effectuated in connection with interstate commerce directly from the cash reserves of Elant and indirectly from the coffers of the Obligated Group (and EverCare), yet PKF again did not disclose any of these material facts, errors or omissions nor did it incorporate them into any material disclosures contained in the audit opinions or AFSs it certified and caused to be publicly filed concerning any of the Elant Defendants or EverCare during the relevant audit periods.

116.    The foregoing glaring omissions of material facts were known to the Individual Auditor Defendants on a contemporaneous basis and yet they deliberately and categorically chose not to incorporate them into their audited statements; notwithstanding that each arose, directly or indirectly out of or in connection with the same core operative facts and circumstances that led to the gross mismanagement of EverCare and the Elant SNFs by Elant; and that gave rise to the  Inter-Company Transfer SODs, the Net Worth Deficiency SODs; and that deceptively led Wells Fargo and the HFA to issue the debt instruments associated with each of those institutions; each of these outcomes had two common elements: (1) Whitney was the key Elant decision-maker and orchestrator behind each illicit act; and (2) none would have been possible without the substantial and knowing participation, contribution and assistance of PKF.

Each of these violations or fraudulent acts was the result of the ongoing and continuous mismanagement and conscious and willful disregard for the truth by Whitney, PKF and others.

117.    As a direct and proximate result of the foregoing errors and omissions of material facts concerning the Obligated Group's financial condition during the Relevant Period, it appears likely that neither member of the Obligated Group could have satisfied the underwriting or reporting criteria of the FHA, Wells Fargo or any other insurer or lender at the time that those Elant entities applied for the FHA Mortgage.

118.    The foregoing facts and circumstances appear to have been the motivating factor driving the misguided decision-making of Whitney and the other directors and officers of Elant and, upon information and belief, led the Elant Defendants to lie to the governmental authorities that regulate EverCare and the Elant SNFs.  And, once the PKF Defendants were drawn into the centrifugal pull of this conspiracy, upon information and belief, their own financial self-interest and desire not to have their own misconduct discovered, appears to have been the central catalyst, causing them to neglect and intentionally fail to uphold their professional and ethical standards and responsibilities to, among others, EverCare.  In short, once they crossed over the proverbial Rubicon, PKF likely knew better but found themselves incapable of doing the right thing.

119.    To date, and as a direct result of the materially false and incomplete State Cost Reports and other frauds and racketeering activity perpetrated by Elant throughout the Relevant Period and beyond, the Individual Elant Parties and Defendants (hereinafter collectively the "Elant Enterprise") in pursuit of these aims, EverCare's PMPM rate continues to be set at an amount significantly less than the cost of its services, resulting in total losses to EverCare reasonably estimated to exceed $25,000,000.

**General Background Facts Concerning EverCare**

120.    EverCare provides services to insured members, primarily the chronically ill, the elderly, and the underserved population throughout its network area.

121.    EverCare's members receive MLTCP services through a contracted provider network throughout the region, which has historically included Elant, the Elant Related Entities, and other entities unrelated to Elant.

122.    MLTCP is a system that streamlines the delivery of long-term services to people who are chronically ill or disabled but wish to stay in their homes.

123.    Necessary services, such as home care, skilled nursing, physical and occupational rehabilitation, are provided through MLTCPs approved by the DOH.

124.    EverCare is a "Health Care Benefit Program" as that term is defined pursuant to 18 USC § 24.

125.    On or about August 20, 2013, EverCare received approval from the DOH to implement a Certified Home Health Agency ("CHHA") in Orange, Rockland and Dutchess Counties.

126.    EverCare's lines of business include the following: (a) its MLTCP for eligible Medicaid recipients in Orange, Rockland and Dutchess counties, known as "EverCare Choice;" (b) its CHHA known as "EverCare at Home;" and (c) its Adult Social Day Care program ("SDC").

127.    MLTCPs are a subset of Managed Care Organizations ("MCO").   MCOs like EverCare are regulated under, *inter alia*, § 4403 of the Public Health Law ("§ 4403") and Part 98 of Title 10 of the NYCRR ("Part 98").

128.    EverCare, as an MCO, is obligated to comply with the rules and regulations promulgated by the State of New York and codified in Part 98 of the NYCRR.

**Defendants' Role as Auditors**

129.    Pursuant to Section 2.1 of the ASAs, Elant was required to provide EverCare, inter alia: stewardship, personnel, management, and services, including but not limited to, accounting, budgeting, cash flow projections, claims processing, information systems necessary to comply with State Cost Reporting requirements, human resources, and other functions regarding EverCare's finances, compliance and operations.

130.    The explicit purpose of the ASAs utilized by Elant to administer the Elant Entities and EverCare was to minimize, through economies of scale, the administrative expenses incurred by each.   This administrative services arrangement was a charade, though, an illusion that enabled the Individual Elant Parties to hide the true financial condition of each of the Elant Entities from EverCare and from the NYS agencies that regulated it.

131.    This hoax was only possible with the deliberate and knowing participation of the Defendants in this massive scheme of corruption.   Each of the PKF Defendants, as the auditors, tax professionals, financial consultants and accountants for EverCare and each of the Elant Entities, could have stopped this continuous and ongoing fraudulent racketeering scheme at any time by upholding the professional responsibilities that governed them under GAAS and GAAP.

132.    Instead, throughout the Relevant Period they chose financial remuneration and the benefits they derived from their engagement as the financial accounting, tax and audit professionals of each of the Elant Entities over their professional responsibilities.   In particular, the PKF Defendants had professional responsibilities to avoid conflicts of interest, to remain independent and to protect EverCare's gates against the onslaught of the Elant Entities' longstanding scheme to deceive and prevent EverCare, the NYS regulatory authorities that governed EverCare and various creditors and third parties from discovering the bogus financial entries that the Defendants knowingly condoned and caused to occur on the books and ledgers of

EverCare throughout the Relevant Period.  PKF's representatives, including the Individual Auditor Defendants, appeared in person at various board meetings and finance committee meetings of one or more of the Elant Entities and presented strategies and reports that both identified and condoned the Elant Entities' unlawful financial strip-mining of EverCare.  In this regard, the PKF Defendants allowed misleading or blatantly false line items to be entered onto EverCare's Cost Reports.  In so doing, the PKF Defendants actively participated in and perpetuated this multi-million dollar money-laundering scheme, serving as a key spoke that enabled the Elant Entities to hide and conceal the fraud while their co-conspirators used EverCare's Cost Reports to launder millions of dollars out of EverCare and prop up the Elant SNFs and hide all of the Elant Entities' financial distress from EverCare, its regulators and its creditors.

133.    Had the PKF Defendants fulfilled their responsibility to report, or at the very least acknowledge, these accounting improprieties by including in the audit opinions and other sections of the AFSs and other Cost Reports they prepared clear qualifications concerning the truth concerning the financial condition of EverCare and each of the Elant Entities, namely that they were in deep financial distress and might not be able to continue as going concern, this corrupt scheme would have stopped in its tracks.

134.    In furtherance of Elant's duties under the ASAs, Elant, among other things, engaged Defendants during the Pre-Separation Period on behalf of EverCare to oversee and audit EverCare's State Cost Reports and other financial reporting obligations to applicable regulatory and oversight agencies of the State that govern and administer the State Medicaid program and ensure compliance with all applicable laws, rules and regulations governing MLTCPs.

135.    Throughout the Relevant Period, including after EverCare's legal separation from Elant in May 2014 and continuing through April 15, 2016 ("Post Separation Period") while

EverCare remained unaware of Defendants' role in the Elant Enterprise or the Town of Ramapo fraud, EverCare continued to employ Defendants as its auditor.

136.    Upon information and belief, Defendants also served a similar role for each of the Elant Entities during the entirety of the Relevant Period.

137.    As the auditors for all of the Elant Entities and EverCare throughout the Relevant Period, the auditors reviewed the books and ledgers of each of the Elant Entities and EverCare and knew that the Individual Elant Entities exclusively managed, operated and controlled any and all facets of these entities pursuant to the various ASAs reposing in Elant full authority and control over virtually every administrative, financial and operational function of the Elant Entities and EverCare.

138.    Aside from the Individual Elant Parties, only Defendants had a complete picture and full knowledge of the true financial condition and accounting practices of each and every one of the Elant Entities and EverCare.

139.    The understanding between EverCare and Defendants as to the terms and objectives of Defendants' obligations and the nature and scope of the services to be provided to EverCare were laid out in a series of engagement letters between Elant and Defendants during the Pre-Separation Period ("Pre-Separation Engagement Letters"), and during the Post Separation Period in a series of engagement letters dated February 7, 2014 ("2014 Engagement Letter"), January 19, 2015 ("2015 Engagement Letter") and February 12, 2016 ("2016 Engagement Letter") (collectively referred to as "Post-Separation Engagement Letters").

140.    Pursuant to the Pre and Post-Separation Engagement Letters, Defendants agreed, *inter alia,* to:

        a.  Audit EverCare's "statement of financial position and the related statement of operations and changes in net assets, and cash flows . . . in all material

respects, in conformity with accounting principles generally accepted in the United States of America ("US GAAP")";

b. "conduct the audit in accordance with auditing standards generally accepted in the United States of America ("US GAAS")";

c. To "obtain reasonable, rather than absolute, assurance that the financial statements are free of material misstatement, whether caused by error or fraud";

d. "examin[e], on a test basis, evidence supporting the amounts and disclosures in the financial statements";

e. "perform additional procedures necessary to certify the supplemental information required by New York State Department of Health in the cost report"; and,

f. "assist in preparation of the Medicaid cost report."

141.    In addition to Defendants' contractual obligations, on November 10, 2015, the NYS DOH amended § 98-1.16 of Part 98 and added subpart 98-3, in order to extend the audit and reporting standards already applicable to other types of MCO's to MLTCPs like EverCare. These amendments went into force and effect for all MCO audits for the FY2015 cost reporting period.

142.    The amended regulations were "closely patterned upon 11 NYCRR 89 (Regulation 118) adopted by the Department of Financial Services and the National Association of Insurance Commissioners model audit rule" ("NAIC Model").

143.    The amendments to Part 98 were promulgated by the Commissioner of Health pursuant to statutory authority contained in Public Health Law § 4403-f(7), authorizing the Commissioner to ensure program oversight and administration of MLTCPs.

144.    These powers reflect the broader federal mandate, as provided for in 42 CFR § 438.242(a), that "[t]he State must ensure, through its contracts, that each MCO and PIHP maintains a health information system that collects, analyzes, integrates, and reports data."

145.    Pursuant to 10 NYCRR § 98-3.11:

"Every MCO subject to this Subpart shall retain a CPA who agrees by written contract with such MCO to comply with the provisions of this section and 98-1.16. The contract must specify:

(a) That the CPA is independent with respect to the MCO and is acting in conformity with the standards of the CPA's profession, such as contained in the Code of Professional Ethics and pronouncements of the AICPA and the Rules of Professional Conduct of the New York Board of Public Accountancy, or similar code and meets the definition of a CPA set forth in subdivision (e) of section 98-3.2 of this Subpart;

(b) That the CPA understands the annual audited financial report, that the CPA's opinion thereon will be filed in compliance with this Subpart and that the Commissioner will be relying on this information in the monitoring and regulation of the financial condition of the MCO;

(c) That the CPA consents to the requirements of section 98-3.12 of this Subpart and that the CPA consents and agrees to make available the work papers for review by the Commissioner; and

(d) A representation that the CPA is in compliance with the requirements of section 98-3.6 of this Subpart."

146.    The specific representations required pursuant to 10 NYCRR 98-3.11, including that Defendants understood their obligation to act in accordance with relevant professional standards, that its audits would be relied upon by the DOH, and that it complied with the requirements of section 98-3.6, are not contained in the 2016 Engagement Letter, but rather, were provided in a separate "Qualifications Letter" dated March 31, 2016 addressed to EverCare's Board of Directors.   Specifically, this letter contains the following representations:

"We are independent certified public accountants with respect to Choice and conform to the standards of the accounting profession as contained in the Code of Professional Conduct and pronouncements of the American Institute of Certified Public Accountants, and the Rules of Professional Conduct of the New York State Board of Public Accountancy.

We understand that Choice intends to file its audited financial statements and our report thereon with the New York State Department of Financial Services in which Choice is licensed, and that the superintendent of that state will be relying

38

on that information in monitoring and regulating the statutory financial condition of Choice . . .

 To the best of our knowledge and belief, we are in compliance with the requirements of Section 7 of the NAIC's Model Rule (Regulation) "Requiring Annual Audited Financial Reports" regarding qualifications of independent certified public accountants."

147.    At the time the Post-Separation Engagement Letters and the Qualifications Letter were authored, and transmitted to EverCare electronically or via U.S. Mail or commercial carrier, and as a result of PKF's prior involvement in the fraudulent schemes related to the State Cost Reports and multiple conflicts of interest arising out of its longstanding and continuing joint representation of the Elant Entities, PKF knew that the covenants and promises contained therein, including its promise to perform its services in compliance with GAAS, GAAP, the NAIC's model Rules and AICPA, as well as that it was "independent" were patently false.   PKF knowingly made these promises to cause EverCare and NYS regulators to rely upon the same so that PKF could continue in its role in the Elant Enterprise.

**Material Deficiencies in EverCare's State Cost Reporting**

*EverCare's IT Systems*

148.    Beginning in or about 2008, and continuing through the Pre-Separation Period, while acting as EverCare's contractual manager, Elant was obligated to, *inter alia,* provide EverCare appropriate MEDS and Encounter Data IT software and a sufficient number of competent data entry staff, who were properly trained to process, enter and/or or reconcile EverCare's Encounter Data with the medical or other expenses that EverCare actually incurred during the Pre-Separation Period.

149.    Encounter Data submission is a monthly contractual reporting obligation, which the DOH requires of all MCOs.  Accordingly, complete and accurate submission of Encounter Data on behalf of EverCare enrollees is essential.

150.    The DOH utilizes the MEDS and related EMR data, *inter alia*, to evaluate a myriad of MCO performance criteria, including, but not limited to: (i) risk-adjusted premium rate setting; (ii) quality incentive calculations; (iii) implementation of New York State-mandated Quality Assurance Reporting Requirements and Healthcare Effectiveness Data and Information Sets measures; (iv) assessing clinical risk; (v) evaluating quality, access and appropriateness of care; (vi) service utilization; and (vii) implementation of other MCO quality and accuracy control systems and procedures.

151.    During the Pre-Separation Period, the IT infrastructure and professional services provided to EverCare by Elant were either grossly inadequate or non-existent.

152.    Due to the absence of an adequate IT system and competent and/or sufficient staffing during the Pre-Separation Period, EverCare was incapable of complying with all applicable federal, state and local laws, rules and regulations.

153.    Elant's failure to provide a functional IT system caused ongoing disruptions of EverCare's business and prevented EverCare from timely and reliably reporting Encounter Data to the DOH for the period leading up to and including in or about June 2012, and continuing through December 31, 2015 - approximately a year after EverCare legally separated from Elant and was able to completely replace its IT System.

154.    In addition to the quarterly MMCOR, the DOH also requires MLTCPs to submit MED to the DOH including, but not limited to, data capturing all services delivered to Medicaid beneficiaries enrolled in managed care plans that receive a capitated, PMPM payment.

155.    MEDS reporting differs from MMCOR in that MEDS logs each time the MLTCP has an encounter with one of its members, and each such contact must be reported monthly.

156.    The MMCOR then incorporates that Encounter Data from the monthly MEDS and converts it into a quarterly financial statement, which includes, but is not limited to, such

40

items as: (i) the medical loss ratio (percentage of premium spent on medical care compared to administrative expenses); (ii) plan spending in different care settings; (iii) administrative expenses; (iv) types, level and cost of various services provided; (v) revenue; (vi) care management expenses; (vii) investments; (viii) contingencies; and (ix) net worth.

157.    The DOH requires the MEDS and MMCOR records to enable it to track the services received by members enrolled in MCO plans and to evaluate MLTC plan performance by benchmarking a particular plan's performance against MMCOR data, and it enables the Medicaid agency reviewing it to do so in accordance with reported expenses.

158.    If an MLTC submits monthly or quarterly Encounter Data in an untimely manner or containing materially false, misleading or omitted Encounter Data, then the MEDS and/or MMCOR records submitted by that MLTC plan will not accurately capture each encounter that occurred at the MLTC plan during the relevant period or the costs associated with the encounter.

159.    An MLTC plan that files such false or misleading MMCOR faces severe adverse consequences and may be subject to stringent penalties and punitive measures by the regulatory authorities, because the MMCOR data is used, in part, by the DOH, *inter alia*, to set future Medicaid reimbursement rates.

160.    At all times relevant herein, EverCare, through its senior staff and employees, continually reported verbally and in writing to Whitney and Zambito that Elant was violating its obligations to provide EverCare with an adequate IT system and preventing EverCare from properly submitting and certifying its MMCOR and MEDS data to the applicable State Agencies.

161.    Specifically, on numerous occasions throughout the Pre-Separation Period, EverCare's senior managers, Sylvia McTigue ("McTigue") and Mary Jo Jobity ("Jobity"), reported to Whitney and Zambito verbally and in writing that Elant was obligated by applicable laws, rules and regulations, and pursuant to the ASA, to provide both IT infrastructure and a

sufficient number of competent contractors to EverCare, each of whom was further required to have certain basic finance and subject matter expertise so that EverCare could comply with its MMCOR and MEDS reporting obligations (the "EverCare IT Requests").

162.    Further, in or about March 2011, Elant engaged McBee Associates, Inc. ("McBee") to conduct, *inter alia*, an operational assessment of EverCare's LTHHCP and other licensed programs.  McBee issued a draft report, dated March 2011 (the "McBee Report"), in which it identified numerous operational deficiencies at EverCare arising, *inter alia*, from the de-centralized billing and software systems and procedures that Elant had implemented at EverCare during the Pre-Separation Period.

163.    The McBee Report identified a host of related issues that arose from Elant's decision to have only one staff member who, rather than being resident at EverCare's administrative headquarters in Newburgh, New York, resided off-site at the Finance Department of Elant located in Goshen, New York.

164.    According to the McBee Report, this Elant representative was unskilled and conducted manual entry of the LTHHCP billing and vendor cost data.

165.    McBee further observed that Elant's manual data entry process and procedures, coupled with multiple, incompatible software systems, required that EverCare's billing and cost data had to be re-keyed from one software platform, the Cerner HomeWorks system, to another, the SOS system, which directly and proximately caused rampant data entry errors and losses.

166.    Elant's use of unsuitable MEDS software solutions for EverCare's MIS needs, together with its failure to hire a sufficient number of competent data entry staff, who understood or were able to properly process, enter and/or reconcile EverCare's Encounter Data with the medical or other expenses that it actually incurred during the Pre-Separation Period, directly

42

prevented EverCare from complying with its payment obligations pursuant to the Prompt Pay Law.

167.    As a result, EverCare was unable to make timely payments to health care providers (within the meaning of that term pursuant to the Prompt Pay Law), who rendered services to its members.

168.    The Prompt Pay Law imposes stringent standards upon insurers, such as EverCare, for the prompt, fair and equitable payment of the kinds of vendor claims that EverCare incurs in connection with the health care services it provides to its members.

169.    The Prompt Pay Law also requires insurers to pay undisputed claims for services rendered by vendors to their clients within 30 days after receipt of an electronic submission or within 45 days after receipt by other means.  If a claim is disputed, the insurer must pay the undisputed portion of the claim, if any, and, within 30 days of receipt of the claim, must also notify the policyholder, covered person or health care provider in writing of the specific reason(s) that the insurer is not liable to pay the claim.  Alternatively, an insurer may request further information necessary for it to determine its potential liability concerning payment of the claim.

170.    An insurer that fails to comply with its payment or notice obligations under the Prompt Pay Law is subject to pay its health care vendors or the person submitting the claim the entire balance of the claim, plus 12% per annum, which amount is computed from the date the claim was first required to be paid.

171.    McBee concluded that the redundant and inefficient systems and procedures that Elant had instituted to measure and record EverCare's Encounter Data were not only very time consuming, but also created "an opportunity for human error," which could lead to violations of applicable laws, rules and regulations governing EverCare, including, but not limited to, the

43

Prompt Pay Law.   Accordingly, McBee recommended that Elant should address these issues immediately.

172.   Rather than investing in IT solutions developed specifically to support an insurance organization, such as EverCare, and its operational care management and cost-reporting needs, and instead of hiring competent personnel to manage that system, Elant chose instead to record its cost and Encounter Data manually, using improperly trained, unskilled personnel, and non-MLTCP software that required substantial retro-fitting and customizations.

173.   Those deficiencies further led to EverCare's inability to capture all of its IBNR, including, but not limited to the legally required Encounter Data concerning the medical and related services that EverCare had incurred during this period on behalf of the Medicaid beneficiaries enrolled in its MLTCP program, but which it had not yet reported as fully adjudicated liabilities in its system.

174.   Accordingly, those IBNR omissions and inaccuracies further rendered the monthly, quarterly and annual cost reports that EverCare submitted to the applicable New York State regulatory agencies during the Relevant Period to be grossly incomplete, inaccurate and, in some cases, materially misleading, which in turn distorted the Medicaid reimbursement rates that the applicable New York State regulatory agencies assigned to EverCare.

*The Loss Transfers*

175.   After creating false liquidity through the underreporting of IBNR, the Individual Elant Parties actively began siphoning cash from EverCare into other Elant Entities including the Elant SNFs without any legitimate business purpose or legal justification, ultimately compounding EverCare's financial distress by causing dire net worth deficiencies and adverse Medicaid rate adjustments that would result in EverCare absorbing tens of millions of dollars in additional damages.

44

176.    Specifically, more than $8.5 million was transferred out of EverCare to these entities, *inter alia*: (i) to offset losses incurred by certain Elant Entities; (ii) to meet payment obligations of certain Elant Related Entities; and (iii) to mitigate liquidity concerns related to the financial viability of certain Elant Entities.

177.    The Inter-Company Transfers included, but are not limited to, the following:

      a.   improper, illegal, and fraudulent conveyances;

      b.   breaches of the fiduciary duties owed to EverCare by the Individual Elant Parties and Elant;

      c.   breaches of Elant's contractual obligations to EverCare; and

      d.   violations of Elant's obligations under applicable New York State rules and regulations, which, *inter alia*, require the **prior** approval of the Commissioner of the DOH (the "Commissioner") for any transfers or loans of funds by any MCO to another MCO within its holding company system in excess of five percent (5%) of the lender's admitted assets as of the end of the prior calendar year (the "5% Admitted Asset Rule").  10 NYCRR Part 98-1.11 (b).

178.    As a result of the Inter-Company Transfers, the DOH issued EverCare two statements of deficiency SODs one in August 2010 and one in August 2014, respectively, for prior fund transfers to Elant and/or the Elant Related Entities, which, *inter alia*, violated Part 98 and which resulted from actions taken by Elant and/or the Individual Elant Parties to transfer funds and assets out of EverCare and to the Elant Entities for insufficient or no consideration.

179.    EverCare received the first of these SODs on or about August 18, 2010 (the "2010 Statement of Deficiency" or, alternatively, the "2010 SOD").

180.    The 2010 Statement of Deficiency obligated EverCare to devise one or more plans of correction ("POC") to remediate the identified deficiencies even though Elant, as EverCare's fiduciary, contractual manager, sole member, active parent and alter ego, caused the violations.

181.     Failure to devise and execute a POC would place EverCare at risk of regulatory penalties, including, but not limited to decreased Medicaid reimbursement rates and loss of Medicaid quality incentive pool monies.

182.     At the time of the 2010 Statement of Deficiency, Whitney served as an executive officer of both Elant and EverCare.

183.     Subsequent to the issuance of the 2010 Statement of Deficiency and despite knowing that ongoing violations of the 5% Admitted Asset Rule and the 2010 Statement of Deficiency existed, placing EverCare at risk of incurring harsh regulatory punishment, Whitney continued to wrongfully siphon assets out of EverCare by causing, *inter alia*, additional, unlawful Inter-Company Transfers to one or more of the Elant Defendants from EverCare without prior approval of the EverCare Board or the Commissioner of the DOH in further violation of Part 98 and without notifying applicable state agencies concerning the purpose and timing of those transfers.

184.     For example, on or about March 31, 2014, Whitney, acting in concert with one or more of the other Individual Elant Defendants, sent a letter to the DOH (the "March 31st DOH Letter").

185.     In the March 31st DOH Letter, Whitney, acting on behalf of EverCare, sought the DOH's *retroactive* consent to transfer from EverCare to Elant more than $2 million that he had *already* caused to be transferred without the prior knowledge, approval or consent of the EverCare Board or the DOH Commissioner.

186.     Whitney knew or reasonably should have known that the transfers identified in his March 31st DOH Letter exceeded five percent of EverCare's admitted assets for the prior calendar year and, therefore, were *already* in violation of the 5% Admitted Asset Rule of Part 98 at the time he sent the March 31st DOH Letter.

187.    In addition to seeking retroactive ratification and approval from the DOH, Whitney's March 31st DOH Letter is replete with other intentionally false and misleading statements and omissions of material facts, which Whitney either knew or reasonably should have known were untrue at the time that he made them, concerning the purported business rationale for the prior fund transfers identified in the letter.

188.    The DOH summarily rejected Whitney's March 31st DOH Letter.

189.    Instead, on or about August 14, 2014, the DOH issued to EverCare another statement of deficiency (the "2014 Statement of Deficiency" or, alternatively, the "2014 SOD") (and, collectively, the 2014 SOD, together with the 2010 Statement of Deficiency, shall be referred to herein as the "Inter-Company Transfer Statements of Deficiency" or, alternatively, the "Inter-Company Transfer SODs").

190.    At all relevant times herein, Whitney failed to disclose to the EverCare Board that he had caused the transfers identified in the March 31st DOH Letter to be made without the DOH's approval in violation of applicable regulations, including, but not limited to, Part 98.

191.    As a result of the wrongful Inter-Company Transfers and the DOH's denial of Whitney's request for retroactive ratification and approval of the Inter-Company Transfers, EverCare suffered millions of dollars in financial harm.

192.    Compounding Whitney's conduct, beginning in or about 2012, Elant, together with one or more of the Elant Related Entities, intentionally caused EverCare to absorb certain losses, debts or obligations, which, upon information and belief, were actually losses incurred by other Elant Related Entities, including, but not limited to, Goshen (the "Goshen Loss Transfers"). Instead of appearing as expenses or liabilities on EverCare's applicable financial statements and cost reports, which is what the Defendants caused to occur, the Goshen Loss Transfers should have appeared as expenses or liabilities on the financial records or reports of

47

Goshen or on the books and records of the Elant Defendants that actually incurred those liabilities or losses.

193.    Specifically, from in or about 2012 through 2014, without seeking approval from the EverCare Board and in violation of Elant's contractual obligations to EverCare, the Individual Elant Parties, acting on behalf of Elant and Goshen, improperly moved more than $1 million in operational losses or liabilities incurred by Goshen from Goshen's financial statements to EverCare's ledgers ("Goshen-EverCare Loss Transfers"), thereby causing Goshen's financial position to appear artificially enhanced.

194.    Consequently, Elant abused its position as EverCare's fiduciary, sole corporate member, contractual manager and administrator to circumvent the EverCare Board, enabling Elant to effectuate fraudulent conveyances from EverCare to one or more of the Elant Entities.

195.    By substituting its authority in place of that of the EverCare Board, Elant caused EverCare to violate its compliance obligations under applicable New York State laws, rules and regulations, *inter alia*, to report truthfully and accurately its financial transactions and condition to State regulators.

196.    At all times relevant to the allegations set forth herein, the Individual Elant Parties, together with other representatives of Elant, used Elant's position as the sole corporate member and active parent of EverCare to exercise total control over EverCare.  As a direct and proximate result of its position of dominance and control over EverCare, Elant, acting through the Individual Auditor Defendants, deliberately concealed the nature and extent of the Inter-Company Transfers (including the Goshen and Goshen-EverCare Loss Transfers) from the EverCare Board and the State Agencies regulating EverCare.  These Inter-Company Transfers were part of an effort to bolster and subsidize the depleted financial condition of the Elant Entities, which at all times relevant to the allegations set forth herein, were in a deep and

48

worsening state of financial distress due to their widespread and pervasively incompetent management by, *inter alia*, Elant and the Individual Elant Parties.

*Elant Artificially Inflates Its Rates Under the ASAs*

197.    In exchange for the services provided by Elant pursuant to Sections 2.1 and 4 of the ASA, Elant received management fees from EverCare on a PMPM basis (the "Management Fees").

198.    Specifically, the PMPM Management Fees for administrative services for the calendar year 2011 were the following:

| Number of Clients | Rate |
|:---:|:---:|
| 100-149 | $267 |
| 150-199 | $186 |
| 200-249 | $140 |
| 250-300 | $112 |

199.    Whitney caused Elant to increase the Management Fees that EverCare paid under the ASA for administration services in 2013 and 2014 well in excess of the contractually agreed to $112 PMPM (based on the number of members that EverCare was serving during those years).

200.    This exorbitant overcharge for the PMPM rates was possible because Whitney, serving simultaneously as the CEO of Elant and EverCare, dominated and controlled the day-to-day financial and operational decision-making of both entities, enabling him to conceal the unlawful Inter-Company Transfers by hiding them within the escalated PMPM Management Fees that he caused EverCare to pay to Elant without any justifiable business reason or cause.

49

201.    Specifically, the Management Fees Elant charged EverCare impermissibly jumped to $267 PMPM regardless of the number of clients when they should have been $112 PMPM.

202.    This significant increase in the Management Fees violated the terms and conditions of the ASA and was imposed unilaterally without the knowledge, consent or approval of the EverCare Board; and, even if the EverCare Board did know, consent to or approve of the rate hike, there was nothing it could do to stop the PMPM increase from being implemented by Elant.

203.    Whitney, Zambito and Cornell, on behalf of Elant, also failed to obtain the approval of the DOH, as required for any changes to the ASA and related rate adjustments, especially changes that dramatically increased EverCare's costs by more than 100%.

204.    The increase in Management Fees bore no relation to the actual administrative costs incurred – or the services provided – by Elant, and had no legitimate business justification.

205.    As a result of this unilateral and improper rate change, Elant received unauthorized overpayments from EverCare of approximately $2.2 million dollars, enabling Elant and the Individual Elant Parties to cloak their fraudulent scheme under a false veil of legitimacy.

206.    Prior to 2013, EverCare paid published Medicaid rates to all SNFs in its provider network pursuant to negotiated contracts.

207.    Upon information and belief, this is standard for Medicaid providers such as EverCare and is consistent with the State's expectations.

208.    On or about January 4, 2014, however, EverCare received a retroactive rate adjustment from the DOH, which should have resulted in a financial gain for EverCare due to the increase in the Medicaid reimbursement rates, which the State retroactively applied.

209.    Two days later, Whitney, recognizing the "opportunity" presented by the DOH's rate increase in EverCare's favor, immediately and improperly "negotiated" and implemented new contracts between EverCare and the Elant SNFs (the "Adjusted Elant SNF Contracts").

210.    Whitney, however, did not cause any of the non-Elant SNF contracts to be renegotiated upward.

211.    These new Adjusted Elant SNF Contracts required EverCare to pay rates to the Elant SNFs that were significantly higher than the Medicaid rates (the "Increased Rates"), but non-Elant SNFs continued to be paid the standard, unadjusted Medicaid rates in accordance with the terms and conditions of their pre-existing agreements with EverCare.

212.    Upon information and belief, Whitney caused EverCare to pay the Increased Rates to offset losses incurred by the less financially stable Elant Related Entities.

213.    The Increased Rates bore no relationship to actual costs of services provided by Elant or the Elant SNFs nor did the Commissioner of Health or EverCare's Board approve them.

214.    In other words, no value-based purchasing of services, quality indicators or other criteria were used to determine the Increased Rates, nor were the Increased Rates offered to any other non-Elant nursing home vendor with whom EverCare contracted; rather the rates paid to EverCare by all non-Elant related SNFs remained at 100% of published Medicaid rates.

215.    The Individual Defendants, individually and on behalf of Elant, caused the Increased Rates to be paid to Elant retroactive to January 1, 2013, by a document dated and signed March 24, 2014.

216.    Upon information and belief, after effectuating the Adjusted Elant SNF Contracts, neither the Individual Defendants nor Elant resubmitted or corrected the MMCORs they previously submitted on EverCare's behalf, which relied on the original rates charged by the Elant SNFs prior to implementing the Increased Rates.

51

217.   To the explicit benefit of the Elant SNFs and to the detriment of EverCare, Elant enforced the Increased Rates both *retroactively* for a one-year period of time applied to January 1, 2013, and *prospectively*, thereby abandoning EverCare's interest.  The Increased Rates were adjusted upward according to the following schedule:

| Choice Contracted SNFs | Start Date | Facility's ~ M[caid Rate | Rate Paid by Choice effective 01/01/13 | % above M[caid rate | New Retroactive Rate [1/1/13] | % above M[caid rate |
|---|---|---|---|---|---|---|
| Friedwald Center | 3/1/13 | na | Medicaid Daily Rate | 0.00% | na | 0.0% |
| Golden Hill Healthcare | 2/1/11 | na | Medicaid Daily Rate | 0.00% | na | 0.0% |
| Pine Valley Center | 8/1/13 | na | Medicaid Daily Rate | 0.00% | na | 0.0% |
| Ramapo Manor | 1/1/08 | na | Medicaid Daily Rate | 0.00% | na | 0.0% |
| Summit Park | 8/1/13 | na | Medicaid Daily Rate | 0.00% | na | 0.0% |
| Goshen | 10/1/10 | $218.80 | $231.91 | 5.99% | $331.32 | 51.4% |
| Meadowhill | 10/1/10 | $203.04 | $250.70 | 23.47% | $273.79 | 34.8% |
| Fishkill | 10/1/10 | $176.25 | $252.80 | 43.43% | $314.72 | 78.6% |
| Wappingers | 10/1/10 | $190.46 | $252.11 | 32.50% | $276.26 | 45.0% |

218.   In addition to the Increased Rates, the newly negotiated contracts, which Elant imposed upon EverCare, included an additional Medicaid surcharge.

219.   Upon information and belief, the additional, unilaterally applied surcharge amounted to a 6% increase over the contractual Medicaid rates, which surcharge had been historically excluded from the amount charged to EverCare.

220.   Upon information and belief, this surcharge was already included in the Medicaid rates that EverCare was charged and, therefore, Whitney deceptively caused the surcharge to be billed twice.

221.   These two changes resulted in a significant increase in SNF expenses for EverCare but were not reported in its cost reports.

222.   The increases remained in effect until EverCare's formal legal separation from Elant effective December 31, 2014, which, *inter alia*, resulted in EverCare gaining its financial autonomy from Elant.

223.    As illustrated by the chart *supra*, EverCare is a Medicaid program, yet the Increased Rates exceeded the Medicaid reimbursement rate by as much as 78.6%.

224.    The retroactive application of the Increased Rates resulted in more than $300,000 of retroactive billings from the previous year being applied to EverCare by Elant.

225.    Upon information and belief, the prospective application of the rate adjustment resulted in an increase in SNF expenses for EverCare in the amount of approximately $900,000.

226.    The Individual Elant Parties were aware of and ignored EverCare's concerns regarding the Increased Rates.

227.    Specifically, in a string of emails between senior EverCare and Elant representatives during January 2014, McTigue, acting in her capacity as EverCare's then Chief Administrative Officer, questioned Zambito about these significant unauthorized increases (the "January 2014 Emails"). Copies of the January 2014 Emails are annexed hereto as Exhibit 4 and are incorporated as if set forth at length herein.

228.    In one of the January 2014 Emails, dated January 10, 2014, McTigue noted to Zambito that the MLTCP is a Medicaid program and paid based on contractually negotiated rates.

229.    Zambito, then the CFO of Elant, responded, stating the "business justification [for the Increased Rates] is supporting the programs within the larger Elant system; . . . We are all standalone [sic] entities but we also are not . . . We are all on the same team and we want to continue to protect all Elant's assets in a manner that is appropriate."

230.    At or about the time of the January 2014 Emails, however, the Elant Related Entities were each facing significant financial difficulties.

231.    For example, according to the Internal Revenue Service ("I.R.S.") Form 990 filed by Goshen for fiscal year 2013, expenses at Goshen exceeded revenue by approximately $1.8

53

million such that by the end of 2013 Goshen had a negative net worth of approximately $4.3 million.

232.    According to the I.R.S. Form 990, filed by Newburgh for fiscal year 2013, Newburgh's expenses in 2013 were nearly $1 million more than revenue and it had a negative net worth of $4.1 million.

233.    Upon information and belief, the Individual Elant Parties' solution to overcome these financial deficits that were occurring at the other Elant Entities was essentially to impose a tax on EverCare in the form of the Increased Rates, which tax was intended to offset the significant financial losses incurred by these less financially stable Elant Related Entities.

234.    Like the Increased Rates EverCare paid to the SNFs, all of EverCare's contracts for Adult Day services were negotiated and paid pursuant to contracts at the then published Medicaid rate.

235.    During Whitney and Zambito's respective tenures at Elant, however, the contracts between EverCare and Elant for Adult Day services were unilaterally increased by Elant significantly above the Medicaid rate as follows:

| Adult Health Care | Facility Medicaid Rate | Contracted Rate | % Above Medicaid |
|---|---|---|---|
| **Goshen** | **$64.20** | **$103.97** | **61.95%** |
| **Newburgh** | **$47.24** | **$94.65** | **100.35%** |

236.    As illustrated by the chart *supra*, which is derived from information compiled and maintained by Jobity, EverCare is a Medicaid program, yet the rate paid to the Elant SNFs for Adult Day Services exceeded the Medicaid reimbursement rate by as much as 100%.

237.    The increase in the Adult Day Services rates had no relation to actual costs of services provided by Elant and were never approved by EverCare's Board.

*Elant Enters EverCare into Sham Lease at Fishkill*

238.    In 2012, at Whitney' direction, Elant, in its capacity as EverCare's agent under the ASA, caused EverCare to enter into a series of below market value, sham lease transactions with Fishkill (the "Fishkill Lease"). The Fishkill Lease, together with a one-year written renewal of the Fishkill Lease (the "Lease Renewal,"), collectively shall be referred to herein as the "Fishkill Lease Documents."

239.    Upon information and belief, Elant created the sham Fishkill Lease Documents for the sole purpose of causing EverCare to incur a fictitious expense on its books that would obligate EverCare to pay rent to Fishkill for space that EverCare could not and would never use.

240.    Upon information and belief, this scam enabled Elant to cause EverCare to prop up Fishkill's deteriorating finances through ledger transfers that enabled Elant to extract more funds from EverCare without a legitimate business justification and without DOH approval.

241.    The Fishkill Lease was originally entered into on or about August 1, 2012, and was executed by Whitney on Fishkill's behalf, as its President and CEO, and on EverCare's behalf by Jobity, who was then serving in the dual capacity as the Controller of Elant and the designated Controller of EverCare pursuant to the ASA.

242.    The Fishkill Lease had a one-year term and included an option for renewal upon its expiration on July 31, 2013.

243.    On or about August 1, 2013, Whiney, as the President and CEO of Fishkill, and Zambito, as the designated CFO of EverCare pursuant to the ASA, executed the Lease Renewal, which was substantially identical to the original lease.

55

244.    The Fishkill Lease obligated EverCare to pay rent at the rate of $24 per square foot – equating to $6,720 per month or $80,640 per year – to Fishkill, for an uninhabitable, dilapidated and deteriorating 3,360 square foot building that was located at the back of the Fishkill property and looked out upon the its garbage dumpster and loading dock.

245.    Upon information and belief, the then fair market rental value for far superior commercial space was $15-18 per square foot.

246.    At the time Whitney caused EverCare to enter into the Fishkill Lease, Whitney, in his dual capacity as the President and CEO of Elant, the Elant Related Entities and EverCare, represented to Jobity, that the building to be leased would be used by EverCare for back-office operations as part of EverCare's planned expansion into Dutchess County.

247.    Upon information and belief, at the time he caused EverCare to enter the Fishkill Lease, Whitney had no legitimate business plan for EverCare's use of the leased building and EverCare had no operational need to use the building for "back office" services, because all of EverCare's administrative services were handled at Elant's headquarters in Goshen, New York.

248.    Upon information and belief, Whitney made these intentionally false representations of material fact to Jobity to deceive Jobity into executing the Fishkill Lease under the mistaken belief that a legitimate business purpose existed for EverCare and that the other terms of the Fishkill Lease were fair and reasonable.

249.    From 2012 until 2014, while under Elant's control, EverCare was defrauded by Elant to pay Fishkill more than $161,000 in "rent" under the Fishkill Lease Documents.

250.    Upon learning of the Fishkill Lease Documents in or around January 2014, McTigue made verbal and written inquiries to Whitney, Zambito and Cornell as to why EverCare was paying rent for office space which it was not using and for which it had no useful purpose, and requested a meeting immediately to discuss the issue.

251.    The Individual Defendants dismissed McTigue's inquiries without explanation, advising only that the Fishkill Lease was approved by the EverCare Board, and that Whitney was unavailable to meet or to discuss the Fishkill Lease

### *Proposed Sale of the Elant SNFs*

252.    Upon information and belief, Elant and certain of the other Elant Entities entered into one or more written agreements in connection with a proposed series of related transactions with a group of private investors for the purchase and sale of the four Elant SNFs: Brandywine, Goshen, Newburgh and Fishkill (the "Proposed Nursing Home Sale").

253.    Upon information and belief, the Elant Board resolved, over the objection of at least one Elant Board member, to enter into the Proposed Nursing Home Sale to provide assurances to the New York State DOH and DFS that Elant could financially subsidize the financially struggling Glen Arden through all or a portion of the proceeds from the Proposed Nursing Home Sale.

254.    Upon further information and belief, the Proposed Nursing Home Sale required New York Supreme Court approval and the approval of the New York Attorney General, pursuant to Sections 510, 511 and 511-a of the New York Not-for Profit Law.

255.    Upon further information and belief, the Proposed Nursing Home Sale requires approval of one or more of the State Enforcement Agencies, including, but not limited to, the DOH's Public Health and Health Planning Council (the "PHHPC").

256.    Upon information and belief, the Defendants and/or the prospective purchasers obtained judicial and regulatory approval of the Proposed Nursing Home Sale through the submission of false, misleading and incomplete petitions to the PHHPC, the Attorney General and this Court, including through the use of incomplete and materially inaccurate AFS certified by Defendants masking the true financial condition of the Elant SNFs.

257.    Upon information and belief, the Defendants and/or the prospective purchasers obtained conditional approval of the Proposed Nursing Home Sale by filing with the PHHPC, the Attorney General and this Court (collectively, the "Approval Bodies") documents, seeking, *inter alia*, approval of the sale transactions.

258.    The documents that were submitted for approval, included, *inter alia*, proposed asset purchase agreements ("APAs") and contracts for the sale by the Defendants to the purchasers of certain assets, liabilities and real estate owned by the Elant SNFs (the "Real Estate Contracts") for each of the Proposed Nursing Home Sale transactions.  Upon information and belief the Real Estate Contracts submitted to the Approval Bodies were incomplete. Collectively, the APAs and the Real Estate Contracts, together with any other instruments executed and/or exchanged by and among the parties to the Proposed Nursing Home Sale transactions, shall be referred to herein as the "Purchase and Sale Agreements."

259.    Further, the Proposed Nursing Home Sale transactions, as described in papers originally submitted to the PHHPC, this Court and the Attorney General (the "Approval Papers"), including, but not limited to the APAs and Real Estate Contracts (and certain of the other Purchase and Sale Agreements), describe the aggregate purchase price to be paid by the purchasers to the Elant Defendants (the "Purchase Price").

260.    Those Approval Papers deceptively described the Purchase Price as including an initial, unrestricted cash down payment totaling the sum of $5 million and a second cash payment, which was due at closing, in the additional sum of $5 million, resulting in a total cash Purchase Price of $10 million.  The Approval Papers, however, were incomplete and omitted, *inter alia*, certain pertinent schedules and exhibits (the "Closing Schedules"), which, upon information and belief, identify assets or liabilities that the parties to the Proposed Nursing Home Sale intended to exclude from the sale transactions.

58

261.    By omitting the Closing Schedules from the Approval Papers presented to this Court, the Attorney General and the PHHPC, the terms and conditions of the transactions presented for approval materially differed from those that were ultimately entered into at the closing of the Proposed Nursing Home transactions.

262.    The parties to the Proposed Nursing Home Sale transactions should have sought further approval by the applicable regulatory and judicial authorities pursuant to Sections 510, 511 and 511-a of the New York Not-for-Profit Corporations Law.

263.    Accordingly, upon information and belief, the requisite judicial, regulatory, and Attorney General approvals for the consummation of the Proposed Nursing Home Sale have not been properly obtained and, therefore, those transactions are subject in the future to being declared void *ab initio* due to the lack of proper authorizations resulting from incomplete and misleading initial disclosures.

264.    Upon information and belief, the total Proposed Nursing Home Sale purchase price is approximately $10 million, exclusive of adjustments (the "Purchase Price").

265.    Upon information and belief, the Purchase Price grossly undervalued the true, fair market value of the Elant SNFs assets and liabilities, and was derived by Whitney from a very rough, "back-of-the-napkin valuation" of the Elant SNFs (the "Whitney Valuation").

266.    Upon information and belief, Elant did not conduct any formal valuation or appraisal of the value of the operations, real estate or any other assets of the Elant SNFs using methods recognized in the valuation and/or appraisal industries in arriving at the Purchase Price.

267.    Thus, upon further information and belief, the Whitney Valuation did not factor in the value of the real property owned by each of the Elant SNFs, or any other assets of the Elant SNFs.

268.    Upon further information and belief, chief among the assets not included in the Whitney Valuation is the share of funds due to each of the Elant SNFs from a pool of settlement proceeds arising from a settlement entered into by the State of New York and numerous New York SNFs, including the Elant SNFs, to resolve amicably nearly all Medicaid rate appeals and lawsuits (the "Universal Settlement").

269.    Upon information and belief, under the broad terms of the Universal Settlement, the State of New York will make payments totaling $850 million over a five-year period in exchange for universal agreement among all participating SNFs to surrender their rights to pursue pending Medicaid rate lawsuits and appeals.

270.    Upon further information and belief, the Elant SNFs are due to receive proceeds from the Universal Settlement reasonably believed to be in excess of $18 million (the "Universal Settlement Proceeds"), which was not included in the Whitney Valuation.

271.    Upon further information and belief, Whitney deliberately concealed from the Elant Board the very existence of the Universal Settlement and, when faced with opposition from one or more Elant Board members at or about the time that the Proposed Nursing Home Sale was presented to the Elant Board for approval, he minimized the impact that the Universal Settlement would have on the fair market valuation of the Elant SNFs' assets to push through the sale transaction over the objections of those Board members and in violation of applicable laws, rules and regulations.

272.    Upon information and belief, the Proposed Nursing Home Sale purchaser has made an initial down payment in the amount of $5 million, the proceeds of which were delivered by the purchaser group to the Foundation on an unrestricted basis (the "Down Payment").

273.    Upon further information and belief, the Down Payment was not placed in an escrow account or subject to an escrow agreement, but rather the Down Payment was placed in the Foundation's general operating account.

274.    Upon information and belief, because the Down Payment was not deposited in a restricted account, it was misappropriated, wasted and transferred by one or more members of the Elant Defendants in further violation of applicable laws, rules and regulations.

275.    Upon further information and belief, the terms and conditions of the Proposed Nursing Home Sale include, *inter alia*, a provision that any future Medicaid rate adjustments affecting the SNFs' reimbursement rates shall inure to the benefit of the purchaser and that any adverse Medicaid rate changes shall be offset against the Purchase Price.

276.    Upon information and belief, Cornell has disclosed to one or more representatives of EverCare that she intends to divert the proceeds from the Proposed Nursing Home Sale by improperly creating a "new community foundation" which she claims will "serve the community as a whole," and which, upon further information and belief, may have no association or affiliation whatsoever with Elant or the Elant Related Entities.  Upon further information and belief, Cornell's diversion of the proceeds will benefit her personally by enhancing her ability to provide jobs and opportunities to wield power and influence over those individuals to whom she bestows benefits such as employment and make them beholden to her.

277.    As a result, upon information and belief, the Defendants caused the Down Payment funds, therefore, to be at a high risk of being diverted, wasted and misappropriated by one or more of the Defendants, and, upon further information and belief, those funds were diverted, wasted and misappropriated by one or more of the Defendants.

278.    Accordingly, the Defendants thereby hindered, delayed or defrauded, EverCare, which, at all times relevant to the Nursing Home Sale transaction, was and has been an existing creditor of the Elant Defendants, including but not limited to, the Elant SNFs.

## HUD MORTGAGE SCHEME

279.    Between 2007 and 2013, Goshen and Newburgh, along with the other Elant Entities, were trapped in a steep and deepening state of insolvency.  As of FY 2007, Newburgh already had a net worth deficiency of $2.7 million, which grew to a total net worth deficiency of $4.1 million by the end of FY 2013.  During the same period, Goshen's financial health deteriorated from a $3.3 million dollar surplus net worth in FY 2007 to a negative net worth deficiency of $4.3 million by FY 2013.

280.    On December 30, 2013, with the knowledge and assistance of PKF, Elant and the Obligated Group fraudulently obtained two federally insured mortgages totaling $23.5 million ($13,805,400 to Goshen and $9,434,300 to Newburgh).  A copy of a press release issued by Simms Mortgage regarding the FHA Mortgages is attached hereto as Exhibit 5.

281.    Funded by Wells Fargo, the FHA Mortgages were fully insured by the FHA through a program administered by HUD pursuant to sections 232 and 223f of the National Housing Act (12 U.S.C. § 1715w, 12 U.S.C. § 1715(b) and 42 U.S.C. 3535) ("Section 232").

282.    Under Section 232, eligible lenders, like Wells Fargo, are required to utilize uniform national standards for applying, underwriting, submitting for approval, closing, managing and servicing mortgages insured or held pursuant to Section 232 of the National Housing Act.

283.    In or about August 2012 and thereafter, in furtherance of the Elant Management's scheme to fraudulently obtain the FHA Mortgages, Elant Management electronically transmitted

multiple application and supporting documents required pursuant to Section 232 to Wells Fargo and HUD.

284.    Attached to these application documents, Elant Management included AFSs prepared by Defendants for Elant, Goshen and Newburgh for FYs 2008-2011, which, contained multiple materially inaccurate and misleading statements that obscured the true financial condition of these facilities, presenting a false picture of liquidity, by, *inter alia* (i) improperly characterizing the Loss Transfers as inter-company loans that had been forgiven; (ii) failing to qualify or otherwise make note of the inherent falseness of income streams based on the Increased Rates and overcharges to EverCare by Goshen and Newburgh for adult day and SNF services well in excess of allowable Medicaid rates; and (iii) misstating the entities' debt to income ratios.

285.    Elant Management submitted these AFS to HUD and/or Wells Fargo along with certification forms created by HUD and executed by Elant Management that conspicuously noted "HUD will prosecute false claims and statements. Convictions may result in criminal and/or civil penalties (18 U.S.C. §§ 1001, 1010, 1012; 31 U.S.C. §§ 3729, 3802; 24 CFR 200.62)."

286.    In addition to submitting AFSs that Elant Management knew were materially false and inaccurate as part of the initial application for Section 232 financing, and with the aid and assistance of Individual Auditor Defendants Suarez, McCarthy and Kennedy, Elant Management subsequently created and transmitted electronically and/or via mail or commercial courier to HUD additional false and misleading documents and financial statements throughout the underwriting period for purposes of qualifying for the HUD Mortgages.  As noted above, these AFSs contained multiple materially inaccurate and misleading statements that obscured the true financial condition of Elant, Goshen and Newburgh.

287.    Emails between Zambito and Suarez, McCarthy and Kennedy in April 2013 confirm that PKF was aware of Elant Management's attempts to obtain the FHA Mortgages and were actively engaged in preparing "HUD refinancing documents" and other schedules containing financial data at Elant Management's request for submission to HUD and Wells Fargo.

288.    Upon information and belief, on or about April 1, 2013, at the request of Elant Management, and with full knowledge that the same would be submitted to Wells Fargo, HUD and other regulatory agencies, Defendants prepared materially misleading AFS for Elant, Goshen and Newburgh for FY 2012 which were subsequently transmitted electronically and/or via mail or commercial courier to HUD and Wells Fargo as part of the underwriting process. As noted above, these AFSs contained multiple materially inaccurate and misleading statements that obscured the true financial condition of Elant, Goshen and Newburgh.

289.    This pattern and practice of deception continued well after the issuance of the FHA Mortgages in December 2013.

290.    Pursuant to 24 C.F.R. §§ 5.801, 200.36 & 232.1009, Goshen and Newburgh as borrowers, were each required to provide HUD and Wells Fargo with annual financial statements audited in accordance with GAAP.  In addition, Elant, as the operator of Goshen and Newburgh was also required to submit quarterly financial statements.

291.    Additionally, pursuant to Commitment Letters executed by Whitney on behalf of Goshen and Newburgh dated September 10, 2013 (collectively "Commitment Letters"), commemorating Wells Fargo's commitment to fund the FHA Mortgages:

> "Until the Insured Loan is repaid in full, the Borrower will provide the Lender with a copy of an annual audit from an independent CPA as required by FHA pursuant to the Regulatory Agreement and, at Lender's option, any other financial statements or other financial or operational information that is required by FHA or otherwise reasonably required by the Lender in connection with its servicing of

the Insured Loan. Such information as is required by FHA shall be delivered to the Lender at the time required by FHA and such other information shall be delivered to the Lender by a reasonable date established by the Lender in its request for such information. The Lender may provide such information to parties with a financial interest in the Insured Loan."

292.    Furthermore, pursuant to paragraph 9(f) of the Regulatory Agreements, as modified by Paragraph D of the LEAN Rider to the Regulatory Agreement attached thereto, executed by Whitney on behalf of Goshen and Newburgh on December 13, 2013 and effective as of December 30, 2013 (collectively "FHA Regulatory Agreements"), Goshen and Newburgh were required, within 90 days following the end of each fiscal year, to furnish the Secretary of HUD with "a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, certified to by an officer of the mortgagor and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary."

293.    Upon information and belief, at the request of Elant Management, and with full knowledge that the same would be submitted Wells Fargo, HUD and other governmental entities, Defendants prepared materially misleading AFS for Elant, Goshen and Newburgh for FYs 2013, 2014, 2015, and 2016 which were subsequently transmitted electronically and/or via mail or commercial courier to HUD and Wells Fargo in keeping with the Obligated Group's compliance obligations under Section 232, the Commitment Letters and the Regulatory Agreement. As with the AFSs prepared by PKF for these entities for FYs 2007-2012, these AFSs improperly characterized the Loss Transfers as inter-company loans, failed to qualify or otherwise note the obviously exorbitant Increased Rates and overcharges by Goshen and Newburgh to EverCare for adult day and SNF services, and misstated the entities debt to income ratios, creating a false picture of the financial health of these entities.

65

294.    By making, certifying and/or transmitting electronically and/or via mail or commercial courier the AFSs for Elant, Goshen and Newburgh in FY 2007-2016, the various application and supporting documents submitted to HUD containing the same and/or other materially misleading or false financial statements for the purposes of fraudulently obtaining the FHA Mortgages, Elant Management, the Obligated Group and Defendants acted in violation of, *inter alia*:

    a.    18 USC 1001, which provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any manner within the jurisdiction of any department or agency of the United States, shall be fined or imprisoned for not more than five years, or both;

    b.    18 U.S.C. § 1014, which prohibits making false statements to a financial institution, such as providing false information regarding income, assets, debt, or matters of identification, or to willfully overvalue any land or property, in a loan and credit application for the purpose of influencing in any way the action of a financial institution shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both; and,

    c.    18 U.S.C. §§ 1341 & 1343, which provides that any person who engages in a scheme to defraud or obtain money from using the mail, commercial courier or electronic communications shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**Elant and the Elant Directors' Role in the Elant Enterprise**

295.    Elant's failure to upgrade EverCare's IT system, the Inter-Company Transfers, gratuitous increase in the rates it charged EverCare for Administrative Services and services provided by other Elant Entities, and the sham Fishkill lease were all part of a greater conspiracy perpetrated by Elant and the Individual Elant Parties to siphon resources from EverCare into the coffers of Elant and the Elant Entities.

296.    Whitney's dual leadership roles at EverCare and Elant created a flagrant conflict-of-interest, uniquely positioning Whitney to facilitate the wrongful diversion of millions of dollars from EverCare without any legitimate business purpose or legal justification, ultimately

compounding EverCare's financial distress by causing dire net worth deficiencies and adverse Medicaid rate adjustments that would result in EverCare absorbing tens of millions of dollars in additional damages that it would not have incurred but for the Defendants' wrongful conduct.

297.    Whitney (like Zambito) behaved as if Elant, EverCare, and the Elant Related Entities were one unified entity; viewing adherence to corporate formalities as inconvenient, and as if Part 98 and other applicable laws, rules and regulations simply did not apply to them or the Elant Defendants.

298.    In actuality, Elant, the Elant Entities, and EverCare were independent legal and corporate entities with separate corporate forms, separate corporate governance rules and responsibilities, separate creditors, separate regulatory governance, and corporate identities.

299.    Likewise, Elant, the Elant Entities and EverCare were each independently subject to applicable state compliance and regulatory regimes that governed their financial and administrative operations.

300.    Notwithstanding that EverCare was a distinct legal entity from Elant, Whitney believed he could exercise "superpowers," whereby, acting in concert with Cornell and Zambito, through Elant, he exercised total and complete control over EverCare in disregard of the decision-making authority vested in the EverCare Board by its by-laws.

301.    Minutes from the EverCare Board's Annual Meeting, dated May 13, 2014, set forth Whitney's complete disregard for the EverCare Board's corporate governance authority and responsibilities (the "May 13th EverCare Board Minutes").

302.    In pertinent part, the May 13th EverCare Board Minutes state, "Mr. Whitney reviewed the past history of EverCare and how the bylaws were written up to this point.  Elant, Inc. had **superpowers** – they could approve/disapprove members, spend monies, etc." (emphasis added).

303.    Whitney expressed this same view in connection with a special meeting of the Elant Board, held on or about May 15, 2014 (the "May 15th Elant Board Special Meeting").

304.    The minutes from the May 15th Elant Board Special Meeting (the "May 15th Meeting Minutes"), state "Mr. Whitney noted the current way **EverCare is set up is that it was totally controlled by Elant, Inc. as the sole member of EverCare.** Elant never needed or used those rights as a board. **Was more through management control that Elant, Inc. rights were exercised. Elant being the member could approve or disapprove the board members**." (emphasis added)

305.    Elant repeatedly abused its position as EverCare's sole corporate member and administrator to circumvent the EverCare Board and make the Inter-Company Transfers totaling millions of dollars from EverCare's accounts to those of the Elant Entities.

306.    The Inter-Company Transfers were improper, illegal and in violation of Elant's fiduciary duties to EverCare and in violation of Elant's contractual obligations under the ASA.

307.    These Inter-Company Transfers by the Defendants also caused EverCare to violate the 5% Admitted Asset Rule of Part 98, requiring that Elant secure the approval of the Commissioner in advance of any monetary transfer from in excess of five percent (5%) of its aggregate admitted assets at year-end, and further led to inaccurate cost reporting.

308.    Upon information and belief, Elant engaged in other improper actions which had a materially adverse impact on EverCare without the knowledge or consent of the EverCare Board – including the manipulation of census data and the deferral of patient discharges at one or more of the Elant Related Entities that were under Whitney's direction or control – in an effort to buoy the financial condition of other unstable Elant Related Entities.

309.    According to the New York State Attorney General, between 2008 and 2011, Elant intentionally postponed the discharge of residents, against their wishes, who were ready to

68

leave its facilities, many of whom had Medicare or Medicaid coverage, to obtain increased reimbursement revenue.

310.    The Attorney General found that many of the patients were given additional, clinically unnecessary services.

311.    In connection with the Attorney General's investigation, Elant admitted to transferring several of its long-term residents to Brandywine in an effort to improve Brandywine's finances.

312.    As a result of the Attorney General's investigation, Elant was forced to pay more than $600,000 in fines and Whitney was required to forfeit his privileges and license as a New York State Nursing Home Administrator. Nonetheless, Cornell on behalf of Elant caused the Elant Board to offer Whitney an overly generous severance, retirement and pension package worth several hundred thousand dollars, notwithstanding that at all times relevant to the allegations set forth herein Whitney had acted outside the scope of his authority as the President and CEO of EverCare and Elant; breached his fiduciary duties to those entities; and misled and deceived one or more State Enforcement Agencies, including, but not limited to the DOH, all to the detriment, harm, and severe prejudice of EverCare.

## COUNT I

## (Violation of 18 U.S.C. § 1962(c) - Civil Rico)

313.    Plaintiff adopts by reference and incorporates herein the allegations set forth above.

## The Elant Enterprise

314.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

315.    The Elant Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of each of the members of the Elant Group and the PKF Defendants.  The Elant Enterprise, was an ongoing organization that functioned as a continuing unit throughout the Relevant Period.  The Elant Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity.

316.    The Elant Management and the PKF Defendants are "persons" distinct from Elant and the Elant Entities.

317.    The Elant Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of generating money for its members, including the Elant Group and PKF, by perpetrating schemes to defraud and by filing false records with governmental agencies and financial institutions, as well as failing to file proper tax returns and endangering the lives and safety of members of the public who participated in EverCare's MLTCP.  The Defendants and their co-conspirators also took steps to conceal their activities from law enforcement, including through the witting or unwitting use of proxies and/or nominees, fraudulent and inflated requests for payment and falsified financial records.

**Effect on Interstate Commerce**

318.    The Elant Enterprise engaged in and affected interstate commerce because, *inter alia*: (i) Members of the enterprise, including, but not limited to the PKF Defendants, transacted business, functioned and had office locations in, and their activities affected, interstate and foreign commerce; (ii) PKF, by, together with and through certain PKF parent, subsidiary and affiliated organizations, conducted its public accounting and business operations for the benefit of its clients like the Elant Group and EverCare throughout the New York, New Jersey and

Connecticut tri-state area; (iii) the PKF Entities overtly marketed that they are member firms of the PKF International Limited network of legally independent firms having offices across the globe; (iv) effectuated its criminal ends through the filing of false state and federal tax returns; and (v) engaged in fraudulent schemes which were intended to, and did, fraudulently obtain federal Medicare funds and/or federally insured mortgages issued by a federal financial institution.

**Pattern and Practice of Racketeering Activities**

319.    Defendants have conducted and participated in the affairs of the Elant Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), including through multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343, bank fraud in violation of 18 U.S.C. § 1344, and money laundering in violation of 18 U.S.C. 1956(a)(l)(B)(i), (a)(l)(B)(ii) & (h); as described above and outlined below.

**Mail and Wire Fraud**

320.    Throughout the Relevant Period, such dates being approximate and inclusive, within the Southern District of New York and elsewhere, the Defendants, together with others, being persons employed by and associated with the Elant Enterprise, an enterprise that engaged in and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally and for the purpose of executing the schemes and artifices identified below, transmit and/or cause to be transmitted, by means of wire communication in interstate and foreign commerce, and/or through the post office or authorized depository for mail or through a private or commercial interstate carrier, one or more writings signs signals, pictures and sounds, interstate e-mails and written communications in violation of 18 U.S.C. §§ 1341 & 1343, to wit:

| RACKETEERING ACT(S) | PERSONS INVOLVED |
|---|---|
| Transmission of materially false and inaccurate State Cost Reports to EverCare and/or state and federal regulators in furtherance of the fraudulent scheme(s) to defalcate EverCare | John Does 1-10, Elant Entities, PKF Entities, Whitney, Cornell, Zambito, McCarthy, Suarez, Higgins, Kennedy and Russo |
| Transmission of grossly inflated demands for payment for management and healthcare related services in excess of allowable and/or published Medicaid Rates in the form of the Increased Rates and artificial and retroactive inflation of charges for adult day and SNF related services provided to EverCare's Plan members by the Elant SNFs and/or seeking payment for the Sham Lease at Fishkill | John Does 1-10, Whitney, Cornell, Zambito, Elant, Goshen and Newburgh. |
| Transmission of Post-Separation Engagement Letters and the Qualifications Letter in furtherance of all Post-Separation fraudulent schemes to defalcate EverCare. | John Does 1-10, PKF Entities, McCarthy, Suarez, and Kennedy |
| Transmission of March 31st DOH Letter and related communications in furtherance of the Inter-Company Transfer fraudulent Scheme. | John Does 1-10, Whitney and Elant. |
| Transmission of the Adjusted Elant SNF Contracts in furtherance of the Increased Rate fraudulent scheme. | John Does 1-10, Whitney and Elant |
| Transmission of the Sham Fishkill Lease and demands for payment for rent in furtherance of the Sham Fishkill Lease fraudulent scheme. | John Does 1-10, Whitney and Elant |
| Transmission of false, misleading and incomplete Purchase and Sale Agreements and petitions to the PHHPC, the Attorney General and this Court in furtherance of the Proposed Nursing Home Sale. | John Does 1-10, Elant Entities, Whitney, Cornell and Zambito |

| RACKETEERING ACT(S) | PERSONS INVOLVED |
|---|---|
| Transmission of false and misleading applications, supporting documents and other false and misleading statements and documents to Wells Fargo and HUD required pursuant to Section 232, the Commitment Letters, Regulatory Agreements and federal law in furtherance of the fraudulent scheme to obtain and remain eligible for the FHA Mortgage. | John Does 1-10, Elant, Goshen, Newburgh, PKF Entities, Whitney, Cornell, Zambito, McCarthy, Suarez, Higgins, Kennedy and Russo |
| Transmission of communications related to and/or directing the transfer of funds between EverCare and the Elant Entities in furtherance of the Inter-Company Transfers and Loss Transfers fraudulent schemes. | John Does 1-10, Elant Entities, PKF Entities, Whitney, Cornell, Zambito, McCarthy, Suarez, Higgins, Kennedy and Russo |

**Bank Fraud**

321.  As more fully described in paragraphs 279-294, between January 2012 and December 2017, such dates being approximate and inclusive, within the Southern District of New York and elsewhere, PKF, Suarez, McCarthy and Kennedy, together with others including Whitney, Cornell and Zambito, being persons employed by and associated with the Elant Enterprise, an enterprise that engaged in and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally and for the purpose of executing the schemes and artifices identified below, conspire to defraud Wells Fargo, a federal financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation, of moneys, funds, credits, assets and other property owned by, and under the custody and control of such financial institution by means of fraudulently applying for and obtaining the FHA Mortgages in violation of 18 U.S.C. § 1344.

**Money Laundering**

322.    Throughout the Relevant Period, such dates being approximate and inclusive, within the Southern District of New York and elsewhere, the Defendants, together with others, being persons employed by and associated with the Elant Enterprise, an enterprise that engaged in and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally and for the purpose of executing the schemes and artifices identified below, conspire (i) to conduct financial transactions affecting interstate and foreign commerce, which in fact involved the proceeds of specified unlawful activity, to wit: wire and/or mail fraud, in violation of 18 U.S.C. §§ 1341 & 1343, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, contrary to 18 U.S.C. § 1956(a)(l)(B)(i); and (ii) to engage in monetary transactions in and affecting interstate commerce in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1957(a), all in violation of Title 18, United States Code, Section 1956(h), to wit:

| RACKETEERING ACTS | PERSONS INVOLVED |
|---|---|
| Elant Management fraudulently obtained $8.5 million in Medicaid funds from EverCare through the use of false and grossly over inflated demands for payment of management and healthcare related services in excess of allowable and/or published Medicaid Rates, through, *inter alia,* the Increased Rates, artificial and retroactive inflation of charges for adult day and SNF related services provided to EverCare's Plan members by the Elant SNFs and/or seeking payment for the Sham Lease at Fishkill, these Loss Transfers were only possible with the active participation by the PKF Defendants | John Does 1-10, Whitney, Zambito, Cornell, Elant, Goshen, Newburgh, McCarthy, Kennedy, Suarez, Russo and Higgins |

| RACKETEERING ACTS | PERSONS INVOLVED |
|---|---|
| who obscured from EverCare, State Agencies and the public the true origins and source of these funds by creating and filing materially false and inaccurate AFSs that failed to expose the various accounting improprieties and | |
| Creation of false State Cost Reports to shield, hide and disguise EverCare's defalcation by the Elant Group from EverCare, state and federal regulators and other third parties | John Does 1-10, Elant Entities, PKF Entities, Whitney, Cornell, Zambito, McCarthy, Suarez, Higgins, Kennedy and Russo |

323.     The above described racketeering activities amounted to a common course of conduct intended to defalcate EverCare for the pecuniary gain of the Elant Group and PKF. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had each caused pecuniary harm to EverCare. Throughout the Relevant Period, Defendants' fraudulent activities were part of their ongoing business and constituted a continuing threat to EverCare's property.

324.     The PKF Defendants and the pattern of racketeering activity alleged herein are separate and distinct from each other.  The PKF Defendants, including, but not limited to each of the Individual Auditor Defendants, engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Elant Enterprise.

**RICO Injury**

325.     Plaintiff's property and business have been injured by reason of these violations, in that they were deprived of more than $8.5 million dollars in funds by virtue of the Inter-Company Transfers, the Loss Transfers, the Increased Rates and the Sham Lease. Additionally, EverCare has suffered in excess of $16.5 million in losses to date as a result of the artificially

depressed PMPM rate which resulted from the intentional and knowing creation and dissemination of misleading AFSs and other State Cost Reports to the State Agencies in connection with the various fraudulent schemes outlined above to defalcate EverCare.

326.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff has been and continues to suffer injury to business or property, as set forth more fully above.

327.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, together with interest, the cost of this suit, including reasonable attorneys' fees, and disbursements.

## COUNT II

### (Violation of 18 U.S.C. § 1962(D) By Conspiring to Violate 18 U.S.C. § 1962(C))

328.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

329.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

330.    Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

331.    As demonstrated in detail above, Defendants' co-conspirators, including, but not limited to, the Elant Management have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of mail and wire

fraud in violation of 18 U.S.C. §§ 1341 & 1343, bank fraud in violation of 18 U.S.C. § 1344, and money laundering in violation of 18 U.S.C. 1956(a)(l)(B)(i), (a)(l)(B)(ii) & (h).

332.    The nature of the above-described Defendants' co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c) but also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.  At all relevant times, all Defendants and all Defendants' co-conspirators were aware of the essential nature and scope of the Elant Enterprise and intended to participate in it.

333.    Plaintiff's property and business have been injured by reason of these violations, in that they were deprived of more than $8.5 million dollars in funds by virtue of the Inter-Company Transfers, the Loss Transfers, the Increased Rates and the Sham Lease. Additionally, EverCare has suffered in excess of $16.5 million in losses to date as a result of the artificially depressed PMPM rate which resulted from the intentional and knowing creation and dissemination of misleading AFSs and other State Cost Reports to the State Agencies in connection with the various fraudulent schemes outlined above to defalcate EverCare.

334.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff has been and continues to suffer injury to business or property, as set forth more fully above.

335.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, together with interest, the cost of this suit, including reasonable attorneys' fees, and disbursements.

## COUNT III
## (Common Law Fraud)

336.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

337.    Throughout the Relevant Period Defendants held themselves out and agreed to act as EverCare's certified public accountants, financial consultants, tax advisors and auditors.

338.    In connection with Defendants' retention as EverCare's public accountants and auditors, and pursuant to the Post-Separation Engagement Letters, Defendants prepared EverCare's State Cost Reports for the FY's 2013-2015.

339.    Those State Cost Reports contained materially false statements, including, by way of example, but not limited to, falsely categorizing assets and obligations of EverCare and improper categorization of Inter-Company Transfers between EverCare and the Elant Entities.

340.    Specifically, but as set forth in greater detail above, throughout the Relevant Period PKF knew but willfully disregarded that, *inter alia,* those publicly filed State Cost Reports and other documents and other communications deceptively categorized the unlawful Inter-Company Transfers and Loss Transfers as "current" assets or obligations of EverCare and/or as loans that EverCare and/or other Elant affiliates had advanced to the Obligated Group and were improperly deemed by PKF to be repayable or forgiven within twelve months, in whole or in part during the Relevant Period.

341.    Further PKF concealed from EverCare material facts including, including but not limiting to, false representations and omissions of material fact relating to the following: (i) the sham transaction concerning the Fishkill Lease; (ii) the filing under false pretenses of materially misleading and untrue EverCare financial statements, MEDS and Encounter Data cost reports, MMCOR, as well as related communications and correspondence, as required by one or

more State Agencies, including but not limited to, the DFS and the DOH; (iii) the exorbitant and excessive PMPM Management Fees that the Elant Group caused to be charged to EverCare and caused EverCare to pay without any justifiable or legitimate business purpose to enable the Elant Group to conceal the unlawful Inter-Company Transfers; (iv) the Goshen Loss Transfers; and (v) the unauthorized distributions and fraudulent conveyances of millions of dollars' worth of Inter-Company Transfers which the Elant Group caused to occur during the relevant period from EverCare to one or more of the Elant Entities and other third parties.

342.    The PKF auditors knew that, with respect to each of the affiliated company transactions between members of the Elant Group and EverCare, the conclusions they reached and opinions that they held, as set forth in each of the applicable AFSs and other State Cost Reports were not true.

343.    At all relevant times herein Defendants knew that the information contained in the AFSs derived from or made a part of the other State Cost Reports, which contained materially misleading or false information.

344.    More specifically, PKF actually knew those representations and omissions of material fact were false at the time they submitted or caused them to be submitted to the State Agencies.

345.    Defendants intended for EverCare and the State Agencies to rely on the State Cost Reports, despite their falsity.

346.    EverCare and the State Agencies did in fact rely on the State Cost Reports prepared by Defendants.

347.    Because Defendants certified the relevant State Cost Reports and because Defendants acted and held themselves out as EverCare's certified public accountants, financial

consultants, tax advisors and auditors, EverCare's and the State Agencies' reliance on Defendants prepared State Cost Reports was justifiable.

348.    As a result of this reliance on the inaccurate State Cost Reports Defendants certified to the State Agencies severely under reporting the number and cost of Encounters, EverCare's PMPM, was reduced by the State to a level insufficient to cover and pay the contractual costs.

349.    As a result of the foregoing, EverCare has been damaged in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, and Defendants are jointly and severally liable to EverCare for all compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of them during their respective periods of disloyalty which were directly and proximately caused by those breaches, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

**COUNT IV**
**(Aiding and Abetting the Elant Group's Common Law Fraud)**

350.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

351.    As set forth in greater detail above and throughout the Relevant Period, the Elant Group made numerous false representations to or fraudulently and deceptively concealed from EverCare material facts including, but not limiting to, false representations and omissions of material fact relating to the following: (i) the sham transaction concerning the Fishkill Lease; (ii) the filing under false pretenses of materially misleading and untrue EverCare financial statements, MEDS and Encounter Data cost reports, MMCOR, as well as related communications and correspondence, as required by one or more State Agencies, including but

not limited to, the DFS and the DOH; (iii) the exorbitant and excessive PMPM Management Fees that the Elant Group caused to be charged to EverCare and caused EverCare to pay without any justifiable or legitimate business purpose to enable the Elant Group to conceal the unlawful Inter-Company Transfers; (iv) the Goshen Loss Transfers; and (v) the unauthorized distributions and fraudulent conveyances of millions of dollars' worth of Inter-Company Transfers which the Elant Group caused to occur during the relevant period from EverCare to one or more of the Elant Entities and other third parties.

352.    At all times relevant to the allegations set forth herein, at the time such representations or omissions of material fact were made, those representations or omissions were false at the time they were made and the Elant Group knew or reasonably should have known that they were false.

353.    The Elant Group, knew that such misrepresentations and omissions of fact were material and that EverCare (and the State Agencies) would rely upon them in connection with reports and other submissions that EverCare was required to make under penalty of perjury to the applicable State Agencies and in operating its business and caring for the health and welfare of the public whom it serves.

354.     Further, each of the Elant Group intended that EverCare would rely on such misrepresentations, and EverCare did rely on those misrepresentations to their detriment.

355.    As a direct and proximate result of the foregoing, EverCare has suffered significant damages.

356.    At all times relevant to the allegations set forth herein, PKF, in their capacities as agents and representatives of each of the Elant Entities, had actual knowledge of each and every fraud committed by the Elant Group and substantially and actively participated, aided and

abetted the Elant Group in connection with and in furtherance of their fraud committed upon EverCare.

357.     As a result of the foregoing, EverCare has been damaged in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, and Defendants are jointly and severally liable to EverCare for all compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of them during their respective periods of disloyalty which were directly and proximately caused by those breaches, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## COUNT V
## (Breach of Fiduciary Duty)

358.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

359.     The PKF Defendants are certified public accountants.

360.     During the Relevant Period, PKF served as the certified public accountants, tax advisors and consultants for EverCare and the Elant Entities.

361.     In this role, PKF was obligated to provide, act or give advice for the benefit of their client, EverCare on matters within the scope of this relationship, including, but not limited to, the State Cost Reports.

362.     At all times relevant to the allegations set forth herein; EverCare further reposed its trust and confidence in PKF to act with due care, loyalty and with complete candor in connection with their obligations and scope of the services they provided to EverCare.

363.     Accordingly, at all times relevant to the allegations set forth herein, PKF owed a fiduciary duty to EverCare.

364.    Instead, throughout the Relevant Period Defendants chose financial remuneration and the benefits they derived from their engagement as the financial accounting, tax and audit professionals of each of the Elant Entities over their professional responsibilities to EverCare.

365.    Specifically the PKF Defendants breached their duty of loyalty by aiding the Elant Group in its scheme to defraud EverCare.

366.    Further, PKF breached their duty of due care and duty of candor to EverCare by, *inter alia*, failing to disclose materially false information being reported in EverCare's State Cost Reports.

367.    As a direct, reasonable, foreseeable, and proximate cause of the numerous and ongoing breaches of fiduciary duties committed by Defendants and each of which is described in greater detail above, EverCare has been and continues to be damaged by each of the Defendants, in an amount to be determined at trial, but which EverCare reasonably believes is currently in excess of $25 million, and each of the Defendants is further jointly and severally liable to EverCare for all compensatory, consequential and punitive damages, with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## COUNT VI
### (Aiding and Abetting the Elant Group's Breaches of Fiduciary Duty)

368.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

369.    From in or about May 1, 2010, through on or about the Separation Date, December 31, 2014, Elant dominated and controlled EverCare and was EverCare's alter ego, sole corporate member and active parent until.

370.     As EverCare's alter ego, sole corporate member and active parent, Elant owed fiduciary duties to EverCare.

371.     From in or about May 1, 2010 through on or about the Separation Date, December 31, 2014, as a reasonable, direct, foreseeable and proximate result of Elant's domination and control of EverCare and its status as the alter ego, sole member and active parent of EverCare and in her capacity as the Chair of both the Elant Board and the EverCare Board, as well  an administrative consultant for and interim CEO of EverCare, EverCare entrusted Cornell with its highly confidential and proprietary information, including, but not limited to its confidential financial, strategic, administrative, operational and patient information.

372.     From in or about May 1, 2010 through on or about the Separation Date, December 31, 2014, as a result of Elant's domination and control of EverCare and its status as the alter ego, sole member and active parent of EverCare, and in her capacity as the actual, *de facto* and/or contractual Chief Financial Officer and/or Controller of EverCare pursuant to the ASA and as a licensed Certified Public Account ("CPA"); EverCare entrusted Zambito with its highly confidential and proprietary information, including, but not limited to its confidential financial, operational, strategic and patient information.

373.      From in or about May 1, 2010 through on or about the Separation Date, December 31, 2014, as a reasonable, direct, foreseeable and proximate result of Elant's domination and control of EverCare, its status as EverCare's alter ego, sole member and active parent and in Whitney's capacity as the actual, *de facto* and/or contractual President and Chief Executive Officer of EverCare pursuant to the ASA; EverCare entrusted Whitney with its highly confidential and proprietary information, including, but not limited to, its confidential financial, strategic, administrative, operational and patient information.

374.    At all times relevant to the allegations set forth herein, EverCare further reposed in Elant Individual Parties its trust and confidence to act with due care, loyalty and with complete candor in connection with her day-to-day management and decision-making with respect to its financial and corporate affairs.

375.    As a result of the foregoing and pursuant to the terms of the applicable ASAs, as well as the statutory duties reposed in the Elant Individual Parties as a directors and/or officers of EverCare in accordance with Article 7, *et seq.*, of the Not-for-Profit Corporation Law (the "NPCL"), at all times relevant to the allegations set forth herein, the Elant Individual Parties owed common law, contractual and statutory fiduciary duties of utmost loyalty, care and candor to EverCare.

376.    For the reasons set forth herein, Elant Individual Parties have breached the contractual and common law fiduciary duties of care, loyalty and candor, as well as the statutory duties pursuant to the NPCL, including, but not limited to, NPCL §§ 717, 719 and 720, which they owed to EverCare.

377.    As set forth in greater detail herein the Elant Group, engaged in a fraudulent scheme that was contrary to and in breach of the fiduciary duties of loyalty, care and utmost candor that Elant owed to EverCare inter alia, by systematically engaging in a clandestine course of conduct through which Elant caused the unauthorized and improper diversion, waste, misappropriation and transfer, directly or indirectly, of significant monies and assets from EverCare to the Elant Entities and EverCare lacked adequate and appropriate EMR systems, personnel, and controls, causing   EverCare to fail to satisfy its MMCOR compliance requirements, in an effort to bolster the failing financial condition of those Elant Related Entities and underwrite their existence.

378.    Elant, through the Individual Elant Entities, failed and refused to invest sufficient capital or other resources to ensure that at all relevant times EverCare satisfied its MMCOR compliance requirements.

379.    Individual Elant Entities engaged in behavior that was contrary to and in dereliction of their positions within both EverCare and Elant and in violation of the fiduciary duties of loyalty, care and utmost candor that they owed to EverCare by, *inter alia,* systematically engaging in a *ultra vires* fraudulent scheme through which Elant caused the unauthorized and improper diversion and transfer of significant monies, property and other assets from EverCare to the Elant Entities (and/or she reasonably, directly, foreseeably and proximately caused the unauthorized diversion and transfer of liabilities from one or more of Elant Defendants to EverCare), in an effort to bolster the financial health of those failing Elant Related Entities and underwrite their existence; by imposing upon EverCare grossly inflated rates—well in excess of those approved by the State—to be charged to EverCare for services rendered by one or more of the Elant SNFs; and by causing EverCare to enter into inflated, unnecessary and unapproved contracts and sham leases, including, but not limited to the Fishkill Lease.

380.    At all times relevant to the allegations set forth herein, the Individual Elant Entities had conflicts-of-interest as a result of their dual positions within both Elant and EverCare; engaged in behavior that was contrary to their positions, and in violation of the fiduciary duties of loyalty, care and utmost candor that she owed to EverCare by, *inter alia,* systematically engaging in an *ultra vires* fraudulent scheme through which Elant caused EverCare to fail to satisfy its MMCOR compliance requirements.

381.    As a result, the Individual Elant Entities failed to faithfully exercise and breached the fiduciary duties they owed to EverCare.

382.     At all times relevant to the allegations set forth herein, PKF, in their capacities as agents and representatives of each of the Elant Entities, had actual knowledge of each and every breach of fiduciary duty committed by the Elant Group and substantially and actively participated, aided and abetted the Elant Group in connection with and in furtherance of its breaches of those fiduciary duties.

383.     As a direct, reasonable, foreseeable, and proximate cause of aiding the numerous breaches of fiduciary duties committed by the Elant Group, which Defendants knowingly and substantially participated in and aided and abetted and each of which is described in greater detail above, EverCare has been and continues to be damaged by each of the Defendants, jointly and severally, in an amount to be determined at trial, but which EverCare reasonably believes is currently in excess of $25 million, and each of the Defendants is further jointly and severally liable to EverCare for all compensatory, consequential and punitive damages, with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## COUNT VII
## (Breach of Contract)

384.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

385.     Throughout the Relevant Period Defendants held themselves out and continued to act as EverCare's certified public accountants, financial consultants, tax advisors and auditors.

386.     In connection with Defendants' retention as EverCare's public accountants and auditors, and pursuant to the Post-Separation Engagement Letters, Defendants promised, *inter alia* to prepare AFSs for EverCare for FYs 2013-2015 and assist in the preparation of EverCare's Medicaid cost reports for those same years.

387.    In connection with these services, Defendants were obligated to perform its audit in compliance with GAAS and GAAP, to "obtain reasonable, rather than absolute, assurance that the financial statements are free of material misstatement, whether caused by error or fraud," to "examin[e], on a test basis, evidence supporting the amounts and disclosures in the financial statements", and to "perform additional procedures necessary to certify the supplemental information required by [the] New York State Department of Health in the cost report."

388.    In addition, and with respect to the 2016 AFS, Defendants represented to EverCare in the Qualifications Letter that it was independent with respect to EverCare, capable of conforming to the professional code of Conduct of the AICP and NYS Board of Public Accountancy and NAIC's Model Rule regarding qualifications of independent CPAs, and that Defendants were aware the FY 2015 AFS would be filed with NYS DFS and that the DFS would be relying on the information contained therein.

389.    EverCare has fully complied with the terms of the Post-Separation Engagement Letters.

390.    Defendants breached the Post-Separation Engagement Letters by, *inter alia*, failing to prepare the AFSs for EverCare for FYs 2013-2015 in accordance with GAAS and GAAP.

391.    Further, Defendants breached the Post-Separation Engagement Letters because they were not independent with respect to EverCare and incapable of conforming to the professional code of Conduct of the AICP and NYS Board of Public Accountancy and NAIC's Model Rule regarding qualifications of independent CPAs, due to inherent conflicts and intercompany balances between EverCare and the Elant Entities.

392.    As a direct and proximate cause of Defendants breaches of the Post-Separation Engagement Letters, EverCare has been and continues to be damaged in an amount to be

determined at trial, but which EverCare reasonably believes is currently in excess of the amount of $25 million, and PKF is liable to EverCare for all compensatory and consequential damages caused by those breaches, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

**COUNT VIII**
**(Auditor Malpractice)**

393.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

394.     The PKF Defendants are certified public accountants.

395.     During the Relevant Period, PKF served as the certified public accountants, tax advisors and consultants for EverCare and the Elant Entities.

396.     As the certified public accountant for EverCare and the Elant Entities, PKF was obligated to use such skill and care in the performance of their work as a reasonably skillful and diligent CPA would use under the same circumstances.

397.     This obligation includes the professional duty to EverCare to conduct their audits of EverCare with due professional care and in accordance with GAAS and GAAP.

398.     PKF breached their duty by failing to conduct their audits of EverCare and the Elant Entities with due professional care in accordance with GAAS and GAAP.  Specifically, PKF failed to investigate facts and issues related to EverCare's and the Elant Entities' audits that would ordinarily be made by a reasonably skillful and diligent accountant under the circumstances and facts set forth above.

399.     Accordingly, PKF is liable for its breach of this duty in an amount to be determined at trial, reasonably estimated to be not less than $25,000,000.

400.    As a direct and proximate cause of Defendants' breaches of its duties to EverCare as its certified public accountant, EverCare has been and continues to be damaged by each of the Defendants, jointly and severally, in an amount to be determined at trial, but which EverCare reasonably believes is currently in excess of the amount of $25 million, and PKF is liable to EverCare for all compensatory and consequential damages caused by those breaches, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff EverCare demands judgment in its favor and against the Defendants as follows:

(a)    On the First Count, a judgment in favor of EverCare and against the PKF Defendants, jointly and severally, awarding EverCare compensatory and consequential damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

(b)    On the Second Count, a judgment in favor of EverCare and against the PKF Defendants, jointly and severally, awarding EverCare compensatory and consequential damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

(c)    On the Third Count, a judgment in favor of EverCare and against the PKF Defendants, jointly and severally, awarding EverCare compensatory, consequential and punitive damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

(d)    On the Fourth Count, a judgment in favor of EverCare and against the PKF Defendants, jointly and severally, awarding EverCare compensatory, consequential and punitive damages  in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any

accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

(e)    On the Fifth Count, a judgment in favor of EverCare and against the PKF Defendants, jointly and severally, awarding EverCare compensatory, consequential and punitive damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

(f)    On the Sixth Count, a judgment in favor of EverCare and against PKF, jointly and severally, awarding EverCare compensatory, consequential and punitive damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

 (g)    On the Seventh Count, a judgment in favor of EverCare and against PKF, jointly and severally, awarding EverCare compensatory, consequential and punitive damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

(h)    On the Eighth Count, a judgment in favor of EverCare and against PKF, jointly and severally, awarding EverCare compensatory, consequential and punitive damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all such matters triable to a jury.

Dated: April 1, 2020
New York, NY                              Respectfully Submitted,

                                         MORITT HOCK & HAMROFF LLP

                                         By:___*/s/ Ted A. Berkowitz*_____
                                            Peter B. Zlotnick
                                            Ted A. Berkowitz
                                            Alexander Litt
                                            *Attorneys for Plaintiff,*
                                            *EverCare Choice, Inc.*
                                            1407 Broadway, 39th Floor
                                            New York, New York 10018
                                            Tel.: (212) 239-2000

2220648v1