UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
EVERCARE CHOICE, INC.,

                    Plaintiff,

       -against-

PKF O'CONNOR DAVIES, LLP; O'CONNOR DAVIES,
LLP, O'CONNOR DAVIES MUNNS & DOBBINS, LLP;
and Individuals THOMAS P. KENNEDY; CHRISTOPHER
J. McCARTHY; MICHAEL J. SUAREZ**;** GARRETT M.
HIGGINS; DOROTHEA RUSSO, AND JOHN DOES 1-10.

                    Defendants.
----------------------------------------------------------------X

**SECOND AMENDED
COMPLAINT** _____

Civil Case No.: 7:20-cv-02733

Date Filed: 4/1/2020

       Plaintiff, EverCare Choice, Inc., ("EverCare"), by and through its attorneys, Moritt Hock

& Hamroff LLP, as and for its First Amended Complaint against Defendants PKF O'Connor

Davies, LLP; O'Connor Davies, LLP; O'Connor Davies Munns & Dobbins, LLP; (collectively,

the "PKF Entities"); Thomas P. Kennedy ("Kennedy"); Christopher J. McCarthy ("McCarthy");

Michael J. Suarez ("Suarez")**;** Garrett M. Higgins ("Higgins"); and Dorothea Russo ("Russo")

(Kennedy, McCarthy, Suarez, Higgins and Russo  shall be referred to herein collectively as the

"Individual Auditor Defendants," and the Individual Auditor Defendants, together with the PKF

Entities shall be referred to herein collectively as the "PKF Defendants," "PKF" or, alternatively,

"Defendants"), states and alleges as follows:

## I.     <u>NATURE OF THE ACTION</u>

       1.    This action arises out of Defendants' multiple acts of fraud, aiding and abetting

fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of

contract and seeks any and all common law damages as well as statutory treble damages,

attorneys' fees and costs pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

2.      EverCare is a not-for-profit managed long-term care plan ("MLTCP") that provides health care services to Medicaid recipients in Orange, Rockland and Dutchess counties. Defendants are certified public accountants, tax advisors and auditors, who, from in or about March 2002 through and including mid-May 2016 (the "Relevant Period"), simultaneously served as certified public accountants, tax advisors and consultants for EverCare, EverCare's former parent company Elant, Inc. ("Elant") and certain of EverCare's former affiliates, including The Elant Foundation, Inc. ("Foundation"), Elant At Brandywine, Inc. ("Brandywine"), Elant At Goshen, Inc. ("Goshen"), Elant At Newburgh, Inc. D/B/A Elant At Meadow Hill ("Newburgh"), Elant At Fishkill, Inc. ("Fishkill"), Glen Arden, Inc. ("Glen Arden") (collectively the "Elant Entities").  Brandywine, Goshen, Newburgh, and Fishkill, all of which are skilled nursing facilities, are collectively referred to herein as the "Elant SNFs."

3.      During the Relevant Period, in concert with Elant's officers and/or directors, including Todd Whitney ("Whitney"), Donna Cornell ("Cornell") and Debra M. Zambito ("Zambito") (collectively the "Elant Leaders"),[1] Defendants, intentionally caused EverCare to severely under-report the data evidencing its principal liability -- millions of dollars in accrued

---

[1] The Elant Entities and the Elant Leaders shall collectively be referred to as the "Elant Group." The Elant Leaders are not parties to this action but were the subject of a prior action, the existence and substance of which are publically available.  In particular, for a detailed recitation of the relevant facts and circumstances giving rise to the claims and assertions against Defendants herein, reference is made to the First Amended and Supplemental Complaint, together with each of the exhibits annexed thereto (collectively, the "Elant Amended Complaint" or, alternatively, the "Elant Amended Cplt."), filed in an action commenced on or about April 19, 2016 by EverCare against Elant and certain of its present and former directors, officers, subsidiaries and affiliates, including each of the Elant Leaders, as well as the Elant Entities, in the Supreme Court of the State of New York, Orange County, captioned *Elant Choice, Inc. d/b/a EverCare v. Elant, Inc., et al.;* Index No. EF002597-2016 (N.Y. Sup. Ct., Orange Co., 2016) (Hon. E. Slobod, J.S.C.) (the "Elant Action"), which Elant Amended Complaint, together with each of the exhibits annexed thereto, is incorporated as if set forth at length herein and attached hereto as **Exhibit 1** to this Amended Complaint against the PKF Defendants.

administrative costs and medical services that  EverCare service providers ("Service Providers") delivered and billed to EverCare's plan Members ("Members") for each encounter or contact that occurred between those plan Members and EverCare's network of Service Providers ("Encounter") during a relevant reporting period ("Encounter Data") -- to New York State ("NYS" or, alternatively, the "State") regulators creating the appearance of a cash surplus on EverCare's balance sheet when in actuality it was drowning in incurred but not reconciled liabilities related to these unreported Encounters.

4.     At all times relevant to the facts and circumstances alleged herein, each of the PKF Defendants, co-conspired with members of the Elant Group and conspired to, and did, direct and control ongoing and continuous racketeering acts and practices through which they stood to and did receive substantial monetary compensation through the use of the United States Postal Service ("USPS"), interstate carriers such as Federal Express ("Fed-Ex"), and interstate bank, telephone, email and other forms of electronic communications, in violation of 18 USC §§ 1341 and 1343.  In particular, throughout the Relevant Period, the PKF Defendants and members of the Elant Group created and then took advantage of EverCare's false "paper" liquidity to *inter alia*: (1) illegally and without proper authorization, transfer cash from EverCare's reserves to Elant and one or more of the other Elant Entities in violation of applicable laws, rules and regulations (the "Inter-Company Transfers Scheme"); (2) artificially inflate the amount EverCare paid Elant for certain management services in violation of NYS and federal law to financially prop up the Elant Entities (the "MMCOR Fraud Scheme") (3) transfer debts owed and expenses incurred by Elant's other affiliated entities, including Goshen and Meadow Hill (the "Obligated Group"), onto EverCare's books (the "Loss Transfer Scheme"); and, (4) secure a $23.5 million

Federal Housing Authority ("FHA") backed mortgage from Wells Fargo, N.A. ("FHA Mortgage") on behalf of the Obligated Group (the "FHA Mortgage Scheme").

5.      The Defendants engaged in these schemes by, *inter alia*, knowingly creating and/or certifying materially false or inaccurate Monthly Encounter Data ("MED")[2], quarterly Medicaid Managed Care Operating Reports ("MMCOR"), yearly Audited Financial Statements ("AFS") and CHAR500 and Form 990, state and federal income tax returns ("Tax Returns"), (collectively, the Tax Returns, MED, MMCOR and AFS shall be referred to herein as the "State Cost Reports").  Despite Defendants' actual knowledge of significant and material deficiencies in the information technology systems provided to EverCare by Elant to collect and report EverCare's Encounter Data and Defendants' direct knowledge of the other improper transfers and accounting improprieties by which Elant defalcated EverCare, Defendants repeatedly certified or issued or caused to be certified or issued unqualified State Cost Reports ignoring these material violations of state and federal law and Generally Accepted Accounting and Auditing Practices ("GAAS" and "GAAP") (the "Financial Statement Fraud").

6.      To date, and as a direct result of the Loss Transfer Scheme, Inter-Company Transfers Scheme, MMCOR Fraud Scheme and FHA Mortgage Scheme (collectively referred to herein as the "RICO Schemes") furthered by Defendant's Financial Statement Fraud, the PKF Defendants, acting jointly and severally, have proximately and directly caused EverCare to suffer ongoing and continuous total actual damages reasonably believed to exceed $25,000,000 and statutory treble damages in excess of $75,000,000.

---

[2] From July 2012 through June 2013 PKF completely failed to file or caused EverCare not to file the MED with the State Agencies.

## II.   PARTIES

7.      EverCare is a not-for-profit corporation organized under the laws of the State of New York.

8.      EverCare is a tax-exempt organization under Section 501(c)(3) of the United States Internal Revenue Code.

9.      EverCare maintains its principal place of business at 31 Cerone Place, Newburgh, New York 12550.

10.     Upon information and belief PKF O'Connor Davies LLP, O'Connor Davies LLP, and O'Connor Davies Munns & Dobbins, LLP conduct business under the name PKF.

11.     Upon information and belief PKF O'Connor Davies LLP, O'Connor Davies LLP, and O'Connor Davies Munns & Dobbins, LLP conduct business under the name PKF.

12.     PKF O'Connor Davies, LLP,[3] formerly known as PKF LLP, is a New York Limited Liability Partnership, and is registered as a public accounting firm with the Public Company Accounting Oversight Board ("PCAOB"). Upon information and belief, PKF has its headquarters in New York.

13.     O'Connor Davies, LLP is a New York Limited Liability Partnership, and a PCAOB registered public accounting firm with its headquarters in New York.

14.     O'Connor Davies Munns & Dobbins, LLP is a New York Limited Liability Partnership and a PCAOB registered public accounting firm with its headquarters in New York.

15.     Upon information and belief, the PKF Entities operate out of and have offices in New York, New Jersey, Connecticut, Maryland, and Rhode Island, and, throughout the Relevant

---

[3] Upon information and belief, during the Relevant Period, PKF O'Connor Davies, had been referred to as PKF O'Connor Davies a division of O'Connor Davies, LLP, but has since ceased operating as a separate division, and now only operates under one name, PKF O'Connor Davies, LLP.

Period, have been members of an international network of public accounting firms.

16.     During the Relevant Period each of the PKF Entities performed work or supplied services related to the allegations herein to EverCare and the Elant Entities.

17.     Upon information and belief, Defendant Kennedy is, and at all times relevant hereto was, an individual who resides in the State of New York.

18.     At all times relevant to the allegations set forth herein, Kennedy, a Certified Public Accountant ("CPA"), was a partner at the PKF Entities working primarily out of the PKF Harrison Office.

19.     Upon information and belief, Defendant McCarthy is, and at all times relevant hereto was, an individual who resides in the State of New York.

20.     At all times relevant to the allegations set forth herein, McCarthy, a CPA, was a partner at the PKF Entities working primarily out of the PKF Harrison Office.

21.     Upon information and belief, Defendant Suarez is, and at all times relevant hereto was, an individual who resides in the State of New York.

22.     At all times relevant to the allegations set forth herein, Suarez, a CPA, was a manager at the PKF Entities working primarily out of the PKF Harrison Office.

23.     Upon information and belief, Defendant Russo is, and at all times relevant hereto was, an individual who resides in the State of New York.

24.     Upon information and belief, at times relevant to the allegations set forth herein, Russo, a CPA, was a partner at the PKF Entities primarily working out of the PKF Harrison Office.

25.     Upon information and belief, Defendant Higgins is, and at all times relevant hereto was, an individual who resides in the State of New York.

26.     At all times relevant to the allegations set forth herein, Higgins, was a partner at the PKF Entities primarily working out of the PKF Harrison Office.

### III.     THE ENTERPRISE

27.     EverCare is either itself the enterprise, a "victim enterprise" and/or an association-in-fact enterprise within the meaning of Title 18, United States Code, Section 1961(4), (the "EverCare Enterprise" or the "Enterprise").

28.     Each of the Defendants agreed to and did direct, control and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding EverCare and others.

29.     The EverCare Enterprise consists of multiple entities/members, including Elant, the Elant Entities and the PKF Entities.  These entities, along with others, including but not limited to the Elant Leaders and the Individual Auditor Defendants, form an enterprise through formal and informal relationships.  Specifically, until on or about December 31, 2014 (the "Separation Date"), Elant served as EverCare's sole member and active parent.  Elant also served as active parent of the other Elant Entities.  Each member of the Elant Entities, each of the Defendants and, from time-to-time throughout the Relevant Period, certain other third parties comprised the members the EverCare Enterprise.

30.     Members, who constitute the Enterprise, directed, controlled or otherwise conducted or participated in the conduct of the affairs of the Enterprise, and are part of it, also have an existence, separate and distinct from the Enterprise as business consultants and accountants who conduct business unrelated to the conduct and affairs of the Enterprise and/or the schemes discussed below.

31.     The EverCare Enterprise constituted an ongoing organization whose members functioned as a continuing unit throughout the Relevant Period, seeking to achieve a common purpose and jointly and severally co-conspired to direct, control and achieve the common objectives of the Enterprise.

32.     At all times during the Relevant Period, PKF, by, together with and through certain PKF parent, subsidiary and affiliated organizations, conducted its public accounting and business operations for the benefit of clients like the Elant Entities and EverCare.

33.     Members of the Enterprise, including, but not limited to the PKF Defendants, had office locations in various jurisdictions, transacted business and functioned in those jurisdictions, and their activities affected, interstate and foreign commerce.

### (a)    Methods and Means of the Enterprise

34.     The principal purpose of the Enterprise was to generate money for its members, including the Elant Group and Defendants, by perpetrating the RICO Schemes to defraud EverCare, implemented through the Financial Statement Fraud; i.e., the creation, certification and/or filing of false financial records, including the AFS, MMCOR, FHA Mortgage documents and tax returns with various governmental agencies.  This purpose was implemented by members of the Enterprise through various criminal activities, including, but not limited to, bank, mail and wire fraud.

### IV.    JURISDICTION AND VENUE

35.     This Court has jurisdiction over the parties pursuant to 28 U.S.C. §§ 1331 and 1367.

36.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965.

## V.    FACTS COMMON TO ALL COUNTS

### (a)    General Background

37.    From EverCare's inception in or about 1999 until on or about December 31, 2014 (the "Pre-Separation Period"), Elant served as EverCare's sole corporate member and active parent. Throughout the Pre-Separation Period, Elant acted as EverCare's alter ego, and totally dominated and controlled EverCare, disregarding its corporate form.[4]

38.    Throughout the Relevant Period, including, but not limited to, during the Pre-Separation Period, in addition to disregarding EverCare's corporate form, Elant and the Elant Leaders also dominated and controlled each of the Elant Entities, which included the Elant SNFs, and various other home health providers and assisted living facilities throughout New York.

39.    This hierarchical organizational structure enabled the Elant Leaders to co-conspire with the Individual Auditor Defendants to limit access to information underlying the execution and perpetration of a massive plan of corruption to a select group, including the Elant Leaders and the Individual Auditor Defendants, permitting the co-conspirators, over the course of many years, jointly and severally, to execute their unlawful and deceptive acts and practices by fraudulently concealing this multi-million dollar Medicaid fraud from EverCare's Board and applicable State regulatory agencies[5].

---

[4] *See* Footnote 4 on p. 3 herein for a detailed recitation of the relevant facts and circumstances giving rise to the claims and assertions against Defendants herein.

[5] By way of example, EverCare has been certified and approved by the New York State Department of Health's ("DOH"), Office of Health Insurance Programs, Division of Long-Term Care ("OHIP").  In addition to the DOH, State governmental agencies having jurisdiction to monitor, control, regulate or enforce any and all laws, rules and regulations governing EverCare's licensure as an MLTCP, include, but are not limited to, the NYS Department of Financial Services ("DFS"), the Office of the New York Medicaid Inspector General ("OMIG") and the Office of the Attorney General of NYS (the "NYAG") (collectively the "State Regulators").

40.    As a DOH-certified MLTCP, EverCare is a managed care organization ("MCO") that provides, *inter alia,* health and long-term care services on a capitated basis to its Members, primarily the chronically ill, elderly, and underserved populations residing throughout its network area who are enrolled as plan participants in the New York State Medical Assistance Program ("Medicaid"), Title 11 of Article 5 of the New York Social Services Law. The DOH is the single State agency charged with responsibility for the administration of the federal Medicaid program, coordinating at the State level the regulatory framework established by the Center for Medicare and Medicaid Services of the U. S. Department of Health and Human Services ("CMS").

41.    MLTCPs, as MCOs, are designed to prevent or postpone Medicaid recipients from progressing to more intensive and expensive forms of in-patient care including, acute care hospitalizations, assisted living and/or nursing homes.  EverCare acts as a partial capitation MLTCP; its sole source of compensation for the services it provides comes from state and federal Medicaid funds in the form of a per Member per month ("PMPM") capitated payment. As its Members receive services from a network of Service Providers contracted by EverCare, EverCare, as a NYS certified MLTCP, is required to record each such Encounter through an appropriate electronic medical records ("EMR") Management Information System ("MIS" or, alternatively, "IT System").  EverCare must compensate the Service Providers for the services they are contracted and authorized to perform, and report each such Encounter to State Regulators, including the DOH, through various State Cost Reports.  The State Cost Reports are then utilized by State Regulators, including the DOH, to, *inter alia*, determine whether EverCare meets various statutory liquidity and reserve requirements required to maintain its license, as well as to determine its PMPM partial capitation rate in the future.

42.     Under this structure, EverCare receives, *inter alia*, fixed monthly PMPM Medicaid reimbursement payments from the State for each plan participants regardless of the goods and services EverCare actually performs or delivers.

**(b)     The Co-Conspirators' Waste, Fraud and Abuse
         And Exploitation of the Partial Capitation Rate-Setting Process**

43.     Additionally, EverCare makes fee-for-service payments to Service Providers in its contracted Service Provider network for certain covered services offered by those Service Providers and authorized by the Plan based upon pre-negotiated fee schedules.

44.     Through this highly regulated process, EverCare generates virtually all of its annual net revenues from a fixed, partially capitated PMPM rate from Medicaid.

45.     Medicaid calculates those revenues annually based upon a complex reimbursement rate formula, but, for any given state fiscal year, the PMPM reimbursement rate is calculated not with respect to the current year's State Cost Reports and MEDs, but frequently it can lag by as much as two to three years due to the MMCOR benchmarking process that requires complex actuarial and risk analyses.

46.     Medicaid reserves the right to review and adjust the reimbursement amounts that each MCO receives and, from time-to-time the Plan's management likewise may request that Medicaid review and revise the MCO's reimbursement rates as well.  Those rates can vary from year-to-year and the laws and regulations applicable to the program are complex and subject to varied interpretation.

47.     Among the multitude of  risk factors that can affect the rate-setting determination, data, including, but not limited to, the following must be considered: (a) the number of Medicaid beneficiaries in the plan's Member or "census" pool for each covered year; (b) its accrued incurred but not reported medical expense liabilities ("IBNR"); (c) certain actuarial risk factors

such as the average life expectancy of the plan or region's Member pool; as well as (d) other data included in the EMR, such as MMCOR, AFS and Encounter Data, which the plan submits on a monthly, quarterly, and annual basis.

48.     Where, as here, an MCO, such as EverCare, submits MMCOR data that does not accurately and correctly reflect the true magnitude of the IBNR or other expense data it has accrued for a given period, the reimbursement rates Medicaid assigns to it for that period may not accurately reflect or sufficiently compensate the MCO for the PMPM goods and services provided to the MCO's Members during the applicable period by its vendors.

49.     From an accounting perspective, IBNRs constitute an estimate of the initial Encounter liability that an MCO accrues as of the date that the MCO's Service Providers record Encounters with the MCO's plan members.  The MCO is legally obligated to capture each Encounter between a Service Provider and the MCO's members and to include that Encounter in its MMCOR and MEDs data for the applicable cost-reporting period.

50.     The MCO must then code and record the Encounter in accordance with a Medicaid prescribed cost schedule, and then, from an accounting perspective, the cost becomes an accrued expense, which the MCO must then aggregate with each of its other Encounters recorded during that MMCOR reporting period.

51.     Once the Service Provider submits an invoice to the MCO for any particular pre-authorized Encounter, an "adjudication" process occurs whereby the plan and the Service Provider reconcile the invoiced fee against the negotiated contracted rate and units of service set forth in the Service Provider's service plan as previously authorized by the MCO.  When the adjudication process is completed, the adjudicated amount then becomes documented as an account payable on the MMCOR and MEDs.

52.     Hundreds of Encounters typically occur on a daily basis between an MCO's Service Providers and its Medicaid beneficiaries.

53.     Accordingly, unless the MCO employs competent and adequate staff and appropriate EMR software, which enables the MCO to properly approve and adjudicate a service claim against the authorization for each Encounter the MCO has with the member, the IBNR and accounts payable information that the MCO reports in its MMCOR or other State Cost Reports to Medicaid and the applicable State Regulators are susceptible to inaccuracies and likely will not properly capture the true costs that the plan incurs each month.

54.     This scenario is exactly what happened in the case of EverCare.  Defendants and the Elant Leaders' collectively determined that they could defalcate EverCare by systematically failing and refusing to implement appropriate MEDs and MMCOR reporting and compliance measures on behalf of EverCare during the Pre-Separation Period. In furtherance of that scheme, Defendants and the Elant Leaders agreed to and did cause EverCare to submit false and misleading State Cost Reports to the DOH, making EverCare appear to be operating more cost-effectively and efficiently than it actually was.  The Defendants and the Elant Leaders then took advantage of this situation to siphon cash out of EverCare and onto the books of Elant and other Elant Entities.  As a direct and proximate result of these actions, including the filing of falsified MMCORs and other State Cost Reports, the DOH set EverCare's Medicaid reimbursement rate artificially too low during the applicable reporting periods, creating a cycle of budgetary crises that has damaged EverCare, resulting in its receiving a series of ongoing and continuing net worth deficiency statements from the DOH commencing in or about June 2016 and continuing through the present (the "Net Worth Deficiency SODs").

55.     As a result of this time-consuming PMPM rate adjustment process and because, throughout all Relevant Periods, EverCare's MLTCP membership enrollment or census and its correlated PMPM revenue growth expanded at a rate that eclipsed its concomitant PMPM expenses, which were simultaneously being artificially and deliberately deflated by each member of the Elant Group and the Defendants through the fraudulent financial transactions and RICO Schemes described in greater detail herein, EverCare appeared to be far healthier from a financial and medical acuity standpoint than it actually was, resulting in its PMPM partial capitation rate being set too low throughout the Relevant Period.  Accordingly, as a direct and proximate result of the knowing and fraudulent submission of the State Cost Reports that each of the Defendants and the Elant Leaders knew contained deceptively false and untrue statements and omissions of material fact, namely that EverCare, as a State certified MLTCP had failed to accurately capture and report Encounter Data during all Relevant Periods, thereby creating a false appearance of liquidity (by failing to account properly for IBNR medical expense liabilities) and causing its PMPM capitated rate to be set too low by State Regulators in future years.

56.     The combination of these factors has resulted in substantial and ongoing financial hardship and distress for EverCare. This financial predicament has been further compounded year-after-year throughout the Relevant Period and continues through and including the present.

(c)     **The Administrative Services Agreements**

57.     During the Relevant Period, Elant caused EverCare to enter into one or more administrative services agreements with Elant, which were executed by representatives of Elant and EverCare (but not by the NYS Commissioner of Health) (the "ASAs").  Pursuant to those ASAs and as a result of Elant's status as the sole member and active parent of EverCare

throughout the Relevant Period, Elant and the Elant Leaders undertook fiduciary duties and accepted the wholesale authority and responsibility to serve, among other things, as EverCare's contractual manager and agreed to provide virtually all of EverCare's administrative, financial, compliance, managerial, systems and controls, and operational functions, practices and procedures.[6]

58.    During the Relevant Period, the managerial and executive operations and services provided by Elant in connection with the ASAs on behalf of EverCare included, but are not limited to, the following: (i) Elant provided all executive management functions for EverCare; (ii) Elant administered all of EverCare's employee benefits programs; (iii) Elant implemented and maintained all of EverCare's accounting systems and activities; (iv) Elant performed all of EverCare's cost-reporting functions, including, but not limited to, ensuring that EverCare complied with all applicable regulatory reporting functions and requirements; (v) Elant oversaw and administered EverCare's billing and collections; (vi) Elant oversaw and administered EverCare's accounts payable and receivable functions; (vii) Elant oversaw and administered EverCare's payroll; (viii) Elant established, oversaw and administered all of EverCare's budget and cash flow projections; (ix) Elant had sole and exclusive signatory control over and the management of EverCare's bank accounts and working capital; (x) Elant oversaw and administered the submission of EverCare's rate and fee schedules; (xi) Elant oversaw and administered property leasing on behalf of EverCare; (xii) Elant oversaw and administered EverCare's insurance policies and procedures; (xiii) Elant oversaw and administered the

---

[6] Pursuant to 10 NYCRR § 98-1.11(j), all management functions that are delegated pursuant to an ASA by an MLTCP, like the ASAs entered into between EverCare and Elant, such as cost-reporting, claims payment, quality assurance and utilization review, require a management agreement that must be approved by the Commissioner of Health.

negotiation and drafting of Service Provider contracts on behalf of EverCare, including, but not limited to, the negotiation, drafting and execution of EverCare's contractual agreements with professional firms such as PKF; (xiv) Elant oversaw and administered the implementation and maintenance of EverCare's entire MIS; (xv) Elant oversaw and administered EverCare's marketing, communications and development departments; (xvi) Elant provided all human resources functions on behalf of EverCare (including the advertising for and hiring of employees); (xvii) Elant oversaw administered and provided advice, consultation and assistance concerning the placement of Members within EverCare's MLTCP; and (xviii) Elant established policies, procedures systems and controls to ensure that EverCare complied with all applicable laws, rules and regulations and adopted programs, systems and procedures to ensure compliance with the same (collectively, the foregoing shall be referred to as the "Administrative Services").[7]

59.     Notwithstanding their contractual obligations to EverCare pursuant to the terms and conditions of the ASAs, during the Relevant Period, Elant and the Elant Leaders failed and refused to provide all or substantially all of the Administrative Services for and on behalf of EverCare. Upon information and belief, however, Elant and the Elant Leaders purported to perform the same or substantially similar Administrative Services on behalf of each of the other Elant Entities during the Relevant Period.

60.     Pursuant to the terms and conditions of the ASAs, Elant and the Elant Leaders, among other things, engaged PKF during the Relevant Period on behalf of EverCare to oversee and audit EverCare's Medicaid-related reporting obligations to the state regulators and other applicable federal and state tax, regulatory and oversight agencies of New York State that govern

---

[7] See paragraphs 136-197 of the Amended Complaint in the Elant Action, which further details the Administrative Services that Elant failed and refused to provide in accordance with the terms and conditions of the applicable ASAs.

and administer the State Medicaid program and ensure compliance with all applicable laws, rules and regulations governing MLTCPs and New York not-for-profit corporations. Those reporting obligations included, but were not limited to, the submission by EverCare of truthful, accurate and comprehensive State Cost Reports.

61.    Upon information and belief, during the Relevant Period, Defendants provided all or substantially all of these same or substantially similar audit and Medicaid-related reporting obligations on behalf of each of the other Elant Entities pursuant to the applicable laws, rules and regulations governing those Elant Entities.

62.    As a result of this retention the PKF Defendants earned hundreds of thousands of dollars during the Relevant Period. Upon information and belief, throughout the Relevant Period, the PKF Defendants were compensated for their role in the RICO Schemes, inter alia, through fees charged to the Elant Entities and EverCare.

63.    As the auditors for all of the Elant Entities and EverCare throughout the Relevant Period, the auditors audited and reviewed the trial balance ledgers and other books and ledgers of each of the Elant Entities and EverCare and knew that Elant exclusively managed, operated and controlled all facets of each of these entities. Additionally, and as a result of its various roles for each of the entities within the Elant Group, Defendants had access to and direct knowledge of the various accounting improprieties perpetrated by the members of the Elant Group during the Relevant Period that made the RICO Schemes possible.

## VI.    THE FINANCIAL STATEMENT FRAUD

64.    Each of the various RICO Schemes depended upon or was enabled by the Financial Statement Fraud, and/or the Financial Statement Fraud permitted Elant and the Elant

Leaders to conceal the RICO Schemes from EverCare, State Regulators and other federal and State agencies and third-parties.

65.     EverCare's State Cost Reports, and particularly the MMCORs and AFSs, were the primary method by which EverCare and State Regulators evaluated EverCare's financial health.  The manipulation of these documents was essential to each of the RICO Schemes and was possible only with Defendants' intentional participation.

66.     Defendants' obligations and the nature and scope of the services to be provided to EverCare were laid out in a series of engagement letters between Elant and the PKF Entities during the Pre-Separation Period ("Pre-Separation Engagement Letters"), and during the Post Separation Period in a series of engagement letters dated February 7, 2014 ("2014 Engagement Letter"), January 19, 2015 ("2015 Engagement Letter") and February 12, 2016 ("2016 Engagement Letter") (collectively referred to as "Post-Separation Engagement Letters").

67.     Pursuant to the Pre- and Post-Separation Engagement Letters, Defendants acknowledged their professional responsibilities to EverCare and agreed, *inter alia,* to do the following:

       a.  Audit EverCare's "statement of financial position and the related statement of operations and changes in net assets, and cash flows . . . in all material respects, in conformity with accounting principles generally accepted in the United States of America ("US GAAP")";

       b.  "conduct the audit in accordance with auditing standards generally accepted in the United States of America ("US GAAS")";

       c.   "obtain reasonable, rather than absolute, assurance that the financial statements are free of material misstatement, whether caused by error or fraud";

       d.  "examin[e], on a test basis, evidence supporting the amounts and disclosures in the financial statements";

e.  "perform additional procedures necessary to certify the supplemental information required by New York State Department of Health in the cost report"; and,

f.  "assist in preparation of the Medicaid cost report."

68.     In addition to Defendants' contractual obligations, Defendants were also obligated to comply with 10 NYCRR Part 98 including subsections § 98-1.11 and § 98-1.16, together with added subpart § 98-3, which extended various applicable audit and reporting standards of publicly regulated companies under Dodd-Frank to MLTCPs like EverCare. These amendments went into force and effect for all MCOs audits for the fiscal year ending December 31, 2015 ("FY2015") cost reporting period.

69.     10 NYCRR § 98-3.11 states in pertinent part the following:

> Every MCO subject to this Subpart shall retain a CPA who agrees by written contract with such MCO to comply with the provisions of this section and 98-1.16. The contract must specify:
>
> (a) That the CPA is independent with respect to the MCO and is acting in conformity with the standards of the CPA's profession, such as contained in the Code of Professional Ethics and pronouncements of the AICPA and the Rules of Professional Conduct of the New York Board of Public Accountancy, or similar code and meets the definition of a CPA set forth in subdivision (e) of section 98-3.2 of this Subpart;
>
> (b) That the CPA understands the annual audited financial report, that the CPA's opinion thereon will be filed in compliance with this Subpart and that the Commissioner will be relying on this information in the monitoring and regulation of the financial condition of the MCO;
>
> (c) That the CPA consents to the requirements of section 98-3.12 of this Subpart and that the CPA consents and agrees to make available the work papers for review by the Commissioner; and
>
> (d) A representation that the CPA is in compliance with the requirements of section 98-3.6 of this Subpart.

70.     The specific representations required pursuant to 10 NYCRR § 98-3.11, including that Defendants understood their obligation to act in accordance with relevant professional

19

standards, that their audits would be relied upon by the DOH, and that they complied with the requirements of 10 NYCRR § 98-3.6, are not contained in the 2016 Engagement Letter, but rather, were provided in a separate "Qualifications Letter" dated March 31, 2016 addressed to EverCare's Board of Directors.  A complete and accurate copy of the Qualifications Letter is annexed hereto as **Exhibit 2** and incorporated as if set forth at length herein.  Specifically, the Qualifications Letter contains the following representations:

> We are independent certified public accountants with respect to Choice [n/k/a EverCare] and conform to the standards of the accounting profession as contained in the Code of Professional Conduct and pronouncements of the American Institute of Certified Public Accountants, and the Rules of Professional Conduct of the New York State Board of Public Accountancy.

> We understand that Choice intends to file its audited financial statements and our report thereon with the New York State Department of Financial Services in which Choice is licensed, and that the superintendent of that state will be relying on that information in monitoring and regulating the statutory financial condition of Choice . . .

> To the best of our knowledge and belief, we are in compliance with the requirements of Section 7 of the NAIC's Model Rule (Regulation) "Requiring Annual Audited Financial Reports" regarding qualifications of independent certified public accountants.

71.     At the time the Post-Separation Engagement Letters and the Qualifications Letter were authored, and transmitted to EverCare via E-Mail, U.S. Mail, or other commercial carrier, Defendants knew that the covenants and promises contained therein, including their promise to perform services in compliance with GAAP and GAAS, the National Association of Insurance Commissioners ("NAIC") model audit rules, and American Institute of Certified Public Accountants ("AICPA"), as well as Defendants' promise that it was capable of acting "independent[ly]" were patently false.  Defendants, in cooperation with or at the behest of the Elant Leaders, knowingly made these promises with the understanding that EverCare, State

Regulators and other third parties including Wells Fargo, HUD and the FHA would -- and did -- rely upon the same when utilizing the State Cost Reports to determine, *inter alia*, EverCare's eligibility for Medicaid funds, to determine EverCare's PMPM capitation rate and Elant and the Obligated Groups' initial and continuing eligibility for the FHA Mortgage.

72.     As explained in greater detail below, under the guise of these covenants and contractual obligations, Defendants actively participated with the Elant Leaders in, and/or helped the Elant Leaders to conceal the various RICO Schemes through drafting, fraudulently certifying, and causing to be filed with New York State Regulators and others, materially false MMCORs, AFSs, MEDs (i.e., Financial Statement Fraud) that ignored Defendants' actual knowledge of material deficiencies in the method and technology provided by Elant to EverCare to collect and report Encounter Data, improper Inter-Company Transfers, improper Loss Transfers, and an ongoing pattern and practice of Medicaid fraud.

73.     Simply stated, the Financial Statement Fraud permeates each and every one of the RICO Schemes and without Defendants' intentional participation, none of these RICO Schemes would have been possible.

## VII.   THE INTER-COMPANY TRANSFERS SCHEME

74.     Throughout the Relevant Period, members of the Elant Group, in concert with each of the Defendants, exploited EverCare's inadequate MIS systems and controls, intentionally failed to account for EverCare's true IBNR and exploited EverCare's artificially inflated cash position on its financial statements and State Cost Reports. Specifically, the Elant Leaders, together with the substantial assistance of the Individual Auditor Defendants took advantage of the appearance of EverCare's artificially high liquidity by siphoning millions of dollars in cash,

critically required to maintain EverCare's solvency, out of EverCare's reserves and into the accounts of one or more of the Elant Entities (the "Inter-Company Transfers").

75.     PKF had actual knowledge of the Inter-Company Transfers, including, but not limited to, unauthorized cash transfers from EverCare's artificially inflated cash reserves to Elant and one or more of the other Elant Entities during the Pre-Separation Period without the prior written consent of the NYS Commissioner of Health (the "DOH Commissioner") in violation of applicable laws, rules and regulations, including New York's so called "5% rule", codified at 10 NYCRR § 98-1.11 (b).

76.     Specifically, PKF knew that the DOH issued to EverCare certain formal statements of deficiency ("SOD") related to the Inter-Company Transfers (collectively, the "Inter-Company Transfer SODs"), one in August 2010 and one in August 2014, respectively, for prior fund transfers to Elant and/or the Elant Entities, which, *inter alia,* violated Part 98 and which resulted from actions taken by Elant and/or the Elant Leaders to transfer funds and assets out of EverCare and to one or more members of the Elant Group for insufficient or no consideration.

77.     EverCare received the first of these Inter-Company Transfer SODs on or about August 18, 2010 (the "2010 Statement of Deficiency" or, alternatively, the "2010 SOD").

78.      The 2010 Statement of Deficiency obligated EverCare to devise one or more plans of correction ("POC") to remediate the identified deficiencies even though Elant, as EverCare's fiduciary, contractual manager, sole member, active parent and alter ego, caused the violations.

79.     Failure to devise and execute a POC would place EverCare at risk of regulatory penalties, including, but not limited to decreased Medicaid reimbursement rates and loss of Medicaid quality incentive pool monies.

80.     At the time of the 2010 Statement of Deficiency, Whitney served as an executive officer of both Elant and EverCare.

81.     Subsequent to the issuance of the 2010 Statement of Deficiency and despite knowing that ongoing violations of the 5% Rule and the 2010 Statement of Deficiency existed, placing EverCare at risk of incurring harsh regulatory punishment, Whitney continued to wrongfully siphon assets out of EverCare by causing, *inter alia,* additional, unlawful Inter-Company Transfers to one or more of the Elant Group from EverCare without prior approval of the EverCare Board of Directors (the "EverCare Board") or the Commissioner of the DOH in further violation of Part 98 and without notifying applicable State agencies concerning the purpose and timing of those transfers.

82.     For example, on or about March 31, 2014, Whitney, acting in concert with one or more of the other Elant Leaders and the Individual Auditor Defendants, sent a letter to the DOH (the "March 31st DOH Letter").

83.     In the March 31st DOH Letter, Whitney, acting on behalf of EverCare, and at the behest and direction of the Individual Auditor Defendants sought the DOH's **retroactive** consent to transfer from EverCare to Elant more than $2 million that he had **already** caused to be transferred without the prior knowledge, approval or consent of the EverCare Board or the DOH Commissioner in violation of the 5% Rule.

84.     Whitney and the Individual Auditor Defendants knew that the transfers identified in his March 31st DOH Letter exceeded five percent of EverCare's admitted assets for the prior

calendar year and, therefore, were ***already*** in violation of the 5% Rule of Part 98 at the time he sent the March 31st DOH Letter. Rather than cure these known violations, though, Whitney, then Elant's Chief Executive Officer, at the behest of the Individual Auditor Defendants, concocted an intentionally false POC to seek retroactive approval from the State to correct these deficiencies, which State Regulators immediately rejected.

85.     In addition to seeking retroactive ratification and approval from the DOH, Whitney's March 31st DOH Letter is replete with other intentionally false and misleading statements and omissions of material facts, which Whitney and the Individual Auditor Defendants knew or callously disregarded that those misstatements were untrue at the time that he made them, concerning the purported business rationale for the prior fund transfers identified in the letter.

86.     The DOH summarily rejected Whitney's March 31st DOH Letter.

87.     Instead, on or about August 14, 2014, the DOH issued to EverCare the second Inter-Company Transfer SOD (the "2014 Statement of Deficiency" or, alternatively, the "2014 SOD"). Elant and the Elant Leaders, as the Administrative Services provider and manager for EverCare received these formal notices from the DOH that EverCare was in violation of the applicable rules and regulations. The Individual Auditor Defendants knew that the State completely rejected Whitney's pretext for these violations, yet the Individual Auditor Defendants made no mention of the continuing uncured deficiencies or Whitney's deceptive explanation for them, in any subsequent AFS that they caused to be filed with State Regulators on behalf of EverCare.

88.     At all relevant times herein, Whitney and the Individual Auditor Defendants further failed to disclose to the EverCare Board that he had caused the transfers identified in the

March 31st DOH Letter to be made without the DOH's approval in violation of applicable laws, rules and regulations, including, but not limited to, Part 98.

89.     As a result of the wrongful Inter-Company Transfers and the DOH's denial of Whitney's request for retroactive ratification and approval of the Inter-Company Transfers, EverCare suffered millions of dollars in financial harm, compounding the harm caused to EverCare by the Inter-Company Transfer SODs, shortly after EverCare separated from Elant and its former affiliates, Defendants McCarthy, Kennedy and Suarez, on behalf of PKF, suddenly and without any prior notice, justification or disclosure to EverCare's representatives, determined the Inter-Company Transfers should be re-characterized as "non-current assets" for the FY2015 AFS, notwithstanding that in Pre-Separation audit years PKF had previously characterized those Inter-Company Transfers as "current assets" and, from EverCare's perspective,  nothing had changed regarding the Elant Entities' ability to repay these obligations.

90.     By casting the Inter-Company Transfers as, "non-current assets," the Individual Auditor Defendants suddenly and without warning determined that these cash transactions constituted advances by EverCare of debt to its former affiliates, for which no documentary facts or information indicating whether this belief or proposition is true exists, and which EverCare was not reasonably likely to collect from these affiliates within the next twelve months.

91.     This change in terminology was not ministerial, particularly since Defendants knew that by misappropriating the Inter-Company Transfers from EverCare and depositing those funds in the coffers of one or more of the Elant Entities without any prior written authorization by the DOH Commissioner, those transfers violated applicable laws, rules and regulations governing cash exchanges between affiliated managed care organizations (i.e., the 5% rule).

     **(a)**      **The PKF Defendants Attempt to Suddenly Shift Key**
                     **Professional Audit Responsibilities onto EverCare and Recast**
                     **"Current" Accounts Receivable as "Non-Current" in the FY2015 AFS**

92.     Defendants further knew exactly how significant this change was.  No material change in circumstances impacting the collection of the Inter-Company Transfers had occurred since PKF had prepared and filed with the applicable State Regulators each of the previous years' annual AFSs on behalf of EverCare since at least the fiscal year ending December 31, 2010.  Rather, the Defendants had continuously and without qualification determined in prior years that it was appropriate to characterize the "due to/due from" Inter-Company Transfers between EverCare and other members of the Elant Group in those prior years as "current" assets or liabilities of EverCare, notwithstanding that the Elant Leaders, in particular Whitney, had failed and refused to comply with the Inter-Company Transfer SODs.

93.     Tellingly, however, in the waning days of March 2016, as the March 31st deadline for filing EverCare's FY2015 AFS was fast approaching pursuant to applicable laws, rules and regulations, the Individual Auditor Defendants engaged in machinations in which they communicated verbally and in writing with EverCare's President and CEO, Ms. Sylvia McTigue, and informed Ms. McTigue, in sum or substance, that they had decided to shift the burden of their professional responsibilities as EverCare's allegedly independent auditors onto their client. Specifically, they wanted EverCare to make the decision whether the Inter-Company Transfers should still be considered as "current" assets for purposes of the FY2015 AFS.  By applying high pressure tactics and undue influence, knowing that EverCare had only a few days to file its AFS but insisting that EverCare change the outstanding Inter-Company Transfer accounts receivable that PKF had historically classified as "current" assets on EverCare's financial statements to "non-current" assets, the PKF Defendants, among other things, breached fiduciary duties that

they owed to EverCare by placing their own interest or the interest of third parties ahead of those of their client, EverCare.  Upon information and belief, this determination was exclusively within the Defendants' professional purview and responsibility to make as EverCare's audit professionals, but they failed and refused to make it at a time when they knew EverCare had few good alternatives – (i) it could make a determination that EverCare's executives were ill-suited and not professionally competent to make or (ii) it could unwittingly submit to its auditors wishes and potentially waive substantive legal rights.

94.     During this same period, PKF also applied other pressure tactics to fraudulently conceal its misplaced loyalties and true motivations from its newly independent client.

95.     For instance, the Individual Auditor Defendants did not disclose at that time to EverCare's senior executives that it was still representing and preparing the audited financial statements and other financial reports of members of the Elant Group, and they also withheld presenting the Qualifications Letter, management representation letter and PKF's boilerplate FY2015 audit engagement letter until the very last days before the EverCare AFS was due to be filed with State Regulators pursuant to applicable laws, rules and regulations and notwithstanding that the engagement letter appeared to have been taken entirely from a form of adhesion that the Individual Auditor Defendants presented to EverCare's executives at the very last minute on a non-negotiable, take-it-or-leave-it basis.

96.     If EverCare did not agree to these terms and conditions they would be in violation of applicable law and regulation and subject to sever sanctions and penalties including forfeiture of their license and ability to operate.

97.     Further, PKF presented these legal documents to EverCare's representatives without affording EverCare a full and adequate opportunity to consult with legal counsel even though the form agreement materially violated key provisions of 10 NYCRR § 98-3.

**(b)     PKF's Concealment of the Universal Settlement**

98.     At or around the same time that PKF was attempting to shift its responsibility with respect to identifying EverCare's receivables, it was also hiding from EverCare a large receivable due to Elant.

99.     Specifically, the Elant SNFs entered into a settlement with the State of New York and numerous New York SNFs, to settle nearly all Medicaid rate appeals and lawsuits (the "Universal Settlement").

100.     Under the broad terms of the Universal Settlement, the State of New York made payments totaling $850 million over a five-year period in exchange for universal agreement among the participating SNFs to surrender their rights to pursue pending Medicaid rate lawsuits and appeals and the Elant SNFs were due to receive a total reasonably believed to be in excess of $18 million (the "Universal Settlement Proceeds").

101.     Upon further information and belief, Whitney deliberately concealed from the Elant Board the very existence of the Universal Settlement.

102.     In an effort to further aid Elant and the Elant Leaders in its many schemes to defraud EverCare and allow the Elant Leaders to abscond with millions of dollars, the receipt of these proceeds were purposefully hidden from EverCare by Defendants.   For example, Defendants never listed the Universal Settlement Proceeds in Elant's AFS.

103.     Indeed, EverCare did not learn about the existence of the Universal Settlement Proceeds until, upon information and belief, Defendant McCarthy, either by accident or out of

guilt, disclosed the existence and amount of Universal Settlement proceeds that were earmarked for the Elant SNFs to EverCare's Chief Executive Officer, Sylvia McTigue.

> **(c)    PKF's Town of Ramapo Financial Statement Fraud**
> <u>**Parallels the EverCare Audited Financial Statement Fraud**</u>

104.    Only later, after EverCare's FY2015 AFS had been filed with the State did EverCare discover the true, self-interested motivations for PKF's sudden attempt to foist onto EverCare the responsibility for characterizing the Inter-Company Transfers as "non-current" rather than "current" assets.

105.    Apparently, PKF's Financial Statement Fraud associated with EverCare's FY2015 AFS and the concealment of the true nature of the Inter-Company Transfers themselves is not the first time Defendants have mischaracterized client assets as "current" instead of "non-current" to fraudulently deceive innocent representatives of their clients, regulatory agencies, and other third parties in violation of GAAS, GAAP, and their most fundamental professional responsibilities.

106.    Indeed, coincidentally, and unrelated to EverCare or the RICO Schemes at issue here, at or about the same time in 2016 that PKF was preparing or assisting in the preparation of the FY2015 AFS and MMCOR for EverCare, PKF auditors from the same Harrison office from which the Individual Auditor Defendants were primarily based, were being investigated by federal law enforcement authorities for allegedly co-conspiring and perpetrating a public accounting financial statement fraud concerning certain AFSs that PKF had prepared and filed or was preparing and filing on behalf of various agencies and quasi-governmental agencies of the Town of Ramapo (the "Town"), which is located in Rockland County, New York (the "Town of Ramapo Fraud").

107.     The striking similarities between the Town of Ramapo Fraud and PKF's fraudulent racketeering conduct and practices in this case – i.e., in both cases PKF's auditors failed to exercise reasonable professional skepticism or to unearth any audit evidence to substantiate its audit findings and opinion – are relevant to Defendants' scienter in the instant case.

108.     In the Town of Ramapo Fraud, PKF allegedly co-conspired with certain Town officials who were later convicted of federal criminal offenses by fraudulently concealing the true nature of millions of dollars of uncollectible accounts receivable that one division of the Town had transferred onto the books of another division.  The PKF auditors in that case then allegedly classified the fraudulent transactions as "current" accounts receivable, when PKF's lead auditors knew the transaction at the center of the fraud (the sale of a parcel of real estate on which a minor league baseball stadium was to be built) would never be consummated and that none of the proceeds from that transaction were actually collectible, much less within 12 months.

109.     In connection with the Town of Ramapo Fraud, the Securities and Exchange Commission ("SEC"), the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation found that PKF issued fraudulent audit reports based on PKF's misstatements and omissions of material fact in connection with the sale of certain municipal bonds that were sold by the Town during the Relevant Period in connection with the baseball stadium sale and purchase transaction.

110.     In connection with the Town of Ramapo Fraud, on or about October 31, 2016, PKF entered into a consent decree with the SEC (the "SEC Consent Decree") in which, *inter alia,* it admitted that it had issued fraudulent AFSs in connection with a municipal bond offering issued by the Town, and the firm agreed to severe fines, penalties and certain non-monetary

remedies against it that arose out of a systemic financial statement fraud that occurred within its

Harrison, New York, Office.  Annexed hereto as **Exhibit 3** is a copy of the SEC Consent Decree.

The PKF Harrison Office is the very same PKF office that oversaw and participated in the

preparation and public filing of EverCare's State Cost Reports throughout the Relevant Period.

111.    According to an SEC press release issued on or about October 31, 2016 (the "SEC

Press Release"), PKF and a senior partner in its Harrison Office "agreed to settle charges they

issued fraudulent audit reports in connection with municipal bond offerings by the [Town of

Ramapo]] and its local development corporation."  *See* SEC Press Release 2016-229, "*Firm and*

*Partner Charged with Issuing Fraudulent Audit Reports"* (the "SEC Press Release" which is

annexed hereto as **Exhibit 4**).  The SEC Press Release states in pertinent part that "the SEC's

Order finds that PKF O'Connor Davies [and its audit partner] allowed the [Town] to record a

$3.08 million receivable in [the Town's] general fund for [the sale of a minor league baseball

stadium] that [the auditors] knew had not occurred."  *Id.*  PKF "also ignored red flags and relied

upon what turned out to be false representations by Town officials about certain other

receivables, interfund transfers, and liabilities."  *Id.*

112.    The SEC further determined in relevant part that "PKF[] failed to take appropriate

steps to mitigate the risk of material misstatements even after senior management became aware

that Ramapo's financial statements were the subject of multiple law enforcement investigations

and [the PKF responsible audit partner] received multiple complaints about possible audit fraud."

*Id.*  In a statement that equally could have been applied with respect to PKF's longstanding fraud

against EverCare, the Director of the SEC's New York Regional Office stated, "[PKF's

representatives] failed to exercise professional skepticism and PKF O'Connor Davies issued

false unmodified audit reports, and they left [their stakeholders] without an accurate picture of

the [client's] finances . . . ."  *Id.*  The Town and certain of its officials were charged with fraud by federal authorities and accused of hiding a deteriorating financial situation from municipal bond investors.

113.    As a consequence of its involvement in the Town of Ramapo Fraud, the SEC, *inter alia*, required PKF to hire a corporate monitor and enjoined it from participating in the future from any kind of audit activities that might lead to the same or a substantially similar public accounting fraud related to the issuance of fraudulent AFSs, such as those it issued on behalf of the Town and on behalf of EverCare here.  Upon information and belief, the SEC's Town of Ramapo investigation against PKF is ongoing and the corporate monitor that it inserted to enforce PKF's compliance with its Consent Order is still in place at PKF's Harrison Office. Upon further information and belief, the PKF Defendants' fraudulent conduct concerning EverCare's FY2015 AFS was motivated in part by a desire to hide its actions from the SEC and other federal prosecutors.

114.    Based upon all of the foregoing and employing the very same or substantially similar professionally unfit and irresponsible methods, customs and practices as it employed in the Town of Ramapo Fraud, Defendants wrongfully enabled Elant to siphon millions of dollars in cash out of EverCare's reserves without proper authorizations and to unlawfully transfer debts, liabilities and expenses from one or more of EverCare's former affiliates onto EverCare's books and records.

## VIII.  MMCOR FRAUD SCHEME

115.    As discussed in further detail herein, during the same period that the Elant Leaders siphoned the Inter-Company Transfers out of and imposed the Loss Transfers onto EverCare for their own illegitimate purposes, they also caused State Cost Reports containing

errors and omissions of material fact to be filed on behalf of EverCare, by charging EverCare exorbitant above market rates for Administrative Services, which exceeded the contractually fixed rates in violation of applicable Medicaid laws, rules and regulations and which they knew EverCare could never recapture from NYS through the PMPM capitated Medicaid reimbursement rates the State paid to EverCare ("MMCOR Fraud").

116.    It is clear PKF knew of the ongoing defalcation given that the most basic audit testing of the rate escalations Elant and the Elant Group charged EverCare throughout this same Relevant Period would have revealed that these impermissible and unauthorized fees compounded EverCare's financial distress and were being utilized by Elant as an illicit means for justifying illegitimate expenses EverCare should never have been charged in the first place.  The Individual Auditor Defendants' failure to identify or note these unlawful inter-company actions had the egregious effect of threatening EverCare's continued existence at a time when EverCare had no means of protecting itself because it was under the total domination and control of its then sole member and active parent, Elant.

117.    After EverCare gained its independence from Elant, as part of its ultimate POC and at the behest of State Regulators, in mid-April 2016, EverCare commenced the Elant Action. While the Elant Action was pending and in furtherance of its remediation plan, EverCare transitioned to a new MEDs IT System by, *inter alia,* investing in excess of half a million dollars in capital which enabled it to discover the true magnitude of the financial fraud perpetrated against it by the Elant Defendants with the substantial assistance and participation of the PKF Defendants.  Evercare then filed its Amended Complaint, which among other things, sought to recover an amount in excess of $25 million in damages against the Elant Defendants.

118.    In short, in violation of NYS and federal law, the Elant Leaders, with the help of Defendants, artificially inflated EverCare's costs by means of the MMCOR Fraud to help prop up the Elant Entities, by, *inter alia*, inflating the cost of services Elant allegedly provided to EverCare and thereby increasing fees paid to Elant, unilaterally increasing rates charged to EverCare by the Elant SNFs, imposing additional surcharges based on these inflated rates, and causing EverCare to enter into sham leases for properties it would never use.

(a)    **Elant Charges Rates to EverCare in**
       **Excess of Those Set Forth in the ASAs**

119.    Specifically, the Elant Leaders artificially inflated the costs and expenses of the various services Elant and its affiliates provided to EverCare under the ASAs in amounts grossly in excess of what was permissible pursuant to NYS and federal law.

120.    In exchange for the services provided by Elant pursuant to Sections 2.1 and 4 of the ASAs, Elant received management fees from EverCare on a PMPM basis (the "Management Fees").

121.    However, the Elant Leaders caused Elant to increase the Management Fees for Administrative Services provided to EverCare to levels significantly higher than the rates allowable by Medicaid (the "Increased Rates").   Non-Elant SNFs continued to be paid the standard, unadjusted Medicaid rates in accordance with the terms and conditions of their pre-existing agreements with EverCare.

122.    The Elant Leaders, on behalf of Elant, also failed to obtain the approval of the DOH, as required under 10 NYCRR § 98-1.11(k) for any changes to the ASAs and related rate adjustments, especially changes that dramatically increased EverCare's costs by more than 100%.

123.    These significant increases in the Management Fees violated the terms and conditions of the ASAs and were imposed unilaterally without the knowledge, consent, or approval of the EverCare Board.  Even if the EverCare Board had known and objected, it was powerless to prevent such PMPM increases from being implemented by Elant. [8]

124.    Upon information and belief, the Individual Auditor Defendants were aware of the Elant Leaders unilateral and dramatic increase in the Management Fees charged by Elant to EverCare in direct violation of the ASAs and without DOH approval and nonetheless caused EverCare to file false or misleading State Cost Reports cloaking the Elant Leaders fraudulent scheme behind a veil of secrecy.

125.    As a result, in the last year of their engagement, Elant obtained unauthorized payments from EverCare of approximately $2.2 million dollars.

**(b)    Elant's Unilateral PMPM Rate Increases**

126.    On or about January 4, 2014, the DOH issued a retroactive increase of EverCare's Medicaid Reimbursement rates.

127.    The Elant Leaders took advantage of this "opportunity" and swiftly, unilaterally, and improperly "negotiated" and implemented new contracts between EverCare and the Elant SNFs (the "Adjusted Elant SNF Contracts").  These new Adjusted SNF Contracts required EverCare to pay rates to the Elant's SNFs that were significantly higher than the allowable Medicaid rates, while non-Elant SNFs continued to charge EverCare the standard, unadjusted Medicaid rates in accordance with the terms and conditions of their pre-existing agreements with

---

[8] *See* paragraphs 206-220 of the Amended Complaint in the Elant Action which further details the Increased Rates and which are incorporated as if set forth at length herein.

EverCare. The Increased Rates bore no relationship to actual costs of services provided by Elant or the Elant SNFs nor did the Commissioner of Health or EverCare's Board approves them.

128.    Compounding the damage, the Elant Leaders inappropriately applied these new rates retroactively.

129.    Upon information and belief, the Individual Auditor Defendants knew of but intentionally disregarded the Elant Leaders unilateral non-arm's length imposition of the Adjusted Elant SNF Contracts on EverCare.

130.    Despite Defendants' knowledge of these rate changes, after effectuating the Adjusted Elant SNF Contracts, Defendants did not cause the Elant Leaders to resubmit or correct the MMCORs, which relied on the original rates charged by the Elant SNFs prior to the imposition of the Increased Rates.[9]

131.    Similarly, the Elant Leaders unilaterally increased the rate paid to the Elant SNFs significantly above the Medicaid rate for the Adult Day services that those Elant SNFs provided to EverCare enrollees.  This increase bore no relationship to the actual costs of services provided by Elant and was never approved by EverCare's board.[10]  In addition to the Increased Rates, the newly negotiated contracts that the Elant Group unilaterally imposed upon EverCare, also inappropriately included an additional Medicaid surcharge, which amounted to 6% over the contractual Medicaid rates.

---

[9] *See* paragraphs 221-253 of the Amended Complaint in the Elant Action, which further details the Adjusted Elant SNF Contracts and which are incorporated as if set forth at length herein.

[10] *See* paragraphs 254-257 of the Amended Complaint in the Elant Action, which further details regarding the increase in the Adult Day services rates and which are incorporated as if set forth at length herein.

132.    Upon information and belief, this surcharge was already included in the Medicaid rates that EverCare was charged and, therefore, the Elant Leaders intentionally and deceptively caused the surcharge to be billed to EverCare twice.

133.    These two changes resulted in a significant increase in SNF expenses for EverCare, but were not reported in its cost reports.

134.    Like the Increased Rates EverCare paid to the SNFs, all of EverCare's contracts for these services were negotiated and paid pursuant to contracts at the then published Medicaid rate, but the Elant Leaders caused Elant to unilaterally increase these rates for EverCare above the Medicaid Rate.

135.    Again, despite Defendants' knowledge of this expense, PKF caused false or misleading State Cost Reports to be filed on behalf of EverCare which disguised these transactions as discussed further below.

**(c)    Elant Enters EverCare into Sham Lease at Fishkill**

136.    Lastly, as part of the Defendants' MMCOR Fraud scheme, in 2012, Elant, in its capacity as EverCare's agent under the ASA, caused EverCare to enter into a series of above market, sham lease transactions with Fishkill (the "Fishkill Lease") for the sole purpose of causing EverCare to incur a fictitious expense on its books that would obligate EverCare to pay rent to Fishkill for office space EverCare neither needed nor ever occupied.

137.    The Fishkill Lease obligated EverCare to pay rent at the rate of $24 per square foot – equating to $6,720 per month or $80,640 per year – to Fishkill, for an uninhabitable, dilapidated and deteriorating 3,360 square foot building located at the back of the Fishkill nursing home property facing the garbage dumpster and loading dock.  Upon information and

belief, the fair market rental value for far superior commercial space was $15-18 per square foot at that time.

138.    Upon information and belief, this fraudulent lease transaction enabled Elant to prop up Fishkill's deteriorating finances by causing EverCare to pay Fishkill for office space it never needed or occupied or intended or occupy.  These inter affiliate cash transfers enabled Elant to extract more funds from EverCare without a legitimate business justification and without DOH approval.

139.    Upon information and belief, Defendants knew the fact that EverCare was paying money for a sham lease at an over-market value for a property that it never intended to, or could, use.  Despite this knowledge Defendants caused false or purposefully misleading State Cost Reports on behalf of EverCare that obscured this information from EverCare and State Regulators.[11]

**(d)   The Loss Transfer Fraud**

140.    Upon information and belief, during the Relevant Period, Elant Leaders and Defendants also caused deceptive and unlawful transfers of bad debts and uncollectible receivables of one or more of the Elant SNFs to occur by concealing them within line items of EverCare's State Cost Reports (the "Loss Transfers").  Upon further information and belief, the Elant Leaders and Defendants executed the Loss Transfers to foster the false and misleading appearance that those obligations were incurred by EverCare (as opposed to one or more members of the Obligated Group) in the ordinary course of EverCare's business, i.e. the "Loss Transfer Fraud."

---

[11] *See* paragraphs 364-383 of the Amended Complaint in the Elant Action which further details the Fishkill Lease and which are incorporated as if set forth at length herein.

141.    The Individual Auditor Defendants substantially aided, abetted and fraudulently conspired with the Elant Leaders to execute this deceptive scheme.  In particular, the Individual Auditor Defendants knew, among other things, that representatives of Elant unlawfully transferred onto EverCare's books, ledgers and State Cost Reports approximately $1 million in uncollectible accounts receivable owed to former affiliates, as well as significant liabilities owed by certain of EverCare's former affiliates to various third parties, namely the Obligated Group. At all relevant times herein, Whitney failed to disclose to the EverCare Board that he had caused the transfers identified in the March 31st DOH Letter to be made without the DOH's approval in violation of applicable regulations, including, but not limited to, Part 98.

142.    As a result of the wrongful Inter-Company Transfers and the DOH's denial of Whitney's request for retroactive ratification and approval of the Inter-Company Transfers, EverCare suffered millions of dollars in financial harm.

143.    Compounding Whitney's conduct, beginning in or about 2012, Elant, together with one or more of the Individual Auditor Defendants and/or Elant Entities, intentionally caused EverCare to absorb certain losses, debts or obligations, which, upon information and belief, were actually losses incurred by other Elant Entities.  Instead of appearing as expenses or liabilities on EverCare's applicable financial statements and cost reports, which is what the Defendants caused to occur, the Loss Transfers should have appeared as expenses or liabilities on the financial records or reports of the appropriate Elant SNF or on the books and records of the Elant Entities that actually incurred those liabilities or losses.

144.    For example, from in or about 2012 through 2014, without seeking approval from the EverCare Board and in violation of Elant's contractual obligations to EverCare, the Elant Leaders, together with the knowledge and substantial participation of the Individual Auditor

Defendants, acting on behalf of one or more members of the Obligated Group, improperly moved more than $1 million in operational losses or liabilities incurred by Goshen from Goshen's financial statements to EverCare's ledgers, thereby causing Goshen's financial position to appear artificially enhanced while EverCare's was inappropriately made to look worse than it actually was.

145.    Consequently, Elant and the PKF Defendants abused Elant's position as EverCare's fiduciary, sole corporate member, contractual manager and administrator to circumvent the EverCare Board, enabling the Elant Group and the PKF Defendants to effectuate fraudulent conveyances from EverCare to one or more of the Elant Entities by means of the EverCare Enterprise.

146.    By substituting its authority in place of that of the EverCare Board, Elant caused EverCare to violate its compliance obligations under applicable New York State laws, rules and regulations, *inter alia,* to report truthfully and accurately its financial transactions and condition to State Regulators.

147.    Accordingly, upon information and belief, as described in greater detail herein, one of the ultimate objectives of this unlawful Loss Transfer Fraud was to enable one or more of the Elant SNFs and other members of the Enterprise, including PKF, to falsify publicly filed financial statements of one or more of the Elant SNFs and EverCare as a means to obtain the FHA Mortgage under false pretenses to the detriment of EverCare, other third parties and the general public.

### IX.   NET WORTH DEFICIENCY AND IBNR RESERVE SCHEME[12]

**(a)   EverCare's Corrective Measures in Response to the Inter-Company Transfer SODs Included Creating a Fully Functional MIS/IT System And the Hiring of Competent, Properly Trained IT Personnel**

148.   Concurrently, and as a direct result of the Loss Transfers and the flawed and inaccurate Encounter Data and other financial information that PKF directly and proximately caused EverCare to report to one or more State Regulators, EverCare's Medicaid capitated reimbursement rates for the managed care services that EverCare contracted to provide to its Members each month during the Relevant Period was unwittingly reduced by the applicable State Regulators to an amount less than EverCare's actual monthly costs for providing those same services to its Members.

149.   At all times relevant herein and subsequent to the date that EverCare formally separated from the Elant Group, EverCare invested significant capital to purchase and install an independent and appropriate MIS system, which ultimately enabled EverCare and, hence, PKF, to discover material and extensive inaccuracies, errors and omissions that the PKF Defendants had included in AFSs during the Pre-Separation Period.

150.   Accordingly, by the end of the first quarter of 2016, while PKF was conducting its audit of EverCare's financial statements related to the FY2015 AFS (the "FY2015 Audit Period"), the Individual Auditor Defendants knew but could no longer intentionally conceal from the EverCare Board and senior management the fact that the EverCare AFSs that it had prepared and filed with State Regulators covering the Pre-Separation Period contained false and misleading errors and omissions of material fact.

_____

[12] *See* paragraphs 459-561 of the Amended Complaint in the Elant Action which further detail the Net Worth Deficiency and IBNR Reserve Scheme and which are incorporated as if set forth at length herein.

151.    Further, just as the Individual Auditor Defendants knew EverCare's pre-separation AFSs and MMCORs were distorted, they also knew the applicable AFSs they prepared and caused to be filed for the Obligated Group contained untrue statements of material fact.  When the new information and data came on-line, EverCare discovered what the Individual Auditor Defendants had long already known.

152.    Prior to this post-separation capital investment by EverCare in its new MIS/IT Systems and MEDs solutions, the EverCare Encounter Data had been manually uploaded to the State's systems by a low-skilled Elant employee who was not properly trained to process this information.  External consulting firms that Elant had hired pre-separation to identify and evaluate those systemic inadequacies recommended that Elant, on behalf of EverCare, should reinvest in an entirely new MIS solution that could properly interface with the State's database and that it should also hire competently trained and skilled staff to run those systems.

153.    According to contemporaneous written and verbal reports and meeting minutes prepared and made during the Relevant Period on behalf of the Elant and EverCare Boards, including, but not limited to, presentations by the Individual Auditor Defendants at or to the Finance Committee of the Elant Board of Directors (the "Elant Board"), upon information and belief, the Individual Auditor Defendants attended the Board meetings in person, reviewed the outside consultants' reports and recommendations and had actual and clear knowledge of the material deficiencies in EverCare's MIS and MEDs.  Those meeting minutes and reports further disclose that the Individual Auditor Defendants recommended to the Elant Board of Directors (the "Elant Board") that it should implement corrective measures on behalf of EverCare to cure these issues, which the auditors knew would have a material adverse impact on EverCare's financial condition.

154.     Notwithstanding the Individual Auditor Defendants' on-the-record recognition of these gross systemic problems, and in violation of GAAS and GAAP, Defendants persistently failed to note any of these material flaws in their audit opinions or the notes to the financial statements contained in the AFSs that Defendants issued for years during which those deficiencies existed, including but not limited to FY2014-2015

   **(b)     The MEDS and MMCOR Cost-Reporting Process**
   **And the Consequences of Filing False or Misleading**
   **Reports by a State-Regulated Managed Care Organization**

155.     MMCOR must specify in detail, *inter alia,* data concerning various administrative and medical service expenses it incurs for each Encounter or contact that EverCare, as a New York State-regulated MLTCP, has with its members during the period covered by the given MMCOR.

156.     Further, under the NYS MEDS, a MLTCP, such as EverCare, that receives a capitated, PMPM payment from the State concerning the MLTC services it provides to members must submit monthly, or more frequent, Encounter Data to the DOH.

157.     The DOH requires MMCORs to be filed by MCOs, such as MLTCPs, so that, *inter alia*, it can track the services received, and associated expenses, for each member enrolled in MCO plans and evaluate MLTCP performance by benchmarking a particular plan's performance against the MMCOR data submitted by MLTCPs statewide.

158.     This benchmarking process enables the DOH to compare the reported expenses of a particular MLTCP against those of competing MLTCPs, thereby ensuring that the performance of the plan under review conforms statistically with other comparable plans' respective performance metrics.

43

159.    If an MLTCP submits MMCOR or Encounter Data to the applicable regulatory agencies in an untimely manner or that contains materially false, misleading, incorrect, or omitted Encounter Data, then the MMCOR or Encounter records submitted by the MLTCP will not accurately capture the Plan's membership activities during the covered period or the costs associated with each of those Encounters.

160.    A MLTCP that files MMCORs containing such false, erroneous or misleading information faces severe adverse consequences and may be subject to stringent fines, penalties and other punitive measures imposed by the State Regulators, because, in addition to its benchmarking feature, MMCOR data is also used by the DOH to set the MLTCP's future Medicaid reimbursement rates.

161.    The net practical result of a MLTCP filing false or misleading MMCOR data with the DOH is not only monetary fines, penalties or other punitive measures from State Regulators, it also can cause the MLTCP to receive an artificially lower Medicaid reimbursement rate from the DOH than it otherwise would, because the plan appears to be at less financial risk than it actually is.

### (c)    Elant and PKF Filed False and Misleading MEDS and MMCOR Data on Behalf of EverCare During the Pre-Separation Period

162.    The filing of false or misleading financial statements and MMCOR data leading to an artificially reduced PMPM rate is exactly what happened to EverCare as a direct and proximate result of Elant and Defendants' failure and/or refusal, *inter alia,* to perform their contractual and fiduciary cost-reporting obligations on behalf of EverCare throughout the Pre-Separation Period.

163.    Specifically, during the Pre-Separation Period, as EverCare's contractual manager, Elant, and Defendants, as its audit professionals, were obligated to, *inter alia,* ensure

44

that EverCare had in place systems and controls, including, but not limited to, appropriate MEDS IT software and a sufficient number of competent administrative and IT staff, who were properly trained to process, enter and/or or to reconcile EverCare's Encounter Data with the medical or other expenses that EverCare actually incurred during the Pre-Separation Period.

164.     Throughout the Pre-Separation Period, however, the EverCare IT system provided by Elant was so inadequate and the personnel Elant hired to manage it so incompetent and understaffed, that the true nature and magnitude of EverCare's financial distress was hidden from EverCare and State Regulators.

165.     Prior to EverCare's separation from the Elant Group, EverCare representatives and outside consultants repeatedly notified the Elant Board and its management verbally and in writing that that the IT platform and personnel it was employing on behalf of EverCare were woefully inadequate and needed to be changed.

166.     Despite those warnings, Elant, through the Elant Leaders, and PKF, through the Individual Auditor Defendants, deliberately and with utter disregard for the well-being and safety of EverCare's members failed and refused to institute or cause to be instituted the IT staffing and systems changes that they themselves and other EverCare representatives and external consultants identified and were recommending as being essential to bring EverCare into the bare minimum level of compliance needed to satisfy EverCare's applicable regulatory obligations.

167.     The deliberate and intentional failure by PKF and Elant to satisfy their compliance obligations on EverCare's behalf also directly prevented EverCare from complying with its payment obligations to certain of its vendors during the Pre-Separation Period and at all times relevant to the facts and circumstances alleged herein.

168.    Those deliberate decisions by the Elant Leaders (with the full knowledge and consent of the Individual Auditor Defendants) not to invest sufficient capital in EverCare's MIS/IT systems and personnel directly, foreseeably, and proximately caused EverCare to be non-compliant with its mandated MEDs and MMCOR obligations during the Pre-Separation Period and led directly to tens of millions of dollars in financial damages that EverCare has already suffered and continues to suffer to this day.

169.    Elant's failure to invest adequate capital in EverCare's IT compliance system, a fact which was knowingly concealed in applicable State Cost Reports by Defendants, further resulted in EverCare's inability to capture all of the legally required Encounter Data that existed and reasonably should have been captured by PKF and Elant on EverCare's behalf during the Pre-Separation Period concerning the IBNR expenses associated with medical and related services that EverCare had caused to be provided during this period to its Members, but which had not yet been reported or confirmed by Defendants as fully adjudicated liabilities in EverCare's system in accordance with GAAP.

**(d)    <u>The Net Worth Deficiency SODs</u>**

170.    As a direct and proximate result of the Defendants' wanton, callous and willful disregard of their contractual, regulatory, and legal compliance obligations to EverCare, as well as their failure and refusal to cause EverCare to file accurate, truthful and complete MMCOR and Encounter Data to the DOH during the Pre-Separation Period, the Defendants, jointly and severally, directly and proximately caused EverCare to receive an ongoing series of Net Worth Deficiency SODs from June 2016 through the present.  The Net Worth Deficiency SODs relate to certain net worth deficiencies that EverCare had incurred for violations of 10 NYCRR Part 98-

1.11(e) as a result of materially flawed and deficient financial statements and MMCOR reports that Elant and PKF filed on behalf of EverCare during the Pre-Separation Period.

171.     In particular, the false and misleading financial statements, MMCOR and Encounter Data that one or more of the Defendants and the Elant Leaders caused EverCare to file during the Pre-Separation Period directly and proximately resulted in the DOH determining that EverCare failed to meet its minimum net worth requirements pursuant to Part 98 for the relevant periods covered by each of the Net Worth Deficiency SODs.

172.     Each of the DOH's Net Worth Deficiency SODs further notified EverCare, *inter alia,* that, based on financial statements PKF caused EverCare to submit for the relevant Pre-Separation Periods covered by each such SOD, it had not met the minimum net worth requirement set forth in 10 NYCRR Part 98-1.11(e) and required EverCare to submit an additional POC.

173.     By way of example, on or about June 7, 2016, less than two months after EverCare filed its original Verified Complaint in the Elant Action on or about April 19, 2016, EverCare received the first of many Net Worth Deficiency SODs, notifying it that its cash reserves were $664,757 below the minimum net worth requirement (the "June 2016 SOD").

174.     Upon information and belief, the DOH derived EverCare's net worth deficiency resulting in the June 2016 SOD directly from financial statements and MMCOR Encounter Data that Elant and PKF caused EverCare to compile, prepare and then file with the DOH during the Pre-Separation Period.

175.     EverCare's CEO, Sylvia McTigue ("Ms. McTigue"), responded to the June 2016 SOD by letter, dated June 13, 2016 (the "McTigue June 13th Letter"), describing the reasons for

the deficit and the actions that EverCare had been taking and intended to continue to undertake to cure it.

176. Thereafter, on or about December 7, 2016, the DOH issued the second of the Net Worth Deficiency SODs, which identified that, during the ensuing six-month period, EverCare's deficit had grown to an amount equal to $8,001,762 below the regulatory minimum net worth requirement (the "December 2016 SOD").

177. Upon information and belief, the DOH also derived EverCare's net worth deficiency in connection with the December 2016 SOD directly from financial statements and MMCOR Encounter Data that were compiled, prepared and then filed with the DOH during the Pre-Separation Period by Elant on behalf of EverCare, with the active and substantial participation of PKF.

178. Ms. McTigue again responded by letter to the DOH, dated December 21, 2016 (the "McTigue December 21st Letter"), and updated the DOH concerning the corrective plan that EverCare was endeavoring to implement.

179. Again, on or about June 1, 2017, EverCare received yet another Net Worth Deficiency SOD, which, *inter alia,* identified that during the first two quarters of 2017, EverCare's deficit had increased to an amount equal to $11,059,252 below the regulatory minimum net worth requirement (the "June 2017 SOD").

180. Upon information and belief, the DOH calculated EverCare's net worth deficiency in connection with the June 2017 SOD based directly on financial statements and MMCOR Encounter Data that were compiled, prepared and then filed with the DOH during the Pre-Separation Period on behalf of EverCare by Elant, with the active and substantial participation of PKF.

181.    On or about June 8, 2017, Ms. McTigue again responded by letter to the June 2017 SOD (the "McTigue June 8th Letter"), detailing EverCare's plan to correct its rapidly deepening financial crisis, which stemmed directly and proximately from Elant's flagrant and reckless mismanagement of EverCare with the active and substantial participation of the PKF Defendants during the Pre-Separation Period.

182.    Since receiving the June 2017 SOD, EverCare has received several other Net Worth Deficiency SODs, the most recent of which it received on or about August 2, 2019 (the "2019 SOD") and each of which, *inter alia,* has identified that, for the period ending December 31 of the prior year, EverCare's deficit had continued to be several millions of dollars below the regulatory minimum net worth requirement.

183.    Upon information and belief, the DOH calculated EverCare's net worth deficiency in connection with each of the Subsequent Net Worth Deficiency SODs based directly on financial statements that were compiled, prepared and then filed with the DOH during the Pre-Separation Period on behalf of EverCare by Elant, with the active and substantial participation of PKF.

184.    Accordingly, EverCare's Net Worth Deficiency SODs grew directly out of the fraudulent, decision-making on behalf of EverCare by Elant and the Individual Defendants, together with the active and substantial participation of PKF and the Individual Auditor Defendants.

185.    The actions and decisions of Elant and the Individual Defendants, together with the active and substantial participation of PKF, directly and proximately resulted from their callous, willful and wanton disregard for, and violations of, the contractual and fiduciary duties that each owed to EverCare; together with their failure and refusal to implement on behalf of

EverCare, *inter alia,* even the most minimal cost-reporting, compliance and accounting policies, procedures and controls necessary to ensure that EverCare had in place the most basic of MEDS and MMCOR reporting programs during the relevant periods as required by the applicable New York state law, rules and regulations.

186.    Accordingly, each of the foregoing errors, omissions and decisions by PKF and the Individual Auditor Defendants, their total abandonment of the interests of EverCare and their blatant disregard for EverCare's independent corporate existence and form during the Pre-Separation Period had and continues to have far-reaching consequences and has directly and proximately caused EverCare to suffer ongoing monetary, compensatory, consequential and punitive damages (including reasonable attorneys' fees) and other injuries in an amount, which will continue to increase, but which, as of now, EverCare reasonably believes exceeds $25 million.

        (e)    **The IBNR Reserve Deficiency**

187.    In accordance with Part 98, all MCOs, including MLTCPs, must establish IBNR reserves (the "IBNR Reserve") for medical claims expenses and/or events that have occurred but have not yet been reported during any given annual MMCOR period.   Duly authorized executives of a MCO such as EverCare must report and certify to the DOH that its IBNR Reserve is truthful and accurate.

188.    As of in or about January 2020, EverCare reported to the DOH that it had an IBNR Reserve deficiency in excess of $15 million, and, upon information and belief, it estimates that, due to, *inter alia,* the errors and omissions of material fact proximately and directly caused by the Defendants in connection with the State Cost Reports they filed or caused to be filed on

behalf of EverCare during the Relevant Period, EverCare's IBNR Reserve requirement has and will continue to accrue at a rate reasonably believe to exceed $4 million per year.

189.    At all relevant times subsequent to EverCare's separation from the Elant Group and its termination of PKF after discovering the fraudulent nature of the FY2015 State Cost Reports that PKF filed or caused to be filed with the State on behalf of EverCare, EverCare has actively and continuously worked with applicable State Regulators to cure any deficiencies that may exist.   To that end, EverCare has actively sought a rate review by the applicable State Regulators to obtain accurate and proper PMPM rate adjustments that reflect EverCare's true MLTCP rate adequacy and risk for fiscal years 2016-17, 2017-18 and 2018-19, based on its true medical acuity and utilization of services by its Members.

## X.    FHA MORTGAGE SCHEME

190.    Beginning in approximately 2010 and continuing at all times relevant, the Elant and PKF Defendants utilized documents and transactions related to the other RICO Schemes and Financial Statement Fraud to permit Elant and the Obligated Group to apply and remain eligible for a mortgage totaling $23.5 million from Wells Fargo, N.A. ("Wells Fargo"), insured by the Federal Housing Authority ("FHA") through a program jointly administered by the FHA and the Department of Housing and Urban Development ("HUD") (the "FHA Mortgage") pursuant to sections 232 and 223f of the National Housing Act (12 U.S.C. § 1715w, 12 U.S.C. § 1715(b) and 42 U.S.C. 3535), in violation of 42 U.S.C. § 1344.

191.    The Elant Leaders on behalf of Elant and the Obligated Group utilized AFSs and other financial records and figures prepared by Defendants to apply and demonstrate continuing eligibility for the FHA Mortgage ("Falsified Financial Records").

192.    The Falsified Financial Records prepared by Defendants and sent by Elant to Wells Fargo, the FHA and/or HUD, *inter alia*, deceptively categorized the Inter-Company Transfers and Loss Transfers as "current" assets or obligations of EverCare and/or as loans that EverCare and/or other Elant affiliates had advanced to the Obligated Group and were improperly deemed by Defendants to be repayable or to be forgiven within twelve months, in whole or in part during the Relevant Period, which gave the Obligated Group a false appearance of solvency. At all times relevant, the Defendants knew that, with respect to each of the affiliated company transactions between members of the Elant Group (including the Obligated Group) and EverCare, the conclusions the Defendants reached and opinions set forth in the Falsified Financial Records were false.   Specifically, they knew that the Inter-Company and Loss Transfers were either the product of fraudulent overbilling (i.e., a product of Medicaid Fraud/overbilling) or that the Obligated Group's affiliates, including EverCare, had not actually forgiven the loans, and in fact, that these debts were listed as current assets on various AFSs prepared by Defendants for the Obligated Group's affiliates, including EverCare.   Effectively, Elant and the PKF Defendants conspired to create the Falsified Financial Records in order to make the Obligated Group appear solvent – when they were actually drowning in debt – in order to ensure the Obligated Group would qualify, and subsequently remain eligible, for the FHA Mortgage (hereinafter the "FHA Mortgage Fraud").

193.    Upon information and belief, at no point during the Relevant Period did Elant document or memorialize any transactions or monetary transfers between EverCare and the Elant Entities as a loan or similar financial transaction.   Further, upon information and belief, the Defendants were in the best position to report these transactions in the State Cost Reports, including but not limited to, the AFS and MMCOR.   As a result of Defendants' conflicts of

interest in representing EverCare and the Elant Entities and failure to exercise professional skepticism, the AFS contained deceptive and misleading characterizations of these transactions that were not noted or qualified in any manner.

194.   But for the Falsified Financial Records, Elant and the Obligated Group could not have met the liquidity, debt to value ratio and other essential covenants and statutory and contractual requirements necessary to qualify and/or remain eligible for the FHA Mortgage.

## XI.   RICO SCHEMES PREDICATE ACTS

195.   As detailed in the Predicate Acts Chart attached hereto as Appendix A, at all times relevant, the Elant and PKF Defendants utilized the USPS, other common carriers, interstate bank wire transfers, as well as email and other electronic communications to effectuate and further the RICO Schemes, Financial Statement Fraud and bank fraud in violation of 18 USC §§ 1341, 1343 and 1344.  Specifically:

a.   The Individual Auditor Defendants sent various communications which passed through interstate email servers ("Interstate Emails") to EverCare and Elant discussing and furthering the substance, creation and eventual filing of the AFSs with state regulators.  See Appendix A, Predicate Act Chart, at ## 32-51, 55-56, 61-65;

b.   PKF caused EverCare to file materially false AFSs with the NYS Office of the Attorney General Charities Bureau (the "NY AG"), when EverCare sent to the NY AG the CHAR500 forms containing the materially false AFSs via the USPS. See Appendix A, Predicate Act Chart, at ## 1, 10 & 26;

c.   Upon information and belief, at times relevant, PKF caused EverCare and the Elant Entities to file materially false AFSs with the DOH, through Interstate Email;

d.   In furtherance of the Inter-company Transfers, in which Whitney sought subsequent approval for those transfers, he sent at least one letter via USPS to the DOH.  See Appendix A, Predicate Act Chart, at ## 56 & 65;

e.   Elant sent various communications and Falsified Financial Records relevant to the application for the FHA Mortgage from its offices in New York to Elant's mortgage consultants, Sims Mortgage Funding, Inc. ("Sims") in New Jersey at the

direction of Whitney, Cornell, Zambito, McCarthy, Kennedy and/or Suarez, see Appendix A, Predicate Act Chart, at ##2-9, 11-12, 14-17, 20-23, 28, 53-54 & 59;

f.  Elant Leaders, including Whitney and Zambito, at the direction of McCarthy, Kennedy and/or Suarez, engaged in one or more interstate telephone conferences with personnel from Sims specifically regarding the characterization of the Inter-Company Transfers and Loss Transfers in the Falsified Financial Records to avoid scrutiny by Wells Fargo, the FHA and/or HUD, id. at ## 13 & 29;

g.  In turn, Sims transmitted the Falsified Financial Records to Summit Consulting, LLC ("Summit"), in Washington D.C., which was providing underwriting support to Elant and the Obligated Group for the FHA Mortgage application, id. at ## 18 & 19;

h.  Upon information and belief, at all times relevant, Elant, Sims and/or Summit also transmitted the Falsified Financial Records to the FHA and or HUD via the USPS, intestate carrier and/or Interstate Emails in furtherance of the FHA Mortgage Fraud;

i.  After the FHA Mortgage was approved, Elant and the PKF Defendants continued to draft and/or transmit, or cause to be transmitted, to Wells Fargo, HUD and/or the FHA additional materially false AFSs falsely characterizing the current versus non-current nature of the Inter-Company Transfers and Loss Transfers in order to continue to remain eligible for the FHA Mortgage, id. at ## 52-54 & 59; and,

j.  Elant Leaders, including Whitney, Cornell and/or Zambito initiated or caused to be initiated, various intrastate bank wire transfers between Elant in Goshen, New York and Wells Fargo's Commercial Mortgage Servicing Unit in Mclean, Virginia related to the FHA Mortgage, including receiving the mortgage proceeds from Wells Fargo, id. at ## 24-25 & 27.

196.   On or before April 30 of each year during the Relevant Period, PKF sent via USPS or other interstate carriers or via interstate wires (through electronic mail) EverCare's AFS for the prior year.

197.   Each AFS was caused to be sent by each of the Individual Auditor Defendants, who each provided services to EverCare related to the fraudulent AFS during the Relevant Period.

198.   During the Relevant Period, Defendant McCarthy served as the "client service partner" for EverCare and oversaw the audit, drafting, preparation and filing of each of the AFS.

199.    During the Relevant Period, Defendant Kennedy served as the "engagement partner" for EverCare and also oversaw the audit, drafting, preparation and filing of each of the AFS.

200.    During the Relevant Period, Defendant Suarez served as the "manager" for EverCare AFS, overseeing the day-to-day details in preparing and finalizing each of the AFS.

201.    During the Relevant Period, Defendant Russo served as the "reimbursement services partner" for EverCare and oversaw the audit, drafting, preparation and filing of each of the AFS and provided an expertise in Medicare reimbursement systems, the rules and regulations relating to those systems and the administrative procedures employed by New York State.

202.    During the Relevant Period, Defendant Higgins oversaw and signed each Form 990 filed with the IRS and the New York State Department of Law (Office of the Attorney General – Charities Bureau) (the "Charities Bureau"), which included a copy of that year's AFS.

203.    Each of the Individual Auditor Defendants knew that as a result of the completion of their work on each AFS, the completed AFS would be mailed or emailed to, *inter alia*, EverCare with the intent that EverCare file with the State Agencies.  Specifically, for example, the Individual Auditor Defendants knew that each AFS would be filed with the DOH and the Charities Bureau.

204.    Therefore, upon information and belief, at the completion of each AFS, PKF at the direction of the Individual Auditor Defendants, repeatedly used the USPS or other interstate carriers and/or electronic wires to send the completed yearly AFS to EverCare.

205.    The AFS were sent from PKF's office at 500 Mamaroneck Avenue, Suite 301, Harrison, NY 10528 (the "PKF Office") to EverCare at 31 Cerone Place, Newburgh, NY 12550

(the "EverCare Office"), or prior to the Separation Date, to Elant at 46 Harriman Drive, Goshen, NY 10924 (the "Elant Office").

206.    Alternatively, the AFS were sent from PKF servers, upon information and belief, through interstate servers, and then to EverCare and/or Elant servers.

207.    Thereafter, Defendants caused EverCare to mail, via USPS or other interstate carries and/or filed through electronic wires through interstate servers, the fraudulent AFS's to the State Agencies.

208.    The purpose in creating and mailing each of these AFS's was to further Defendant's and Elant's conspiracy to defraud EverCare and the relevant State Agencies out of millions of dollars to benefit Elant and PKF.

209.    As detailed above, each of these AFS's contained materially false or misleading information, which Defendants' knew would be relied upon by EverCare and the State Agencies.

210.    As discussed in more detail above, Defendants knowingly did not include material information in the AFS and/or purposefully recharacterized material information to deceive the State Agencies.

211.    The preparation and filing of each AFS was the culmination of all the RICO Schemes, meaning that all of the RICO Schemes would not have been possible without Defendants' aid in completing fraudulent AFS that mimics EverCare's fraudulent records.  Each and every AFS further perpetrated Elant's and Defendants' earlier frauds.  Therefore, each act done in preparing the AFS was an overt act taken in furtherance of the conspiracy between the Elant Leaders and Defendants.  For example, as discussed in more detail above, just prior to completing and filing EverCare's FY2015 AFS, without any prior notice, justification or disclosure to EverCare's representatives, Defendants determined the Inter-Company Transfers

should be re-characterized as "non-current assets" for the FY2015 AFS, notwithstanding that in Pre-Separation audit years Defendants had previously characterized those Inter-Company Transfers as "current assets" and, from EverCare's perspective,  nothing had changed regarding the Elant Entities' ability to repay these obligations.  This sort of overt act was done solely to further the conspiracy and continue to perpetrate Defendants' earlier frauds.

212.    The filing of the AFS directly caused EverCare's damages discussed in detail herein.

213.    During the relevant period, PKF at the direction of the Individual Auditor Defendants, who each provided the relevant services to EverCare, repeatedly used the USPS or other interstate carriers and/or electronic wires to invoice EverCare for services they did not, and could not have provided, given their total lack of independence and involvement in the RICO Schemes.  These fraudulent invoices, purporting to bill for ordinary professional services, were sent from the PKF Office to the EverCare Office, or prior to the Separation Date, to the Elant Office.

214.    In response to each of the invoices, EverCare would make payment to PKF through the use of the USPS or other interstate carriers, by mailing checks, from the EverCare office, or prior to the Separation Date, from the Elant Office to the PKF Office.

215.    The following charts details dates of fraudulent mailings discussed above in furtherance of this conspiracy related to Defendants' involvement in the AFS, specifically the mailings of invoices to EverCare and payment in response to said invoice:

| Invoice Date | Invoice No | Amount of Invoice | Check/Payment Date | Check No | Amount | Invoice Payment was applied to |
|---|---|---|---|---|---|---|
| 12/31/2008 | 95524 | $ 3,000.00 | 1/30/2009 | 9974 | $ 3,000.00 | 95524 |
| 1/28/2009 | 95937 | $ 3,000.00 | 3/4/2009 | 10112 | $ 3,000.00 | 95937 |
| 2/26/2009 | 96364 | $ 3,000.00 | 5/29/2009 | 10499 | $ 9,000.00 | 93694/96855/97527 |
| 3/16/2009 | 96855 | $ 3,000.00 | 5/29/2009 | 10499 | $ 9,000.00 | 93694/96855/97527 |
| 4/10/2009 | 97527 | $ 3,000.00 | 5/29/2009 | 10499 | $ 9,000.00 | 93694/96855/97527 |
| 5/29/2009 | 100054 | $ 2,000.00 | 12/31/2009 | 11304 | $ 2,000.00 | 100054 |
| 2/29/2012 | 139903 | $ 17,000.00 | 4/13/2012 | 14274 | $ 17,000.00 | 139903 |
| 2/28/2014 | 186754 | $ 10,000.00 | 4/4/2014 | 19291 | $ 10,000.00 | 186754 |
| 11/15/2014 | 211931 | $ 4,000.00 | 12/18/2014 | 21983 | $ 4,000.00 | 211931 |
| 3/31/2014 | 189731 | $ 10,000.00 | 5/2/2014 | 19509 | $ 10,000.00 | 189731 |
| 3/31/2015 | 222821 | $ 27,000.00 | 5/15/2015 | 23832 | $ 27,000.00 | 222821 |
| 10/31/2015 | 245798 | $ 2,000.00 | 11/19/2015 | 30769 | $ 2,000.00 | 245798 |
| 2/29/2016 | 258294 | $ 25,000.00 | 2/16/2017 | 35818 | $ 15,000.00 | 258294 |

## COUNTS

## COUNT I

## (Violation of 18 U.S.C. § 1962(d) By Conspiring to Violate 18 U.S.C. § 1962(d))

216.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

217.    Through the RICO Schemes and Financial Statement Fraud conducted with Elant, the Defendants violated or conspired to violate 18 U.S.C. §1962(c), which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

### *The EverCare Enterprise*

218.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

219.    The EverCare Enterprise is a victim enterprise and/or an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of members of the Elant Group and the

Defendants. The EverCare Enterprise was an ongoing organization that functioned as a continuing unit throughout the Relevant Period.

220. The Elant Leaders and the Defendants are "persons" distinct from EverCare.

221. The Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of generating money for its members, including the Elant Group and Defendants, by perpetrating the Financial Statement Fraud and RICO Schemes. The Defendants and their co-conspirators also took steps to conceal their activities from law enforcement, including through the witting or unwitting use of proxies and/or nominees, fraudulent and inflated requests for payment and Falsified Financial Records.

*Effect on Interstate Commerce*

222. The Enterprise engaged in and affected interstate commerce because, *inter alia*: (i) Members of the Enterprise, including, but not limited to the Defendants, transacted business, functioned and had office locations in, and their activities affected, interstate and foreign commerce; (ii) Defendants, by, together with and through certain PKF parent, subsidiary and affiliated organizations, conducted its public accounting and business operations for the benefit of its clients like the Elant Entities and EverCare throughout the New York, New Jersey and Connecticut tri-state area; (iii) the PKF Entities overtly marketed that they are member firms of the PKF International Limited network of legally independent firms having offices across the globe; (iv) effectuated its criminal ends through the filing of false state and federal tax returns; and (v) engaged in fraudulent schemes which were intended to, and did, fraudulently obtain federal Medicaid funds and/or federally insured mortgages issued by a federal financial institution.

*Pattern and Practice of Racketeering Activities*

223.    Defendants have conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), including through multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 and bank fraud in violation of 18 U.S.C. § 1344, as described above and outlined below, which began in 2002 and continued through and including mid-May 2016,

*Mail and Wire Fraud*

224.    Throughout the Relevant Period, such dates being approximate and inclusive, within the Southern District of New York and elsewhere, the Defendants, together with others, being persons employed by and associated with the Enterprise, an enterprise that engaged in activities which affected, interstate and foreign commerce, did knowingly and intentionally and for the purpose of executing the schemes and artifices identified below, transmit and/or cause to be transmitted, by means of wire communication in interstate and foreign commerce, and/or through the post office or authorized depository for mail or through a private or commercial interstate carrier, one or more writings signs signals, pictures and sounds, interstate e-mails and written communications in violation of  18 U.S.C. §§ 1341 & 1343.

225.    By way of example, sample of the above referenced predicate acts are detailed in the Predicate Acts Chart attached hereto as Appendix A.

*Bank Fraud*

226.    As more fully described in section X of this Amended Complaint, between January 2012 and December 2017, such dates being approximate and inclusive, within the Southern District of New York and elsewhere, PKF, Suarez, McCarthy and Kennedy, together with others including Whitney, Cornell and Zambito, being persons employed by and associated with the Enterprise, an enterprise that engaged in and the activities of which affected, interstate

and foreign commerce, did knowingly and intentionally and for the purpose of executing the schemes and artifices identified below, conspire to defraud Wells Fargo, a federal financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation, of moneys, funds, credits, assets and other property owned by, and under the custody and control of such financial institution by means of fraudulently applying for and obtaining the FHA Mortgages in violation of 18 U.S.C. § 1344.

227.    By way of example, sample of the above referenced predicate acts are detailed in the Predicate Acts Chart attached hereto as Appendix A.

228.    As a direct and proximate cause of the RICO Schemes and Financial Statement Fraud, that was furthered by this pattern of racketeering, EverCare has been injured in their business within the meaning of 18 U.S.C. §1964(c) in that it was defalcated of more than $25 million dollars in funds.

229.    EverCare acknowledges that the PKF Defendants may not have personally mailed the items alleged to have violated the mail fraud or wire fraud statutes. But, PFK caused the mailings and wires to be sent by subordinate(s) or employees at the PKF Entities or Elant. Thus, the PKF Defendants conspired with each other and Elant to defraud EverCare.  Accordingly, the RICO claim is brought against the PKF Defendants pursuant to §1962(d), for conspiring to violate §1962(c).

230.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

231.    Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or

indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

232.     As demonstrated in detail above and in Appendix A, Defendants' co-conspirators, including, but not limited to, the Elant Leaders have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 and bank fraud in violation of 18 U.S.C. § 1344.

233.     The nature of the above-described Defendants/co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to take actions constituting violations of 18 U.S.C. § 1962(c), but that they were aware that their ongoing fraudulent acts have been and were at all times part of an overall pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  The Defendants' agreement to participate reflects the necessary *mens rea* sufficient to further the conspiracy.  At all relevant times, all Defendants and all Defendants' co-conspirators were aware of the essential nature and scope of the EverCare Enterprise and intended to participate in it.

234.     By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff for statutory treble damages in amount equal to three times EverCare's compensatory and consequential damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of three times $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

235.     As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c),

Plaintiff has been and continues to suffer injury to business or property, as set forth more fully above.

## COUNT II

### (Violation of 18 U.S.C. § 1962(c) - Civil Rico)

236.    Plaintiff adopts by reference and incorporates herein the allegations set forth above.

237.    Through the RICO Schemes and Financial Statement Fraud conducted with Elant, the PKF Defendants violated or conspired to violate 18 U.S.C. §1962(c), which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

238.    Each of the PKF Defendants is a "person" within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

239.    The RICO Schemes and the Financial Statement Fraud consisted of acts constituting a "pattern" of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), including through multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 and bank fraud in violation of 18 U.S.C. § 1344, as described above and outlined below, which began in 2002 and continued through and including mid-May 2016,

240.    The Enterprise affected interstate commerce.  As such, it is a RICO enterprise pursuant to 18 U.S.C. §1961(4). The PKF Defendants used EverCare to carry out their scheme to enrich themselves and Elant, at EverCare's expense.

241.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff for statutory treble damages in amount equal to three times EverCare's compensatory and consequential damages in an amount to be determined at trial, but

which EverCare reasonably believes is in excess of three times $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## COUNT III

### (Common Law Fraud)

242.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

243.    Throughout the Relevant Period Defendants held themselves out and agreed to act as EverCare's certified public accountants, financial consultants, tax advisors and auditors.

244.    In connection with Defendants' retention as EverCare's public accountants and auditors, and pursuant to the Post-Separation Engagement Letters, Defendants prepared EverCare's State Cost Reports for the FY's 2013-2015.

245.    Those State Cost Reports contained materially false statements, including, by way of example, but not limited to, falsely categorizing assets and obligations of EverCare and improper categorization of Inter-Company Transfers between EverCare and the Elant Entities.

246.    Specifically, but as set forth in greater detail above, throughout the Relevant Period PKF knew but willfully disregarded that, *inter alia*, those publicly filed State Cost Reports and other documents and communications deceptively categorized the unlawful Inter-Company Transfers and Loss Transfers as "current" assets or obligations of EverCare and/or as loans that EverCare and/or other Elant affiliates had advanced to the Obligated Group and were improperly deemed by PKF to be repayable or forgiven within twelve months, in whole or in part during the Relevant Period.

247.    Further PKF concealed from EverCare material facts including, but not limiting to, false representations and omissions of material fact relating to the following: (i) the sham

transaction concerning the Fishkill Lease; (ii) the filing under false pretenses of materially misleading and untrue EverCare financial statements, MEDS and Encounter Data cost reports, MMCOR, as well as related communications and correspondence, as required by one or more State Regulators, including but not limited to, the DFS and the DOH; (iii) the exorbitant and excessive PMPM Management Fees that the Elant Group caused to be charged to EverCare and caused EverCare to pay without any justifiable or legitimate business purpose to enable the Elant Group to conceal the unlawful Inter-Company Transfers; and (iv) the unauthorized distributions and fraudulent conveyances of millions of dollars' worth of Inter-Company Transfers which the Elant Group caused to occur during the relevant period from EverCare to one or more of the Elant Entities and other third parties.

248.    The Defendants knew that, with respect to each of the affiliated company transactions between members of the Elant Group and EverCare, the conclusions they reached and opinions that they held, as set forth in each of the applicable AFSs and other State Cost Reports were not true.

249.    At all relevant times herein Defendants knew that the information contained in the AFSs derived from or made a part of the other State Cost Reports, which contained materially misleading or false information.

250.    More specifically, Defendants actually knew those representations and omissions of material fact were false at the time they submitted or caused them to be submitted to the State Regulators.

251.    Defendants intended for EverCare and the State Regulators to rely on the State Cost Reports, despite their falsity.

252.    EverCare and the State Regulators did in fact rely on the State Cost Reports prepared by Defendants.

253.    Because Defendants certified the relevant State Cost Reports and because Defendants acted and held themselves out as EverCare's certified public accountants, financial consultants, tax advisors and auditors, and because of the various covenants contained in the "Qualifications Letter" dated March 31, 2016, EverCare and the State Regulators' reliance on Defendants prepared State Cost Reports was justifiable.

254.    As a result of the Financial Statement Fraud, which caused EverCare to severely under report the number and cost of Encounters, EverCare's PMPM capitation rate was reduced by the State to a level insufficient to cover and pay the contractual cost of providing services to its Members.

255.    Additionally, Defendants, by presenting EverCare with the Qualifications Letter, intentionally misrepresented their ability to, among other things, perform services in compliance GAAP and GAAS, the NAIC model audit rules, AICIPA, as well as Defendants' promise that PKF was capable of acting "independent[ly]", in order to induce EverCare to enter into the 2016 Post-Separation Engagement Letter.

256.    Upon information and belief, Defendants fraudulently induced EverCare to enter into the 2016 Post-Separation Engagement Letter, in an effort to obscure their past involvement in the Financial Statement Fraud and RICO Schemes, which was motivated, at least in part, by their desire during the Relevant Period to avoid additional scrutiny by EverCare and/or federal regulators concerning the ongoing federal investigation into their involvement in the strikingly similar Town of Ramapo Fraud.

257.    As a direct and proximate result of the foregoing, Defendants are jointly and severally liable to Plaintiff for all compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of them during their respective periods of disloyalty which were directly and proximately caused by each of  those breaches, in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## COUNT IV

### (Aiding and Abetting the Elant Group's Common Law Fraud)

258.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

259.    As set forth in greater detail above and in the Elant Amended Complaint, throughout the Relevant Period, the Elant Group made numerous false representations to or fraudulently and deceptively concealed from EverCare material facts including, but not limited to, false representations and omissions of material fact relating to: (i) the sham transaction concerning the Fishkill Lease; (ii) the filing under false pretenses of materially, misleading and untrue EverCare financial statements, MEDS and Encounter Data cost reports, MMCOR, as well as related communications and correspondence, as required by one or more State Regulators, including but not limited to, the DFS and the DOH; (iii) the exorbitant and excessive PMPM Management Fees that the Elant Group caused to be charged to EverCare and caused EverCare to pay without any justifiable or legitimate business purpose to enable the Elant Group to conceal the unlawful Inter-Company Transfers; and (iv) the unauthorized distributions and fraudulent conveyances of millions of dollars' worth of Inter-Company Transfers which the Elant Group

caused to occur during the relevant period from EverCare to one or more of the Elant Entities and other third parties.

260.    At all times relevant to the allegations set forth herein, at the time such representations or omissions of material fact were made, those representations or omissions were false at the time they were made and the Elant Group knew that they were false.

261.    The Elant Group, knew that each such misrepresentation and omission of fact was material and that EverCare (and the State Regulators) would and did justifiably rely upon them in connection with reports and other submissions that EverCare was required to make under penalty of perjury to the applicable State Regulators and in operating its business and caring for the health and welfare of the Plan Members whom it serves.

262.    Further, each of the Elant Group intended that EverCare would rely on such misrepresentations, and EverCare did rely on those misrepresentations to their detriment.

263.    As a direct and proximate result of the foregoing, EverCare has suffered significant monetary damages.

264.    Throughout the Relevant Period, each of the Defendants, jointly and severally, *in their capacities as agents and representatives of the PKF Defendants and as agents and representatives of each of the Elant Entities, had actual knowledge of each and every fraud committed by the Elant Group and substantially and actively perpetrated, participated, aided and abetted the Elant Group in connection with and in furtherance of the frauds committed upon EverCare.

265.    As a direct and proximate result of the foregoing, Defendants are jointly and severally liable to Plaintiff for all compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of them

during their respective periods of disloyalty which were directly and proximately caused by those breaches, in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## COUNT V

## (Breach of Fiduciary Duty)

266.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

267.    The Defendants are certified public accountants.

268.    During the Relevant Period, Defendants served as the certified public accountants, tax advisors and consultants for EverCare and the Elant Entities.

269.    In this role, Defendants were obligated to provide, act or give advice for the benefit of their client, EverCare on matters within the scope of this relationship, including, but not limited to, the State Cost Reports.

270.    At all times relevant to the allegations set forth herein; EverCare further reposed its trust and confidence in Defendants to act with due care, loyalty and with complete candor in connection with their obligations and scope of the services they provided to EverCare.

271.    Accordingly, at all times relevant to the allegations set forth herein, Defendants owed a fiduciary duty to EverCare.

272.    Instead, throughout the Relevant Period Defendants chose financial remuneration and the benefits they derived from their engagement as the financial accounting, tax and audit professionals of each of the Elant Entities over their professional responsibilities to EverCare.

273. Specifically, the PKF Defendants breached their duty of loyalty by aiding the Elant Group in its scheme to defraud EverCare.

274. Further, Defendants breached their duties due care, loyalty and candor to EverCare by, placing their own interests ahead of those of EverCare, when in March 2016, Defendants foisted the responsibility of determining whether the Inter-Company Transfers should still be considered as "current" assets for purposes of the FY2015 AFS.

275. Upon information and belief, this determination was exclusively within the Defendants' professional purview and responsibility to make as EverCare's audit professionals, but they failed and refused to make it at a time when they knew EverCare had few good alternatives – (i) it could make a determination that EverCare's executives were ill-suited and not professionally competent to make or (ii) it could unwittingly submit to its auditors wishes and potentially waive substantive legal rights.

276. Upon further information and belief, Defendants proceeded in this fashion because they were being investigated by Federal Authorities for strikingly similar behavior related to the Town of Ramapo Fraud and wished to avoid scrutiny of their prior mischaracterization of the Inter-Company Transfers.

277. Defendants further knew the dire financial consequences this decision could have for EverCare.  No material change in circumstances impacting the collection of the Inter-Company Transfers had occurred since PKF had prepared and filed with the applicable State Regulators each of the previous years' annual AFSs on behalf of EverCare since at least the fiscal year ending December 31, 2010.  Rather, the Defendants had continuously and without qualification determined in prior years that it was appropriate to characterize the "due to/due from" Inter-Company Transfers between EverCare and other members of the Elant Group in

those prior years as "current" assets or liabilities of EverCare, notwithstanding that the Elant Leaders, in particular Whitney, had failed and refused to comply with the Inter-Company Transfer SODs.

278.    Defendants breached their fiduciary duties to EverCare by placing their own self-interest above their professional responsibilities and contractual obligations to EverCare.

279.    As a direct, reasonable, foreseeable, and proximate cause of the numerous and ongoing breaches of fiduciary duties committed by Defendants and each of which is described in greater detail above, EverCare has been and continues to be damaged by each of the Defendants, jointly and severally, in an amount to be determined at trial, but which EverCare reasonably believes is currently in excess of $25 million, and each of the Defendants is further jointly and severally liable to EverCare for all compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of them during their respective periods of disloyalty which were directly and proximately caused by those breaches, with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## COUNT VI

### (Aiding and Abetting the Elant Group's Breaches of Fiduciary Duty)

280.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

281.    Elant dominated and controlled EverCare and was EverCare's alter ego, sole corporate member and active parent from in or about May 1, 2010, through on or about the Separation Date, December 31, 2014.

282.    As EverCare's alter ego, sole corporate member and active parent, Elant owed fiduciary duties to EverCare.

283.    At all times relevant to the allegations set forth herein, EverCare further reposed in Elant Group its trust and confidence to act with due care, loyalty and with complete candor in connection with the day-to-day management and decision-making with respect to its financial and corporate affairs.

284.    As a result of the foregoing and pursuant to the terms of the applicable ASAs, as well as the statutory duties reposed in the Elant Group as directors and/or officers of EverCare in accordance with Article 7, et seq., of the Not-for-Profit Corporation Law (the "NPCL"), at all times relevant to the allegations set forth herein, the Elant Group owed common law, contractual and statutory fiduciary duties of utmost loyalty, care and candor to EverCare.

285.    For the reasons set forth herein, the Elant Group has breached the contractual and common law fiduciary duties of care, loyalty and candor, as well as the statutory duties pursuant to the NPCL, including, but not limited to, NPCL §§ 717, 719 and 720, which they owed to EverCare.

286.    As set forth in greater detail herein the Elant Group, engaged in multiple fraudulent schemes contrary to and in breach of the fiduciary duties of loyalty, care and utmost candor that Elant and the Elant Leaders owed to EverCare *inter alia*, by systematically engaging in a clandestine course of conduct through which Elant and the Elant Leaders caused the unauthorized and improper diversion, waste, misappropriation and transfer, directly or indirectly, of significant monies and assets from EverCare to the Elant Entities and EverCare lacked adequate and appropriate EMR systems, personnel, and controls, causing EverCare to fail to satisfy its MMCOR compliance requirements, in an effort to bolster the failing financial

condition of those related Elant Entities and underwrite their existence (i.e., the Financial Statement Fraud and RICO Schemes).

287.    Elant, through the Elant Entities, failed and refused to invest sufficient capital or other resources to ensure that at all relevant times EverCare satisfied its MMCOR compliance requirements.

288.    The Elant Group engaged in behavior that was contrary to and in dereliction of their positions within both EverCare and Elant and in violation of the fiduciary duties of loyalty, care and utmost candor that the Elant Leaders owed to EverCare by, *inter alia,* systematically engaging in a *ultra vires* fraudulent scheme through which Elant caused the unauthorized and improper diversion and transfer of significant monies, property and other assets from EverCare to the Elant Entities (and/or she reasonably, directly, foreseeably and proximately caused the unauthorized diversion and transfer of liabilities from one or more of Elant Defendants to EverCare), in an effort to bolster the financial health of those failing related Elant Entities and underwrite their existence; by imposing upon EverCare grossly inflated rates—well in excess of those approved by the State—to be charged to EverCare for services rendered by one or more of the Elant SNFs; and by causing EverCare to enter into inflated, unnecessary and unapproved contracts and sham leases, including, but not limited to the Fishkill Lease.

289.    At all times relevant to the allegations set forth herein, the Elant Leaders had conflicts-of-interest as a result of their dual positions within both Elant and EverCare; engaged in behavior that was contrary to their positions, and in violation of the fiduciary duties of loyalty, care and utmost candor that she owed to EverCare by, *inter alia*, systematically engaging in an *ultra vires* fraudulent scheme through which Elant caused EverCare to fail to satisfy its MMCOR compliance requirements.

290.     As a result, Elant and the Elant Leaders failed to faithfully exercise and breached the fiduciary duties they owed to EverCare.

291.     At all times relevant to the allegations set forth herein, Defendants, in their capacities as agents and representatives of each of the Elant Entities, had actual knowledge of each and every breach of fiduciary duty committed by the Elant Group and substantially and actively participated, aided and abetted the Elant Group in connection with and in furtherance of its breaches of those fiduciary duties (i.e., the Financial Statement Fraud and RICO Schemes).

292.     As a direct, reasonable, foreseeable, and proximate cause of aiding the numerous breaches of fiduciary duties committed by the Elant Group, which Defendants knowingly and substantially participated in and aided and abetted and each of which is described in greater detail above, EverCare has been and continues to be damaged by each of the Defendants, jointly and severally, in an amount to be determined at trial, but which EverCare reasonably believes is currently in excess of $25 million, and each of the Defendants is further jointly and severally liable to EverCare for all compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of them during their respective periods of disloyalty which were directly and proximately caused by those breaches, with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## COUNT VII

## (Breach of Contract)

293.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

294.    Throughout the Relevant Period the PKF Entities held themselves out and continued to act as EverCare's certified public accountants, financial consultants, tax advisors and auditors.

295.    In connection with the PKF Entities' retention as EverCare's public accountants and auditors, and pursuant to the Post-Separation Engagement Letters, the PKF Entities promised, *inter alia* to prepare AFSs for EverCare for FYs 2013-2015 and assist in the preparation of EverCare's Medicaid cost reports for those same years.

296.    In connection with these services, the PKF Entities were obligated to perform its audit in compliance with GAAS and GAAP, to "obtain reasonable, rather than absolute, assurance that the financial statements are free of material misstatement, whether caused by error or fraud," to "examin[e], on a test basis, evidence supporting the amounts and disclosures in the financial statements", and to "perform additional procedures necessary to certify the supplemental information required by [the] New York State Department of Health in the cost report."

297.    In addition, and with respect to the 2016 AFS, the PKF Entities represented to EverCare in the Qualifications Letter that it was independent with respect to EverCare, capable of conforming to the professional code of Conduct of the AICP and NYS Board of Public Accountancy and NAIC's Model Rule regarding qualifications of independent CPAs, and that the PKF Entities were aware the FY 2015 AFS would be filed with NYS DFS and that the DFS would be relying on the information contained therein.

298.    EverCare has fully complied with the terms of the Post-Separation Engagement Letters.

299.    The PKF Entities breached the Qualifications Letter and Post-Separation Engagement Letters by, inter alia, failing to prepare the AFSs for EverCare for FYs 2013-2015 in accordance with GAAS and GAAP.

300.    Further, the PKF Entities breached the Qualifications Letter and Post-Separation Engagement Letters because they were not independent with respect to EverCare and incapable of conforming to the professional code of Conduct of the AICP and NYS Board of Public Accountancy and NAIC's Model Rule regarding qualifications of independent CPAs, due to inherent conflicts of interest, their own unclean hands and various intercompany balances between EverCare and the Elant Entities.

301.    As a direct and proximate cause of the PKF Entities breaches of the Qualifications Letter and Post-Separation Engagement Letters, EverCare has been and continues to be damaged in an amount to be determined at trial, but which EverCare reasonably believes is currently in excess of the amount of $25 million, and the PKF Entities are jointly and severally liable to EverCare for all compensatory and consequential damages caused by those breaches, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff EverCare demands judgment in its favor as follows:

a)      On the First Count, a judgment under 18 U.S.C. § 1962(d)  in favor of EverCare and against Defendants, jointly and severally, awarding statutory treble damages in amount equal to three times EverCare's compensatory and consequential damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of three times $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

b)      On the Second Count, a judgment under 18 U.S.C. § 1962(c)  in favor of EverCare and against Defendants, jointly and severally, awarding statutory treble damages in amount equal to three times EverCare's compensatory and consequential damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of three times $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

c)      On the Third Count, a judgment for common law fraud in favor of EverCare and against Defendants, jointly and severally, awarding EverCare compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of them during their respective periods of disloyalty which were directly and proximately caused by those breaches, in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

d)      On the Fourth Count, a judgment for aiding and abetting common law fraud in favor of EverCare and against Defendants, jointly and severally, awarding EverCare compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of them during their respective periods of disloyalty which were directly and proximately caused by those breaches, in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

e)      On the Fifth Count, a judgment for breach of fiduciary duty in favor of EverCare and against Defendants, jointly and severally, awarding EverCare compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of the Defendants during their respective periods of disloyalty which were directly and proximately caused by those breaches, in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

f)      On the Sixth Count, a judgment for aiding and abetting breach of fiduciary duty in favor of EverCare and against Defendants, jointly and severally, awarding EverCare compensatory, consequential and punitive damages, including, but not limited to, the forfeiture of all compensation and benefits paid or given to each of the Defendants during their respective

periods of disloyalty which were directly and proximately caused by those breaches, in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

g)      On the Seventh Count, a judgment for breach of contract in favor of EverCare and against the PKF Entities, jointly and severally, awarding EverCare compensatory, consequential and punitive damages in an amount to be determined at trial, but which EverCare reasonably believes is in excess of $25 million, together with any accrued but unpaid interest, costs (including reasonable attorneys' fees) and disbursements;

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all such matters triable to a jury.

Dated: October 8, 2020
New York, NY

Respectfully Submitted,

MORITT HOCK & HAMROFF LLP

By:    */s/ Peter B. Zlotnick*
Peter B. Zlotnick
Ted A. Berkowitz
Alexander Litt
*Attorneys for Plaintiff*
*EverCare Choice, Inc.*
1407 Broadway, 39th Floor
New York, New York 10018
Tel.: (212) 239-2000

2364728v4

78