UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
EVERCARE CHOICE, INC.,

                                    Plaintiff,                    Civil Case No. 7:20-cv-02733-PMH

            -against-


PKF  O'CONNOR  DAVIES,  LLP;  O'CONNOR
DAVIES,  LLP,  O'CONNOR  DAVIES  MUNNS  &
DOBBINS,  LLP;  and  Individuals  THOMAS  P.
KENNEDY;   CHRISTOPHER    J.    McCARTHY;
MICHAEL  J.  SUAREZ**;** GARRETT  M.  HIGGINS;
DOROTHEA RUSSO, AND JOHN DOES 1-10.

                                    Defendants.
-----------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR AN ORDER STAYING OR DISMISSING THIS
ACTION AND COMPELLING MEDIATION AND ARBITRATION**


MORITT HOCK & HAMROFF LLP
*Attorneys for Plaintiff*
1407 Broadway, 39th Floor
New York, NY 10018
(516) 873-2000

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................. 3

POINT I

EVEN IF THE ARBITRATION PROVISIONS ARE DEEMED ENFORCEABLE,
EVERCARE'S CLAIMS AGAINST DEFENDANTS IN THIS ACTION ARISE
OUTSIDE THEIR SCOPE ............................................................................................. 3

    A.   The Arbitration Provisions Are Narrow ........................................................... 4

    B.   The Narrow Arbitration Clause Does Not Encompass EverCare's Claims .................... 7

POINT II

THE 2016 ENGAGEMENT LETTER IS AGAINST PUBLIC POLICY
AND IS THEREFORE VOID *AB INITIO* .................................................................. 10

    A.   The 2016 Engagement Letter Violates Public Policy. ..................................... 12

POINT III

THE ARBITRATION PROVISIONS VIOLATE THE
MASTER AGREEMENT AND ARE THEREFORE VOID ..................................... 21

POINT IV

DEFENDANTS' ARGUMENT THAT BECAUSE EVERCARE HAS NOT
SATISFIED A CONDITION PRECEDENT TO ARBITRATION, EVERCARE HAS
VIOLATED THE ENGAGEMENT LETTER, IS SPECIOUS AND WITHOUT MERIT ..... 23

POINT V

THIS COURT MUST DECIDE THE ISSUE OF ARBITRABILITY ..................................... 24

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Ace Ltd. v. Cigna Corp. & CIGNA Holdings*,
  2001 WL 767015 (S.D.N.Y. 2001) ........................................................ 6

*Adams v. Suozzi*,
  433 F.3d 220 (2d Cir. 2005) ................................................................. 12

*In re Adler, Coleman Clearing Corp.*,
  263 B.R. 406 (S.D.N.Y. 2001) .............................................................. 19

*AMC Ent. v. Entretenimiento GM de Mexico S.A. de C.V.*,
  555 F. App'x 12 (2d Cir. 2014) .............................................................. 7

*Anabas Export, Ltd. v. Alper Indus., Inc.*,
  603 F.Supp. 1275 (S.D.N.Y.1985) ........................................................ 12

*Arbeeny v. Kennedy Exec. Search, Inc.*,
  893 N.Y.S.2d 39 (1st Dept. 2010) ........................................................... 7

*Armor All/STP Products Company v. TSI Products, Inc.*,
  337 F.Supp.3d 156 (D. Conn. 2018) ..................................................... 25

*AT & T Technologies, Inc. v. Communications Workers*,
  475 U.S. 643 (1986) .............................................................................. 24

*Bd. of Managers of Marbury Club Condo. v. Marbury Corners, LLC*,
  958 N.Y.S.2d 306 (Westchester County 2010),
  *aff'd,* 950 N.Y.S.2d 280 (2d Dept. 2012),
  *lv. Denied* 20 N.Y.3d 862 (NY 2013) ................................................... 19

*Bily v. Arthur Young & Co.*,
  3 Cal. 4th 370, 834 P.2d 745 (1992) ..................................................... 16

*Bingham v Zolt*,
  66 F.3d 553, 559-60 (2d Cir. 1995) ...................................................... 12

*Borecki v. Raymours Furniture Co., Inc.*,
  2017 WL 5953172 (S.D.N.Y. Nov. 28, 2017) ............................... 4, 5, 7, 8

*Collins & Aikman Prods. Co. v. Building Sys.*,
  58 F.3d 16 (2d Cir 1996) ........................................................................ 4

*Diana Jewelers of Liverpool, Inc. v. A.D.T. Co., Inc.,*
 167 A.D. 2d 965 [4th Dept. 1990]........................................................ 18

*First Options of Chicago, Inc. v. Kaplan,*
 514 U.S. 938 (1995) ........................................................................... 24

*Flegenheimer v. Brogan,*
 284 N.Y. 268 (1940) .......................................................................... 12

*Fuller v. Guthrie,*
 565 F.2d 259 (2d Cir. 1977) ................................................................. 4

*Gen. Elec. Capital Corp. v. New York State Div. of Tax Appeals,*
 2 N.Y.3d 249 (NY 2004)..................................................................... 13

*Giant Grp., Ltd. v. Sands,*
 142 F. Supp. 2d 503 (S.D.N.Y. 2001).................................................. 16

*Granite Rock Co. v. Int' Bhd. Of Teamsters,*
 561 U.S. 287 (2010) ............................................................................. 9

*Howsam v. Dean Witter Reynolds, Inc.,*
 537 U.S. 79 (2002) ............................................................................... 3

*Interocean Shipping Co. v. National Shipping & Trading Corp.,*
 462 F.2d 673 (2d Cir. 1972)............................................................... 11

*Ji Dong Cheng v. HSBC Bank USA, N.A.,*
 467 F.Supp.3d 46 (E.D.N.Y. 2020)...................................................... 5

*Joel A. Rakower, CPA, P.C. v. Germain,*
 226 A.D.2d 264 (1st Dept. 1996)........................................................ 19

*John Hancock Life Ins. Co. v. Wilson,*
 254 F.3d 48 (2d Cir. 2001).................................................................. 7

*Kessler v. Kessler,*
 43 A.D. 3d 42 (2nd Dept. 2006) ......................................................... 12

*Korea Life Ins. Co. v. Morgan Guar. Tr. Co. of New York,*
 269 F. Supp. 2d 424 (S.D.N.Y. 2003).................................................. 19

*Leshinsky v. Telvent GIT, S.A.,*
 873 F. Supp. 2d 582 (S.D.N.Y. 2012).................................................. 14

- iii -

*Lothar's of California, Inc. v. Weintraub*,
  158 Misc. 2d 460, 601 N.Y.S.2d 231 (N.Y. County Sup. Ct. 1993).......................... 19

*Matter of Validation Rev. Associates, Inc.*,
  223 A.D. 2d 134 (2d Dept.)............................................................................ 13

*McConnell v. Commonwealth Pictures Corp.*,
  7 N.Y.2d 465 (NY 1960)................................................................................ 20

*McDonell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*,
  858 F.2d 825 (2d Cir. 1988)....................................................................... 3, 4, 6

*Ministry of Indus. & Trade, The Hashemite Kingdom of Jordan v. S. Kasmas & Bros.*,
  No. 01 CIV. 3575 (DC), 2001 WL 1035133 (S.D.N.Y. Sept. 7, 2001).................... 11

*Nantucket Industries, Inc. v. Varo*,
  129 F.3d 114 (1997)...................................................................................... 9

*NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*,
  770 F.3d 1010 (2d Cir. 2014)........................................................................ 24

*New Hampshire Ins. Co. v. Canali Reinsurance Co.*,
  2004 WL 769775 (S.D.N.Y. 2004)................................................................... 5

*New York State Med. Transporters Ass'n, Inc. v. Perales*,
  566 N.E.2d 134 (1990)................................................................................. 12

*Oxford Health Plans LLC v. Sutter*,
  569 U.S. 564 (2013)..................................................................................... 24

*R.A.C. Grp., Inc. v. Bd. of Educ. of City of New York*,
  21 A.D.3d 243 (2d Dept. 2005)...................................................................... 20

*Rutkin v. Reinfeld*,
  229 F.2d 248 (2d Cir.1956)........................................................................... 12

*S. New England Tel. Co. v. Glob. Naps, Inc.*,
  2006 WL 1169805 (D. Conn. 2006) ................................................................. 6

*Shearson/American Express v. McMahon*,
  482 U.S. 220 (1987)................................................................................ 9, 10

*SI Venture Holdings, LLC v. Catlin Specialty Ins.*,
  118 F. Supp. 3d 548 (S.D.N.Y. 2015).............................................................. 12

*Specht v. Netscape Commc'ns Corp.*,
  306 F.3d 17 (2d Cir. 2002) ........................................................... 9

*Sphere Drake Insurance Limited, v. Clarendon National Insurance Company
and Clarendon America Insurance Company*,
  2001 WL 34113736 (C.A.2), 27 (Case No. 00-9464) .................................... 10, 11, 21

*Stone v. Freeman*,
  298 N.Y. 268 (1948) ................................................................ 12

*Tracy v. Talmage*,
  14 N.Y. 162, 1856 WL 6757 (1856) ................................................... 19

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
  363 U.S. 574 (1960) ................................................................ 3, 4

*Volt Info. Sciences v. Bd. of Tr. of the Leland Stanford Junior Univ.*,
  489 U.S. 468 ....................................................................... 7

*Weir Metro Ambu-Serv., Inc. v. Turner*,
  442 N.E.2d 1268 (1982) ............................................................. 12

*Yale Club of N.Y.C., Inc. v. Reliance Ins. Co.
(In re Ancillary Receivership of Reliance Ins. Co.)*,
  863 N.Y.S.2d 415 (1st Dept. 2008) .................................................. 7

**Statutes, Rules and Regulations**

10 NYCRR § 98-1.1 .................................................................... 14

10 NYCRR § 98.3 .................................................................. *passim*

10 NYCRR § 98-3.1 .................................................................... 14

10 NYCRR § 98-3.2(g) ................................................................. 15

10 NYCRR § 98-3.6 ................................................................ *passim*

10 NYCRR § 98-3.11 ............................................................. 15, 17, 18

10 NYCRR § 98-3.16 ................................................................... 14

11 NYCRR § 89 ....................................................................... 14

42 CFR § 438.242(a) ................................................................. 14

9 U.S.C.A § 4 ................................................................................................. 10

NAIC MDL-205 § 3E ..................................................................................... 15

NAIC MDL-205 § 7(A)(2) ............................................................................. 15

Public Health Law § 4403-f(7) .............................................................. 13, 14

Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 ......................................... 14

**<u>Other Authorities</u>**

*Audited Financial Statements for Managed Care Organizations*,
    11/10/15 N.Y. St. Reg. HLT-42-14-00001-A. ........................................ 14, 15, 20

## PRELIMINARY STATEMENT

Plaintiff EverCare Choice, Inc. ("EverCare") respectfully submits this Memorandum of Law in opposition to Defendants' motion for an Order staying or dismissing this action and compelling mediation and arbitration ("Motion to Compel Arbitration").[1]

As set forth in the accompanying McTigue Declaration and Verified Second Amended Complaint, Defendants, in concert with Former EverCare Management, devised and executed a variety of fraudulent schemes, over the course of more than a decade, involving the improper transfer, embezzlement, and diversion of funds from EverCare (a distressed not-for-profit entity) to related entities also controlled by Former EverCare Management. Former EverCare Management and Defendants, together, created and issued false accounting statements, misclassified financial transactions, and concealed and mischaracterized related-party transactions, to disguise and mask their fraudulently activity; namely, the transfers and diversion of EverCare funds to related entities to enrich Former EverCare Management and Defendants.

Once Former EverCare Management was ousted by year end 2014, EverCare's Board of Directors appointed Sylvia McTigue ("Ms. McTigue") as its President and Chief Executive Officer. The Board tasked Ms. McTigue with revitalizing and salvaging EverCare, and she promptly launched an investigation which began unearthing the magnitude of Former EverCare Management's various fraudulent schemes. In an attempt to cover up their wrongdoing on the eve of EverCare's 2015 audit due date, Defendants pressured Ms. McTigue to sign a back-dated Engagement Letter containing impermissible limitation of liability and arbitration clauses. Although she refused to sign the 2016 Engagement Letter at first, Defendants threatened Ms.

---

[1] For ease of reference, all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Second Amended Complaint in this Action and the accompanying Declaration of Sylvia McTigue, sworn to December 21, 2020, in Opposition to Defendants' Motion for an Order Staying or Dismissing this Action and Compelling Mediation and Arbitration ("McTigue Declaration").

McTigue that if she did not execute the Engagement Letter, they would not release the 2015 audit. This pressure placed Ms. McTigue in an untenable position: either file an audit replete with material errors, omissions and outright false statements thereby keeping EverCare afloat; or fail to file an audit, knowing that these overreaching terms and conditions that PKF was foisting upon EverCare compromised the truthfulness and accuracy of its audited financials and placed EverCare at grave risk of violating the laws, rules and regulations governing EverCare, an action which could have led to significant monetary penalties, and, ultimately decertification  and dissolution of EverCare as a MLTCP by New York State regulators.

The back-dated Engagement Letter contains a host of illegal provisions which violate 10 NYCRR §§ 98.3 *et seq.* ("Part 98"), the statutory framework that governs auditors of MLTCP's, (like EverCare), including, but not limited to, several provisions that impermissibly limit PKF's liability under the engagement. It also contains an arbitration provision that provides, *inter alia*, that "[a]ny claim or controversy ("dispute") arising out of or relating to this engagement, the services provided thereunder, or any other services provided by [PKF] to [EverCare] … shall first be submitted in good faith for mediation administered by the American Arbitration Association ("AAA") under its Mediation" and "[i]f the dispute is not resolved by mediation within 90 days of its submission to the mediator, then, and only then, the parties shall submit the dispute for arbitration administered by the [AAA] … ."

As demonstrated below and in the accompanying McTigue Declaration, Defendants' Motion to Compel Arbitration should be denied in its entirety for a multitude of reasons. **First**, the arbitration provisions in this dispute are narrow, since they are limited to the "engagement," the "services under the engagement" or "any other services provided by [PKF] to [EverCare]". If PKF, the sole drafter of the engagement letter, intended the arbitration provision to be broader,

it would have inserted an unlimited arbitration provision. Therefore, even if the arbitration provisions are deemed enforceable, EverCare's claims against Defendants for, *inter alia*, violations of RICO, fraud, and aiding and abetting fall outside the purview of the narrow arbitration provision. **Second**, the Defendants employed ultra-high pressure tactics to induce EverCare to execute the back-dated 2016 Engagement Letter on the eve the 2015 audit was due to be publicly filed.   PKF knew EverCare had no choice but to sign the document, notwithstanding that it, is replete with self-serving, exculpatory provisions prohibited by Part 98, undermining and compromising PKF's independence. Accordingly, the 2016 Engagement Letter and its arbitration provision are void as against public policy, and therefore unenforceable.

For all of the foregoing reasons and for the reasons set forth below, this Court respectfully should deny Defendants' Motion to Compel Arbitration in all respects.

## **ARGUMENT**

### **POINT I**

#### **EVEN IF THE ARBITRATION PROVISIONS ARE DEEMED ENFORCEABLE, EVERCARE'S CLAIMS AGAINST DEFENDANTS IN THIS ACTION ARISE OUTSIDE THEIR SCOPE**

The Federal Arbitration Act ("FAA") reflects the fundamental principle that arbitration is a matter of contract. 9 U.S.C. §§ 1 – 16; *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). "[A] party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 580 (1960). The purpose of the FAA "was to make arbitration agreements as enforceable as other contracts, but no more so." *McDonell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 831 (2d Cir. 1988) (*quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n. 12 (1967)).  Although federal policy favors arbitration, "federal

policy alone cannot be enough to extend the application of an arbitration clause far beyond its extended scope." *Fuller v. Guthrie*, 565 F.2d 259, 261 (2d Cir. 1977). Instead, contracts providing for arbitration must "be carefully construed." *United Steelworkers of Am.*, 363 U.S. at 590.

A.    **The Arbitration Provisions Are Narrow**

Prior to determining the scope of an arbitration provision, courts in the Second Circuit must decide, "whether the arbitration agreement is broad or narrow. *Collins & Aikman Prods. Co. v. Building Sys.*, 58 F.3d 16, 20 (2d Cir 1996) (internal quotations and alterations omitted). "Broad" clauses purport to refer all disputes to arbitration, whereas "narrow" clauses limit arbitration to specific types of disputes. *McDonnell Douglas Fin. Corp.*, 858 F.2d at 832.

In *Borecki v. Raymours Furniture Co., Inc.*, the plaintiff (customer) and defendant (furniture manufacturer) entered into an agreement for the purchase of furniture which contained the following arbitration provision: "**any claim, dispute, or controversy between you and us that in any way arises from or relates to the goods and/or services you have purchased or are purchasing from us …**" 2017 WL 5953172, at *2-3 (S.D.N.Y. Nov. 28, 2017) (emphasis added). The plaintiff commenced an action against the defendant, alleging that the defendant violated the Telephone Consumer Protection Act (the "TCPA") by improperly using the plaintiff's cell phone number to send spam texts to the plaintiff's cell phone, and the defendant moved to compel arbitration. *Id.*, at *3. The Court held that the arbitration provision was narrow, because it was "limited to 'any claim, dispute or controversy ... that in any way arises from or relates to … the goods and/or services you have purchased or are purchasing from us ... including the ... negotiation or discussion regarding purchase, discount, price or credit terms....'" *Id.*, at *2.

4

Similarly, in *Ji Dong Cheng v. HSBC Bank USA, N.A.*, 467 F.Supp.3d 46, 49 (E.D.N.Y. 2020), when the plaintiff (bank customer) opened a savings account with the defendant (a bank), he entered into an Electronic Balance Transfer Service Agreement (the "Service Agreement") which contained the following arbitration provision: "[i]f either of us has any dispute or disagreement with the other regarding this Service that we cannot resolve amicably, both parties agree that the sole and exclusive remedy shall be binding arbitration in accordance with the then-current rules and procedures of the American Arbitration Association." The plaintiff commenced an action against the defendant alleging that the defendant failed to properly pay interest on the plaintiff's savings account, and defendant moved to compel arbitration. *Id*. The Court denied the defendant's motion, because the arbitration provision was narrow and "applie[d] exclusively to disputes regarding the service described in the Service Agreement, [and therefore] was clearly not meant to 'cover all disputes that might arise between the parties.'" *Id*. at 51.

Likewise, the Court in *New Hampshire Ins. Co. v. Canali Reinsurance Co.*, 2004 WL 769775, at *3 (S.D.N.Y. 2004) rejected the petitioner's argument that the arbitration provision in the parties' arbitration agreement was broad. There, the Court held that a review of an arbitration provision omitting limiting language within the provision, rendered it "as mere surplusage" and "defie[d] the plain meaning of the clause." *Id*. When "[r]ead properly and as a whole," the Court concluded the arbitration clause was narrow, covering "only a specific category of disputes." *Id*.

Here, when read as whole, the Court should classify the arbitration clause as narrow based on the precise language limiting arbitration to a subset of three potential types of disputes between the parties relating to: (1) "this engagement;" (2) "the services provided thereunder;" or (3) "any other services provided by or on behalf of the firm or any of its subcontractors or agents to [**EverCare**] …" Engagement Letters (emphasis added); *see also Raymours Furniture* (holding

that arbitration provision which provided that "any claim, dispute, or controversy between you and us that in any way arises from or relates to the goods and/or **services** you have purchased or are purchasing from us" was narrow) (emphasis added); *S. New England Tel. Co. v. Glob. Naps, Inc.,* 2006 WL 1169805, at *4 (D. Conn. 2006) (classifying arbitration clause as narrow instead of broad where language was "clearly intended to apply only to a subset of the possible claims."); *Ace Ltd. v. Cigna Corp. & CIGNA Holdings*, 2001 WL 767015, at *3 (S.D.N.Y. 2001) (finding arbitration clause narrow where it referred to particular subset of potential disputes).

If, by contrast, PKF intended to insert a broad arbitration provision, the arbitration provision would have no limitation on the types of claims subject to arbitration. *See, e.g., McDonnel Douglas Fin. Corp.,* 858 F.2d at 832 (*"*We conclude that the clause at issue here is a narrow one. It is not the sort of broad clause in which parties agree to submit to arbitration disputes 'of any nature or character,' or simply 'any and all disputes.'") (citation omitted). That PKF decided to limit the scope of the arbitration provision to three specific classes of claims, rather than enlarge it to cover "any and all disputes," strongly militates in favor of a narrow construction.

Importantly, PKF is **NOT** permitted to enter into broad arbitration provisions with managed care organizations ("MCO") such as EverCare, under Part 98, which regulates the retention of auditors by MCO's.  Specifically, 10 NYCRR 98-3.6(b) provides that, "A MCO may enter into an agreement with a CPA to have disputes relating to an **audit** resolved by mediation or arbitration." 10 NYCRR 98-3.6(b) (emphasis added). If the Court finds the arbitration provisions entered into between PKF and EverCare were intended to be broad, and covered all claims between them, the arbitration provisions would violate Part 98, since they would not be limited to "audits."

Lastly, to the extent the arbitration provision language in the Engagement Letters is ambiguous; it must be construed strongly against the drafter. *See Raymours Furniture Co.; see also Arbeeny v. Kennedy Exec. Search, Inc.*, 893 N.Y.S.2d 39, 43 (1st Dept. 2010) (using *contra proferentem* to construe employment agreement against drafter); *Yale Club of N.Y.C., Inc. v. Reliance Ins. Co. (In re Ancillary Receivership of Reliance Ins. Co.)*, 863 N.Y.S.2d 415, 416 (1st Dept. 2008) (employing *contra proferentem* in insurance context).

**B.**      **The Narrow Arbitration Clause Does Not Encompass EverCare's Claims**

Courts must treat agreements to arbitrate like any other contract. *See Volt Info. Sciences v. Bd. of Tr. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478. "Like any other contract, courts must interpret an arbitration provision to give effect to the parties' intent as expressed by the plain language of the provisions." *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001). Where arbitration clause is narrow, only disputes that are "on [their] face within the purview of the clause are subject to arbitration." *AMC Ent. v. Entretenimiento GM de Mexico S.A. de C.V.*, 555 F. App'x 12, 13 (2d Cir. 2014) (citation omitted).

Here, the arbitration provision only applies to claims relating to PKF's engagement to audit EverCare, the audit services provided thereunder, and any other services provided by PKF to EverCare. Excluded from the category of arbitrable claims are the very claims asserted by EverCare in the Second Amended Complaint -- that Former EverCare Management, in conjunction with the Defendants, perpetrated a variety of fraudulent schemes, over the course of a decade, to divert, siphon, and embezzle funds from EverCare to the Elant Related Entities. Specifically, the Second Amended Complaint details the various fraudulent schemes by the Former EverCare Management, together with the Defendants, including creating, issuing and disseminating false accounting statements, misclassifying financial transactions, and concealing

7

and mischaracterizing related-party transactions, to disguise and mask their fraudulently activity.

Specifically, the Elant Leaders, together with the Individual Auditor Defendants took advantage of the appearance of EverCare's artificially high liquidity by siphoning millions of dollars in cash, critically required to maintain EverCare's solvency, out of EverCare's reserves and into the accounts of one or more of the Elant Entities (the "Inter-Company Transfers"). PKF had actual knowledge of the Inter-Company Transfers, including, but not limited to, unauthorized cash transfers from EverCare's artificially inflated cash reserves to Elant and one or more of the other Elant Entities during the pre-separation period without the prior written consent of the NYS Commissioner of Health (the "DOH Commissioner") in violation of applicable laws, rules and regulations, including New York's so called "5% rule", codified at 10 NYCRR § 98-1.11 (b).  None of these unlawful Inter-Company Transfers, which totaled in excess of $2.5 million and were the subject of two separate Statements of Deficiency issued by the DOH, constitute "other services" as that term is used in any of the PKF engagement letters.

Defendants may argue that the fraudulent schemes referenced above and in the Second Amended Complaint constitute "other services" provided by PKF to EverCare. This interpretation is unpersuasive for a variety of compelling reasons. First, contriving schemes to divert, fraudulently transfer, embezzle and siphon funds from a company, and mischaracterize, hide and conceal financial transactions, does not constitute "services" performed on behalf of an audit client. Second, the same verbiage was used in the arbitration provision in *Raymours Furniture*, *supra*, as the one in this case -- "any claim, dispute, or controversy between you and us that in any way arises from or relates to the goods and/or services" -- the Court held in that case the arbitration provision was narrow. Third, as explained above, if there is any ambiguity in the term "other services," then that term should be construed strongly against the drafter, which,

in this case, is PKF.

In short, the parties' disputes related to the claims asserted by EverCare in the Second Amended Complaint clearly fall outside the scope of Defendants' arbitration provisions. *See Nantucket Industries, Inc. v. Varo*, 129 F.3d 114 (1997) (holding that the plaintiff's RICO claims fall outside the scope of the arbitration agreement contained in the parties' purchase agreement); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (declining to compel arbitration of dispute over software program as outside scope of agreement); *Granite Rock Co. v. Int' Bhd. Of Teamsters*, 561 U.S. 287, 307 (2010) (reversing order compelling arbitration, in part, because labor dispute fell outside the "relatively narrow" scope of arbitration provision).

Defendants naturally rely on *Shearson/American Express v. McMahon*, 482 U.S. 220 (1987) for the irrelevant legal proposition that generally "a RICO claim does not render [] mediation and arbitration clauses ineffective" and "RICO claims can be, and must be when the parties have previously agreed to, arbitrated [*sic*]." (Defendants' Mem., at 9.) While Defendants' quote a benign generalized statement from the *Shearson* opinion, there are sharply defined, indisputable differences between this case and *Shearson*.

In *Shearson*, the respondents (customers) alleged in their complaint that the petitioners (brokerage firm and stock broker) excessively traded respondents' brokerage accounts and made false statements and omitted material facts in providing advice to respondents. *Id*., at 223. The parties entered into a brokerage agreement which required them to resolve through arbitration "any controversy arising out of or relating to [respondents'] accounts, to transactions [between respondents and petitioners,] or to this agreement or the breach thereof." *Id*. The Supreme Court held that the respondents' claims against the petitioners for violating the RICO Act were arbitral and fell within the purview of the arbitration provision. *Id*., at 242.

This case is significantly different from *Shearson*, because in that case the respondent alleged that the petitioner churned their brokerage account to inflate commissions and provided poor financial management advice, claims that fell squarely within the subject arbitration provision and covered the same types of transactions and advice about which the respondents were complaining. By contrast EverCare's allegations here center on a RICO conspiracy between Defendants and a variety of third parties, many of whom were not even signatories to the engagement agreement containing the arbitration provision.  The RICO claims in this case involve numerous fraudulent schemes to embezzle and divert funds from EverCare to related third parties. Those types of claims are well outside the scope of the arbitration provisions in the Engagement Letters which only cover certain kinds of disputes involving PKF's engagement, services provided thereunder, and other services provided by PKF **TO** EverCare.

For the reasons set forth above, this Court respectfully should deny Defendants' Motion in all respects.

## POINT II

## THE 2016 ENGAGEMENT LETTER IS AGAINST
## PUBLIC POLICY AND IS THEREFORE VOID *AB INITIO*[2]

"[I]n spite of the FAA's presumption in favor of arbitration, a court may compel arbitration under the Act only if the agreement is not null and void, inoperative or incapable of being performed." *Sphere Drake Ins. Ltd. v. Clarendon Nat'l. Ins. Co*., 263 F.3d 26, 30 (2d Cir. 2001) (citations omitted); *see also* 9 U.S.C.A § 4. If a party raises an issue as to the making of

---

[2] The 2016 Engagement Letter is also void because it was the subject of duress, fraudulent inducement, and/or is unconscionable. EverCare has not raised these defenses herein, as this Motion to Compel Arbitration is strictly focused on whether this action should be stayed or dismissed pending mediation and arbitration; however, in the event this Court determines that this dispute is not arbitrable, as EverCare contends it should, EverCare hereby respectfully reserves the right to present these and other grounds more fulsomely on the merits and does not waive its right to do so.

the agreement by "present[ing] some evidence in support of its claim"—then the court must set the issue for trial. *Id.* (internal quotation omitted); *see also Ministry of Indus. & Trade, The Hashemite Kingdom of Jordan v. S. Kasmas & Bros.,* No. 01 CIV. 3575 (DC), 2001 WL 1035133, at *2 (S.D.N.Y. Sept. 7, 2001) (denying motion to compel arbitration and requiring a trial on the validity of the agreement).

As demonstrated below, the 2016 Engagement Letter is void because it violates public policy, and therefore the arbitration provision contained in the 2016 Engagement Letter is likewise void and unenforceable.[3] Importantly, the 2016 Engagement Letter is the only agreement between the parties covering their relationship during the period between April 15, 2015 (when the prior engagement for the original 2014 audit ended)[4] and the present, during which time Defendants authored the 2015-14 audited financial statement, which, *inter alia,* included an alleged "reclassification" of "[c]ertain amounts for 2014 . . . to conform with the 2015 financial statement presentation."[5] Given the four-year statute of limitations on damages

---

[3] The Engagement Letters entered into before EverCare's separation from Elant on December 31, 2014 (i.e., 2013 and 214 Engagement Letters) are also void because they were executed by Mr. Todd Whitney, CEO of Elant, who did not have proper authority to enter into such an agreement on behalf of EverCare. While Elant acted as the parent corporation to EverCare, it did not have authority to bind EverCare because the administrative services agreements between EverCare and Elant, which would have given Elant that authority, was never approved by the Commissioner of Health. *See* Second Amended Complaint ¶ 57, FN 6 (citing Part 98-1.11(j)). "If an agent has no authority to bind the principal, by definition the principal has not consented. And if the principal has not consented to a contract containing an arbitration clause, he cannot be compelled to arbitrate. *Sphere Drake Insurance Limited, v. Clarendon National Insurance Company and Clarendon America Insurance Company*, 2001 WL 34113736 (C.A.2), 27 (Case No. 00-9464) (relying on, among others, *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673, 677 (2d Cir. 1972)).

[4] By their own terms, each of the Engagement Letters terminated "on delivery of [PKF's] audit report." *See* Declaration of Thomas R. Manisero affirmed on December 7, 2020, ("Manisero Dec.") Exh 1-3 (2013 - 2015 Engagement Letters).

[5] *See,* Note 2 to Elant Choice Audited Financial Statements, December 31, 2015 and 2014, p. 8. Manisero Dec. Exh. 5. In the EverCare audited financial statements prepared by PKF for the years ending December 31, 2015 and 2014, the Defendants violated generally accepted auditing standards by, *inter alia,* failing and refusing to amend and restate the audited financial statements they had issued on behalf of EverCare during the immediately prior audit years, ending December 31, 2013 and 2014. *Id.*

related to Federal RICO Claims (*Bingham v Zolt*, 66 F.3d 553, 559-60 (2d Cir. 1995)),[6] this period encapsulates nearly all of Plaintiff's RICO damages. Accordingly, Plaintiff's claims or causes of action related to Defendants' actions after April 15, 2015 and/or the 2015 and 2014 restated audits are not arbitrable.

### A.     The 2016 Engagement Letter Violates Public Policy.

"When contract formation is at issue in an FAA case, [this Circuit] generally appl[ies] state-law principles." *Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005). "It is well settled that a court should not enforce rights that arise under an illegal contract." *Stone v. Freeman*, 298 N.Y. 268 (1948); *Flegenheimer v. Brogan*, 284 N.Y. 268 (1940); *accord*, *Rutkin v. Reinfeld*, 229 F.2d 248 (2d Cir.1956); *Anabas Export, Ltd. v. Alper Indus., Inc.*, 603 F.Supp. 1275 (S.D.N.Y.1985). "A void contract produces no legal obligation." *Sphere Drake Ins. Ltd.*, 263 F.3d 31; *New York State Med. Transporters Ass'n, Inc. v. Perales*, 566 N.E.2d 134, 138 (1990) (*citing Weir Metro Ambu-Serv., Inc. v. Turner*, 442 N.E.2d 1268, 1268 (1982)) ("illegal contracts are not generally enforceable"); *Kessler v. Kessler*, 43 A.D. 3d 42, 45 (2nd Dept. 2006) ("Parties may not enter into a contract in violation of the Federal or State constitution, a statute, an ordinance, or a regulation, and contracts may be set aside or held void as unconscionable or in violation of public policy"). An agreement may be void as against public policy. As explained by Judge Scheindlin, in *SI Venture Holdings, LLC v. Catlin Specialty Ins.*, 118 F. Supp. 3d 548, 551 (S.D.N.Y. 2015):

> There is no magic formula for determining when a contract—or a particular provision of a contract—is void as against public policy. Under New York law, "[a]n agreement may be unenforceable [ ] as contrary to public policy even in the absence of a direct violation of a criminal statute, if the sovereign has expressed a

---

[6] The Court in *Bingham* recognized the "separate accrual" rule for RICO claims in which a new claim accrues "each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations". *Id*. But a plaintiff may only recover for "injuries discovered or discoverable within four years of the time suit is brought." *Id*. Because EverCare's claims and resulting damages occur subsequent to the 2016 Engagement Letter (which EverCare contends is void) the claims fall outside the scope of the arbitration provisions of the prior Engagement Letters.

concern for the values underlying the policy implicated." A contract is "contrary to public policy, not only if it directly violates a statutory prohibition ... but also if it is contrary to the social judgment on the subject implemented by the [relevant] statute."

(citations omitted).

Courts in New York look to the State's Constitution and Statutes when determining what is "public policy." *See, e.g.*, *Matter of Validation Rev. Associates, Inc.,* 223 A.D. 2d 134, 135 (2d Dept.), *order* <u>*rev'd*</u> *on other grounds*, 91 N.Y. 2d 840 (1997) ("[p]ublic policy may be found, *inter alia*, 'by the expression of the will of the legislature contained in statutory enactments'") (*citing* 21 N.Y. Jur. 2d, Contracts, § 144, at 552). While the legislature determines public policy through statute,[7] courts in New York also "look to" statutes' "implementing regulations to ascertain public policy." *Gen. Elec. Capital Corp. v. New York State Div. of Tax Appeals,* 2 N.Y.3d 249, 258 (NY 2004). To the extent "an agency adopts a regulation that is consistent with its enabling legislation and is not 'so lacking in reason for its promulgation that it is essentially arbitrary'. . . the rule has the force and effect of law." *Gen. Elec. Capital Corp.,* at 254.

EverCare is a MCO that provides health care services to vulnerable, indigent and sick individuals who are eligible for Medicaid services funded by tax-payer dollars. It is highly regulated by the New York State Department of Health ("DOH") and other state agencies and subject to a variety of laws, including, *inter alia*, Section 4403-f of the Public Health Law ("§ 4403-f") and Part 98 of Title 10 of the NYCRR ("Part 98"). On November 10, 2015, the DOH amended Section 98-1.16 of Part 98 and added subpart 98-3 ("Part 98-3"), in order to extend the audit and reporting standards already applicable to other types of managed care organizations to

---

[7] *See* 2 N.Y. Jur. 2d Administrative Law § 54 ("Statutes set the public policy, and administrative officers may only apply the policy declared in the statutes. They may not set different standards or change the policy").

MLTCPs like EverCare.[8]  The amended regulations were "closely patterned upon 11 NYCRR 89 (Regulation 118) adopted by the Department of Financial Services and the National Association of Insurance Commissioners model audit rule" ("NAIC Model"). *S Audited Financial Statements for Managed Care Organizations*, 11/10/15 N.Y. St. Reg. HLT-42-14-00001-A.9.

In promulgating Part 98, the Commissioner of the DOH intended to "ensure that regulated companies engage in best practices related to auditor independence, corporate governance and internal controls over financial reporting." *Id.* Importantly, the declared "purpose of [Part 98] is to apply audit and reporting standards upon [MCOs] … modeled on the standards imposed on public companies by the Sarbanes-Oxley Act of 2002." *See* 10 NYCRR 98-3.1;[10] *see also* Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 *et seq.* ("SOX"). SOX provides for a "comprehensive regime of audits and internal management controls and reports designed to ensure greater transparency and accountability." 11/10/15 N.Y. St. Reg. HLT-42-14-00001-A; *see also* 10 NYCRR § 98-1.1; *Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582, 598 (S.D.N.Y. 2012) (SOX was passed by Congress "[a]fter a series of celebrated accounting debacles," and that the "statute was 'designed to improve the quality of and transparency in financial reporting and auditing of public companies'") (internal citations omitted).

Part 98-3 strictly forbids a CPA from entering into an agreement of indemnity or release from liability related to the performance of an audit. *See Audited Financial Statements for*

---

[8] Absent limited exceptions, the amendments to Part 98 "apply beginning with the reporting period ending December 31, 2015", and initially applied to the audited financial statements due April 1, 2016. 10 NYCRR 98-3.16 (a); *Audited Financial Statements for Managed Care Organizations,* 11/10/15 N.Y. St. Reg. HLT-42-14-00001-A.

[9] Similar language was contained within the proposed rulemaking notice propounded by the then NYS Insurance Department (now Department of Financial Services), when Regulation 118 was originally proposed. *See Audited Financial Statements, 1/12/11 N.Y. St. Reg. INS-02-11-00001-P.*

[10] The amendments to Part 98 were enacted to the Commissioner of Health under statutory authority contained in Public Health Law § 4403-f(7) to ensure program oversight and administration of MCOs, including MLTCPs. These powers reflect the broader federal mandate, as provided for in 42 CFR § 438.242(a), for "[t]he State [to] ensure, through its contracts, that each MCO [and by extension MLTCP] … maintains a health information system that collects, analyzes, integrates, and reports data."

*Managed Care Organizations*, 11/10/15 N.Y. St. Reg. HLT-42-14-00001-A.11. Part 98 is explicit that an MCO "may utilize a CPA for the purposes specified in this Part provided that the CPA … has not either directly or indirectly entered into an agreement of indemnity or release from liability (collectively referred to as indemnification) with respect to the audit of the" regulated entity. 10 NYCRR 98-3.6(a). Likewise, guidance on the NAIC Model states that "[t]he commissioner shall not recognize a person or firm as a qualified independent certified public accountant if the person or firm . . . [h]as either directly or indirectly entered into an agreement of indemnity or release from liability (collectively referred to as *indemnification*) with respect to the audit of the insurer." NAIC MDL-205 § 7(A)(2).

Both Part 98-3 and the NAIC Model define "Indemnification" as "an agreement of indemnity or a release from liability where the intent or effect is to shift or limit ***in any manner*** the potential liability of the person or firm for failure to adhere to applicable auditing or professional standards, whether or not resulting in part from knowing of other misrepresentations made by the [Insurer/MCO] or its representatives." 10 NYCRR § 98-3.2(g) (emphasis added); NAIC MDL-205 § 3E.[12]

In addition to the above, 10 NYCRR § 98-3.11 provides in pertinent part:

Every MCO subject to this Subpart shall retain a CPA who agrees by written contract with such MCO to comply with the provisions of this section and 98-1.16. The contract must specify:
(a) That the CPA is independent with respect to the MCO and is acting in conformity with the standards of the CPA's profession, such as contained in the Code of Professional Ethics and pronouncements of the AICPA and the Rules of Professional Conduct of the New York Board of Public Accountancy, or similar code and meets the definition of a CPA set forth in subdivision (e) of section 98-3.2 of this Subpart;

---

[11] Similar language was contained within the proposed rulemaking notice propounded by the then NYS Insurance Department (now Department of Financial Services), when Regulation 118 was originally proposed. *See Audited Financial Statements*, 1/12/11 N.Y. St. Reg. INS-02-11-00001-P.
[12] Text of NAIC MDL-205 is available at: http://www.naic.org/store/free/MDL-205.pdf.

(b) That the CPA understands the annual audited financial report, that the CPA's opinion thereon will be filed in compliance with this Subpart and that the Commissioner will be relying on this information in the monitoring and regulation of the financial condition of the MCO;

(c) That the CPA consents to the requirements of section 98-3.12 of this Subpart and that the CPA consents and agrees to make available the work papers for review by the Commissioner; and

(d) A representation that the CPA is in compliance with the requirements of section 98-3.6 of this Subpart.

The Commissioner of Health modeled Part 98 on federal regulations intended to ensure, *inter alia*, auditor independence in securities transactions. This is significant.  The importance of auditor independence in the context of audits of publicly traded companies is central to the public trust in the securities markets. "Federal securities laws place a heavy burden on financial auditors to ensure their own independence." *Giant Grp., Ltd. v. Sands*, 142 F. Supp. 2d 503, 510 (S.D.N.Y. 2001).  The Supreme Court has noted that

> [b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust... Thus, the independent auditor's obligation to serve the public interest assures that the integrity of the securities markets will be preserved....

*Giant Grp., Ltd. v. Sands*, at 510 (*quoting U.S. v. Arthur Young & Co.*, 465 U.S. 805, 817–18 (1984)).

This case may not involve the investing public, but it most assuredly does concern a more vulnerable subset of the public – the chronically ill, infirmed and the aged – as well as EverCare and the DOH, each of whom are intended beneficiaries of the public policy goals in play. *See Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 383, 834 P.2d 745, 751 (1992), *as modified* (Nov. 12, 1992) ("The accounting profession's public consists of clients, credit grantors,

16

governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce. This reliance imposes a public interest responsibility on certified public accountants") (*quoting* 2 AICPA Professional Standards (CCH 1988) § 53.01); *see also* Part 98-3.11(b) (requiring the accountant to acknowledge that it is aware the DOH will be relying on its audit findings).

It is beyond cavil that ensuring auditor independence is a central purpose of Part 98. It is also clear that an auditor cannot legally be independent under Part 98 if it has in any manner entered into an agreement of indemnity or a limitation on or release of liability with an MLTCP in which it seeks to put its own interests ahead of the public interest. The "Needs and Benefits" section of the DOH's Notice of Adoption of Part 98, specifically highlights "the NAIC model, Regulation 118 and the proposed amendments to Part 98 all require the regulated insurer to forbid its certified independent public accountant (CPA) from entering into an agreement of indemnity or release from liability." *Id.* (emphasis added). The State of New York's settled public policy reflected in the authorizing legislation and subsequently promulgated rules and regulations of the Public Health Law, is that in order to be legally qualified to perform audit services for MLTCP's like EverCare, a CPA cannot, *in any manner*, limit its own liability, because such limitations fatally impair auditor independence.

The 2016 Engagement Letter, covering EverCare's 2014 and 2015 audit periods, violates Part 98 and its underlying established public policy because it contains a variety of illegal indemnification and liability limiting provisions:

> Our firm's maximum liability to [EverCare] for any reason relating to the services under this letter shall be limited to three times the fees paid to the firm for the services or work product giving rise to liability, except to the extent it is finally determined that such liability resulted from the willful or intentional misconduct

or fraudulent behavior of the firm. In no event shall the firm be liable to [EverCare], whether a claim be in tort, contract or otherwise, for any consequential, indirect, lost profit or similar damages.

*          *          *

In the event that we become obligated to pay any cost, settlement, judgment fine, penalty or similar award or sanction as a result of a claim, investigation, or other proceeding instituted by any third party, as a direct or indirect result of an intentional, knowing or reckless misrepresentation or provision to us of inaccurate or incomplete information by [EverCare] or any director, officer or employee thereof in connection with this engagement, and not any failure on our part to comply with professional standards, you agree to indemnify us against such obligations.

*          *          *

You agree to indemnify our firm, its partners principals and employees, to the fullest extent permitted by law for any expense, including compensation for our time at our standard billing rates and reimbursement for our out-of-pocket expenses and reasonable attorneys' fees, incurred in complying with or responding to. . . . any governmental agency or investigative body or by a party in any litigation or dispute other than litigation or disputes involving claims by [EverCare] against the firm. This indemnification will survive termination of this engagement.

2016 Engagement Letter, "Liability" section[13].

In addition to violating Part 98-3 by including these provisions in the 2016 Engagement Letter, Defendants compounded the illegality at issue by sending a "Qualifications Letter," dated March 31, 2016, pursuant to Part 98-3.11, specifically warranting, *inter alia*, that PKF understood its obligation to act in accordance with relevant professional standards related to auditor independence (including the NAIC specifically), that PKF understood its audits would be relied upon by the DOH, and that it had specifically complied with the requirements of section 98-3.6. *See* McTigue Decl., Exh. "A," at ¶ 7. Given the inclusion of obviously illegal clauses limiting liability highlighted above in the 2016 Engagement Letter and the Qualification Letter

---

[13] The Liability Section also contains a clause limiting EverCare's time in which to bring a claim arising under the engagement. While EverCare is aware of case law in the jurisdiction that finds that the contractual shortening of the Statute of Limitations does not, limit a party's liability (*see e.g., Diana Jewelers of Liverpool, Inc. v. A.D.T. Co., Inc.,* 167 A.D. 2d 965 [4th Dept. 1990]), PKF's inclusion of this clause in the **Liability** section demonstrates its intent to use this clause, like the indemnification clauses, to limit its liability. PKF's intention to limit its liability, rendered it not an independent CPA, in violation of Part 98.

18

Defendants, inarguably lacked the independence required under Part 98-3 and the NAIC and were legally unqualified to perform audit services for EverCare. *See* Part 98-3.6(a) and NAIC MDL-205 § 7(A)(2) (both unequivocally proclaiming that an auditor who enters into liability limiting agreement with client is not qualified to act as an independent auditor).

The violations at issue here render the 2016 Engagement Letter unenforceable because they strike at the heart of the public policy concerns Part 98 serves to protect. *See Bd. of Managers of Marbury Club Condo. v. Marbury Corners, LLC*, 958 N.Y.S.2d 306 (Westchester County 2010), *aff'd,* 950 N.Y.S.2d 280 (2d Dept. 2012), *lv. Denied* 20 N.Y.3d 862 (NY 2013) ("When a statute does not expressly provide that a violation will render a contract unenforceable, courts routinely imply such a provision when the enforcement of the contract would defeat the central purpose of the statute"); *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 494 (S.D.N.Y. 2001) (upholding recission of trades based on malum prohibitum securities law violations where party attempted to "enforce the benefits of their agents' wrongful acts, while ignoring the effects of those offenses on some of the central purposes of the securities laws"); Cf. *Joel A. Rakower, CPA, P.C. v. Germain*, 226 A.D.2d 264, 264 (1st Dept. 1996) (a contract that violated regulations promulgated by the Board or Regents with respect to accounting practices was illegal); *Lothar's of California, Inc. v. Weintraub*, 158 Misc. 2d 460, 463, 601 N.Y.S.2d 231 (N.Y. County Sup. Ct. 1993) (agreement in violation of accounting regulations was "tantamount to an illegal contract").[14]

---

[14] Importantly, New York Courts recognize a distinction between "'those illegal contracts where both parties are equally culpable, and those in which, although both have participated in the illegal act, the guilt rests chiefly upon one,'" where the parties are not equally guilty, as here, courts will provide relief to the victim. *See Korea Life Ins. Co. v. Morgan Guar. Tr. Co. of New York*, 269 F. Supp. 2d 424, 441–42 (S.D.N.Y. 2003) (citing and quoting *Tracy v. Talmage*, 14 N.Y. 162, 181, 1856 WL 6757 (1856)). Here, Plaintiff was neither complicit in nor aware of Defendants' role in the ongoing RICO conspiracy. Likewise, Defendants' presentation of the Qualifications Letter to Plaintiff was clearly intended to, and did, give Plaintiff the false impression that Defendants were in compliance with Part 98 and legally competent to perform the audit services in question.

Further, voiding the entire 2016 Engagement Letter in light of Defendants' behavior is proportionate and appropriate in this case because Part 98 lacks an enforcement mechanism to punish Defendants.[15]

In addition to the foregoing, any remaining semblance of independence in this case was destroyed by Defendants' ongoing involvement in the 15-years-long RICO conspiracy. Defendants' false statements in the Qualifications Letter and use of illegal clauses in the 2016 Engagement Letter was part and parcel of their 15-year-long RICO Conspiracy to defraud EverCare. It would be abhorrent to permit Defendants to enforce the 2016 Engagement Letter in a manner that works further injustice against EverCare. *See R.A.C. Grp., Inc. v. Bd. of Educ. of City of New York,* 21 A.D.3d 243, 249 (2d Dept. 2005) (upholding the voiding of a contract that violated a *malum prohibitum* statute where the party seeking enforcement engaged in "fraud or other immoral conduct in tendering its performance under the contract" in light of "long-settled public policy clos[ing] the doors of our courts to those who sue to collect the rewards of corruption") (*citing and quoting McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 471 (NY 1960)); *see also McConnell,* at 471 ("Consistent with public morality and settled public policy, we hold that a party will be denied recovery even on a contract valid on its face, if it appears that he has resorted to gravely immoral and illegal conduct in accomplishing its performance").

The 2016 Engagement Letter is clearly void *in toto ab initio* as against public policy; therefore, the arbitration clause in the 2016 Engagement Letter, is also void and unenforceable.

---

[15] As acknowledged by the DOH in the Notice of Adoption of Part 98, "[t]he proposed regulation also restricts its application only to those entities over which the Health Department has jurisdiction unlike the NAIC model, which also contains rules that apply to CPAs." *Audited Financial Statements for Managed Care Organizations*, 11/10/15 N.Y. St. Reg. HLT-42-14-00001-A.

Particularly with respect to the 2014 restated and 2015 Audit or any aspect of the parties' relationship between April 15, 2015 and the present. *See Sphere Drake Ins. Ltd,* at 30. Even if the Court is not satisfied that the 2016 Engagement Letter is void, there is at least a genuine issue of fact as to whether the agreement is valid, and therefore, the Court respectfully should deny Defendants' Motion to Compel Arbitration.

<u>**POINT III**</u>

**THE ARBITRATION PROVISIONS VIOLATE THE**
**<u>MASTER AGREEMENT AND ARE THEREFORE VOID</u>**

As a state-regulated MLTCP, EverCare is required to enter into a Managed Long Term Care Partial Capitation Contract with the State (the "Master Agreement") (a copy of the Master Agreement is annexed the McTigue Declaration as Exhibit "B."). Article VII(C)(10)(g) of the Master Agreement requires any arbitration provisions entered into between EverCare and any of its service providers, including PKF, to contain three essential obligations: 1) it must expressly acknowledge that the Commissioner of the DOH is not bound by any arbitration or mediation decisions; 2) it must state that the arbitration or mediation shall occur in New York; and 3) it must state that the Commissioner of the DOH will be given notice of all issues going to arbitration or mediation and copies of all decisions. Specifically, Article VII(C)(10)(g) of the Master Agreement provides, in pertinent part, the following:

*          *          *

A procedure for the resolution of disputes between the Contractor [EverCare] and its providers. Any and all such disputes shall be resolved using the Department's interpretation of the terms and provisions of this Agreement and portions of provider contracts executed hereunder that relate to services pursuant to this Agreement. <u>If a Provider Contract provides for arbitration or mediation, it must expressly acknowledge that the Commissioner of the Department of Health is not bound by arbitration or mediation decisions. Arbitration or mediation must occur within New York State, and the Provider Contract must provide that the Commissioner will be given notice of all issues going to arbitration or mediation</u>

21

<u>and copies of all decisions.</u>[16]

(emphasis added.)

PKF was aware of the obligations contained in Article VII(C)(10)(g) of the Master Agreement. PKF was required to comply with generally accepted accounting standards ("GAAS") the "authoritative standards" with which auditors must comply under U.S. Public Company Accounting Oversight Board ("PCAOB") standards and Generally Accepted Accounting Principles ("GAAP"). "Statements on Auditing Standards," known within the accounting industry as "AU," specifically provide among other things, that:

- Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. (AU § 150.02);

- Due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence." (AU § 230.07); and

- The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." (AU § 326.21(c)).

PKF, as part of its audit responsibilities, was under a duty to review, and certainly did review, the Master Agreement between EverCare and the State, which expressly authorizes EverCare to provide services to its membership population and receive partial capitation rates from the State. Nevertheless, PKF required EverCare to enter into the Engagement Letters (including the 2016 Engagement Letter which PKF used to hold EverCare's 2015 audit hostage by requiring execution with no time to review or negotiate) containing arbitration provisions that

---

[16] The Master Agreement defines "Provider Contract, in Exhibit "J," as "a written contract with the Contractor [EverCare] pursuant to which a person or entity provides certain services or items the Contractor [EverCare] deems necessary or advisable to the operation of the plan." The Engagement Letters between EverCare and PKF fall within the definition of a "Provider Contract" since it is a "written contract" between EverCare and PKF for audit services, which are necessary and advisable for the operation of EverCare's managed long-term capitation plan.

violate Article VII(C)(10)(g) of the Master Agreement.

Specifically, PKF's arbitration provisions in its Engagement Letters intentionally deprive the DOH Commissioner from any notification of disputes between EverCare and PKF. Under the PKF arbitration provision, any wrongdoing committed by PKF is required to be maintained in a confidential non-dispute resolution forum concealed from the State regulator tasked with the responsibility to oversee and monitor EverCare and its service providers, including PKF. This is a gross deviation from the rules which govern MLTCPs set forth in EverCare's Master Agreement with the State, and which PKF was aware of and chose to deliberately circumvent. This Court should not permit PKF to enforce an arbitration which violates the Master Agreement and shields its nefarious conduct from review.

Thus, the Court should void the arbitration provisions in PKF's Engagement Letters.

## POINT IV

### DEFENDANTS' ARGUMENT THAT BECAUSE EVERCARE HAS NOT SATISFIED A CONDITION PRECEDENT TO ARBITRATION, EVERCARE HAS VIOLATED THE ENGAGEMENT LETTER, IS SPECIOUS AND WITHOUT MERIT

Defendants contend that "no mediation has yet taken place as required by the agreement between the parties, and therefore EverCare has violated this condition precedent contained in the engagement letter." (Defendants Mem., at 6.) This argument fails for at least several reasons.

Even if this Court were to determine that the arbitration provisions were enforceable (which they are not), that the Engagement Letters are not *void ab initio* and/or that the arbitration provisions are not narrow and the claims alleged in this action do not fall outside the scope of the arbitration provisions, EverCare's counsel sent correspondence to Defendants' counsel inquiring about mediation. Yet, Defendants have not responded. (*See* Zlotnick Declaration, Exhs. "A" – "C"; ¶¶ 6 - 11.)  Accordingly, Defendants should not be permitted to ignore EverCare's request

to proceed to mediation, on the one hand, and then argue, on the other hand, that EverCare has violated a condition precedent.

## POINT V

## THIS COURT MUST DECIDE THE ISSUE OF ARBITRABILITY

Defendants contend that an arbitrator should determine the arbitrability of Plaintiff's claims. (Defendants' Mem., at 7.)  Defendant's provide neither factual nor legal support for this meritless contention.

"The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the "*question of arbitrability*," is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986) (emphasis in original); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995). While questions of arbitrability are ordinarily decided by a court, contracting parties can agree to delegate questions of arbitrability to an arbitrator instead. *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, FN2 (2013). Because an arbitrator deciding questions of arbitrability is contrary to the ordinary course of events, contracting parties must express their intent to delegate questions of arbitrability to an arbitrator "clearly and unmistakably." *AT&T*, 475 U.S. at 649 Accordingly, "unless the party seeking arbitration "point[s] to a clear and unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration," the court must decide the issue of arbitrability. *NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014).

Nowhere in the arbitration provision does it "clearly and unmistakably" reflect the parties' intent to have an arbitration decided by an arbitrator. Nor does the arbitration agreement incorporate by reference any current rules that empower an arbitrator to decide these issues. At

24

most, the arbitration provision refers to outmoded and antiquated Professional Accounting and Related Services Dispute Resolution Rules (the "Rules") of the American Arbitration Association that are no longer in effect. Lastly, even if this Court were to determine that an arbitrator should determine arbitrability of this matter (which respectfully it should not),  the parties would be required to navigate the same issues with the arbitrator in "a drawn-out, duplicative process [that] would run counter to the policy of economy embodied in the Federal Arbitration Act and the more general principle that the rules governing who decides should be simple and clear." *See Armor All/STP Products Company v. TSI Products, Inc.*, 337 F.Supp.3d 156, 166 (D. Conn. 2018). (citations omitted).   Accordingly, this Court should determine arbitrability.

## CONCLUSION

For all of the foregoing reasons, EverCare respectfully requests that the Court deny Defendants' motion to stay or dismiss this action and compel mediation and arbitration in its entirety.

Dated: New York, New York
      December 21, 2020

MORITT HOCK & HAMROFF LLP
*Attorneys for Plaintiff EverCare Choice, Inc.*

By:   s/Peter B. Zlotnick
     Peter B. Zlotnick
     Ted A. Berkowitz
     Stephen J. Ginsberg
     Alexander Litt
1407 Broadway, 39th Floor
New York, New York 10018
Tel.: (212) 239-2000