# EXHIBIT 9

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
Release No. 10242 / October 31, 2016

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 79196 / October 31, 2016

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 3821 / October 31, 2016

**ADMINISTRATIVE PROCEEDING**
File No. 3-17654

| | |
|---|---|
| In the Matter of<br><br>**DOMENICK F. CONSOLO, CPA AND PKF O'CONNOR DAVIES, LLP,**<br><br>Respondents. | ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE AND DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted against Domenick F. Consolo ("Consolo") and PKF O'Connor Davies, LLP ("O'Connor Davies") (collectively "Respondents") pursuant to Sections 8A of the Securities Act of 1933 ("Securities Act"), Sections 4C[1] and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.[2]

---

[1] Section 4C provides, in relevant part, that:

> The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others . . . (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order, as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[3] that:

**A.   SUMMARY**

1. O'Connor Davies was the independent auditor for the Town of Ramapo, New York (the "Town") and the Ramapo Local Development Corporation (the "RLDC," and collectively with the Town, "Ramapo") for fiscal years ended December 31, 2009 through December 31, 2014. Consolo was the audit partner responsible for the audits during that period. In that capacity, Respondents issued audit reports for these fiscal years stating that the Town's and the RLDC's financial statements were presented fairly, in all material respects, in conformity with generally accepted accounting principles ("GAAP")[4] and that the audits were performed in accordance with generally accepted auditing standards ("GAAS"). These statements were false in that the financial statements were not fairly presented in all material respects in accordance with GAAP and the audits were not performed in accordance with GAAS.

2. Respondents knew or should have known that the audit reports were or would be incorporated in municipal securities offering documents by the Town and the RLDC. Between

---

aided and abetted the violation of, any provision of the securities laws or the rules and regulations thereunder.

[2]   Rule 102(e)(1)(ii) provides, in pertinent part, that:

> The Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . to have engaged in unethical or improper professional conduct.

[3]   The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

[4]   As disclosed in Ramapo's financial statements, the Governmental Accounting Standards Board ("GASB") is the accepted standard setting board for establishing governmental accounting and financial reporting principles.

2010 and 2015, Ramapo raised approximately $300 million from investors (including about $85 million in "new money" issuances and the balance in refundings of existing debt) pursuant to 16 securities offerings, the official statements for which contained Respondents' then most recent audit reports.

3. Between 2010 and 2011, four official statements contained the Town's fiscal year ("FY") 2009 financial statements. These financial statements included a $3,080,000 receivable in the Town's primary operating fund, called the General Fund, purportedly for a sale of land known as the "Hamlets" to the RLDC. While auditing the financial statements, Consolo learned that the alleged sale had not been completed. Nevertheless, as discussed below, following an inquiry from a Town finance department employee as to whether to book the receivable, Consolo allowed it to be recorded. The receivable represented approximately 75% of the Town's FY 2009 General Fund balance.

4. While auditing the Town's FY 2010 financial statements in or around April 2011, Consolo learned that the sale of the Hamlets, which he had previously been told would take place by December 2010, did not occur. Nevertheless, Respondents issued unmodified audit reports for the Town's and the RLDC's FY 2010 – FY 2014 financial statements, which continued to improperly reflect the receivable for the Hamlets sale as an asset in the Town's General Fund and the Hamlets land as an asset of the RLDC. Without the receivable, the General Fund would have had a negative balance in each of these fiscal years.

5. Consolo violated applicable professional standards by failing to exercise due professional care and skepticism and to obtain sufficient appropriate audit evidence in connection with auditing the $3,080,000 receivable as well as various other receivables, interfund transfers, and liabilities reported by the Town and the RLDC for FY 2009 – FY 2014.

6. Additionally, while auditing the Town's FY 2011 – FY 2013 financial statements, Consolo failed to appropriately respond when employees in the Town's finance department either expressed concerns concerning the propriety of the financial statements or declined to complete a fraud questionnaire.

7. Beginning in May 2013, senior management at O'Connor Davies learned that Ramapo's financial statements were the subject of investigations by the Federal Bureau of Investigation, the United States Attorney for the Southern of District of New York, and the Commission and that the $3,080,000 receivable was a focus of their respective inquiries. However, O'Connor Davies failed to appropriately respond to the revelation that the Ramapo engagements presented a heightened risk of fraud. Subsequent to that revelation, the firm issued unmodified audit reports for the Town's FY 2012 – FY 2014 financial statements, which reflected inflated General Fund balances as a result, among other things, of continued recognition of the $3,080,000 receivable. The firm also issued unmodified audit reports for the RLDC's FY 2012 – FY 2014 financial statements, which continued to improperly reflect the Hamlets property as an RLDC asset.

**B.     RESPONDENTS**

8.     Consolo, age 61, of Yorktown Heights, New York, is a Certified Public Accountant ("CPA") licensed to practice in New York. Consolo has served as an accountant of O'Connor Davies and its predecessors since 1979. Consolo served as the O'Connor Davies engagement partner on, and had final audit responsibility over, the Town and RLDC engagements from FY 2009 through FY 2014. He has also acted as a quality control reviewer for O'Connor Davies on other municipal audits.

9.     O'Connor Davies is a PCAOB-registered public accounting firm with its headquarters in Harrison, New York. The conduct at issue occurred in the course of audits of the Town and the RLDC, clients of the firm's municipal practice.

**C.     OTHER RELEVANT ENTITIES**

10.    The Town is an incorporated municipal government in Rockland County, New York. The Town is governed by an elected five member board, including a supervisor whose function is akin to a mayor.

11.    The RLDC is a not-for-profit corporation established in 2008 for the purpose of engaging in development projects within the Town. The RLDC is a component unit of the Town, but operates independently of the Town. During the relevant period, the president of the RLDC was the Town's supervisor.

**D.     FACTS**

**The Securities Offerings and the Audit Reports**

12.    Between September 2010 and September 2015, the Town conducted 14 municipal securities offerings. During the same period, the RLDC conducted two securities offerings, which were guaranteed by the Town.

13.    The official statements for the Town's offerings contained unmodified audit reports accompanying the Town's financial statements. The official statements for the RLDC's offerings contained unmodified audit reports accompanying both the Town's and the RLDC's financial statements.

14.    Although these official statements disclosed that O'Connor Davies was "not associated" with their preparation, Consolo knew or should have known that the official statements would include O'Connor Davies' audit reports. Consolo agreed, when possible, to complete the audits on a timetable that would permit the use of the audited financial statements in connection with Ramapo's offerings. Consolo, on behalf of the firm, also effectively consented to inclusion of the FY 2010 and FY 2012 audit reports in certain of Ramapo's offering documents.

15.    The audit reports stated in pertinent part, "We conducted our audit in accordance with auditing standards generally accepted in the United States of America . . . . In our opinion, the

4

financial statements . . . present fairly, in all material respects, the respective financial position [of the Town/ the RLDC] in conformity with accounting principles generally accepted in the United States of America."

16. A summary of the relevant offerings and the audit reports contained therein is set out below:

| Issuer | Official Statement Date | Issue Size (in millions) | Audit Report |
|---|---|---|---|
| Town | 09/21/10 | $12.0 | FY 09 |
| Town | 10/27/10 | $06.7 | FY 09 |
| Town | 12/07/10 | $20.4 | FY 09 |
| RLDC | 04/15/11 | $25.0 | FY 09 |
| Town | 06/01/11 | $15.0 | FY 10 |
| Town | 09/27/11 | $14.2 | FY 10 |
| Town | 11/30/11 | $19.9 | FY 10 |
| Town | 05/24/12 | $15.0 | FY 10 |
| Town | 09/21/12 | $22.0 | FY 11 |
| Town | 11/28/12 | $19.3 | FY 11 |
| RLDC | 02/07/13 | $25.0 | FY 11 |
| Town | 04/05/13 | $12.2 | FY 11 |
| Town | 05/24/13 | $31.2 | FY 11 |
| Town | 05/21/14 | $35.7 | FY 12 |
| Town | 05/19/15 | $33.3 | FY 14 |
| Town | 09/11/15 | $13.4 | FY 14 |

17. The audit reports contained in the offering documents were signed by O'Connor Davies. As engagement partner, Consolo approved issuance of the audit reports.

18. The FY 2009 – FY 2014 audit reports were also publicly available pursuant to continuing disclosure agreements.

**The General Fund**

19. The General Fund is the Town's primary operating fund. Tax revenues and other receipts that are not allocated by law or contractual agreement to another fund are accounted for in the General Fund.

20. Financial statements for governmental funds, including the General Fund, focus on near-term inflows and outflows of spendable resources. As explained in the Town's financial statements, governmental fund financial statements were reported using a current financial resources measurement focus and a modified accrual basis of accounting, under which revenues were recognized as soon as they were both "measurable" and "available"; *i.e.*, collectible within the current period or soon enough thereafter to pay liabilities of the current period. According to

5

the Town's financial statements, a 90 day availability period was used for recognition of most governmental fund revenues.

21. Consolo believed that a decline in the reported General Fund balance may have resulted in a credit rating downgrade on Ramapo's bonds, leading investors to demand higher interest rates on the bonds.

22. As of fiscal year-end 2008, the Town reported a General Fund balance of $4,501,666. However, revenues declined following the onset of the financial crisis, resulting in a decrease in the General Fund balance. Beginning in FY 2009, pressure on the Town's finances also resulted from increased debt service payments stemming from bonds issued to finance various projects, including the purchase of land for the construction of a minor league baseball stadium.

### $3,080,000 Receivable

23. In FY 2009, the Town recorded a $3,080,000 receivable as an asset in the General Fund, which was purportedly for a sale by the Town of the Hamlets property, a 13.7-acre parcel of land, to the RLDC. The receivable represented approximately 75% of the Town reported General Fund balance for FY 2009.

24. While auditing the FY 2009 financial statements in April 2010, Consolo learned that the sale of the Hamlets was not expected to take place until sometime later in FY 2010. As he acknowledged to a colleague, "This is going to be a real problem. It's not even close to a sale by December 31, 2009."

25. Nevertheless, Consolo allowed the recording of the $3,080,000 receivable in the Town's General Fund and the inclusion of the Hamlets property as an asset of the RLDC in the FY 2009 financial statements. The audit co-manager wrote in a contemporaneous email to a colleague, "No one wants to give the ok for this, but Dom [Consolo] said go ahead and book it."

26. At the time of the FY 2009 audit, O'Connor Davies' quality control policies and procedures required an independent preissuance review of the Town's financial statements. However, the audit workpapers do not contain evidence that such a review was conducted of the Town's FY 2009 audited financial statements.

27. While auditing the Town's FY 2010 financial statements, Consolo learned that the sale of the Hamlets still had not occurred because a habitat for timber rattlesnakes, a threatened species, was located on the land. That habitat called into question the potential to develop the Hamlets. Therefore, the Hamlets sale would not go forward.

28. Nevertheless, for FY 2010 – FY 2014, the audit workpapers reflected the continued recognition in the financial statements of a receivable in the General Fund for sale of the Hamlets

to the RLDC and inclusion of the Hamlets property as an asset of the RLDC.[5] In each such fiscal year, inclusion of the receivable represented the difference between the Town reporting a positive or a negative General Fund balance.

29. During the FY 2010 audit, Consolo received false representations from Town officials that the Town would receive an identical $3,080,000 from the RLDC during the 2011 calendar year pursuant to a reimbursement agreement executed in connection with the transfer of an unrelated parcel of land that was to be the site of a housing project (the "Housing Project Land").

30. In relying on the Town's false representations concerning the RLDC's intention and ability to pay $3,080,000 and the Town's continued recognition of the $3,080,000 receivable, Consolo ignored red flags. For example, Consolo knew that the Town's FY 2009 financial statements had reported the Housing Project Land as a donation to the RLDC. Consolo also knew that, on its face, the reimbursement agreement relating to the Housing Project Land contained no reference to a $3,080,000 payment.

31. Furthermore, Consolo was aware based on the terms of the reimbursement agreement that any amount possibly to be paid by the RLDC in connection with the Housing Project Land was undetermined and contingent on numerous events, including completion of the Housing Project, the repayment of construction loans, and the RLDC's ability to pay. According to an audit workpaper prepared in connection with the RLDC's FY 2010 financial statements, the RLDC had "no intention" of paying $3,080,000 to the Town in the near future.

32. It was improper to include a receivable based on the Housing Project reimbursement agreement in the Town's General Fund financial statement, the focus of which was to provide information on near-term inflows, outflows and balances of spendable resources.

33. While O'Connor Davies required that the receivable be classified as "nonspendable" on the Town's FY 2012 through FY 2014 financial statements, Consolo's failure to consider the need for a restatement resulted in a continued overstatement of the total balance of the Town's General Fund.

### $314,000 Receivable

34. While auditing the Town's FY 2010 financial statements, Consolo learned that a new, $314,000 receivable in the General Fund was recorded for a contemplated – but unconsummated – sale of property to a third-party also controlled by the Town's supervisor. Consolo did not obtain sufficient audit evidence to support inclusion of the receivable, which increased the General Fund balance by $314,000 as if the sale had taken place.

---

[5] In FY 2014, the receivable was reduced to $2,500,000.

### **$743,338 Receivable**

35. While auditing the Town's FY 2012 financial statements, Consolo learned that the General Fund included a $743,338 receivable for federal reimbursement aid relating to Hurricane Sandy.

36. Under GASB Statement No. 33, municipalities that receive expenditure-driven grants, such as federal reimbursement aid, "should recognize revenues in the period when all applicable eligibility requirements have been met *and* the resources are available." (Emphasis in original). According to the GASB Comprehensive Implementation Guide applicable to the Town's FY 2012 financial statements, the criterion that revenues from expenditure-driven grants "should be recognized when the expenditure is made" is an "additional requirement" that does not substitute for consideration of whether or not the resources are available.

37. Consolo verified that the expenditures associated with the $743,338 receivable were made in FY 2012, such that the eligibility requirement had been satisfied. Consolo also required documentation that the $743,338 claim had been approved by the federal government. However, Consolo failed to take sufficient steps to assess the availability of the $743,338. In particular, while the Town's FY 2012 financial statements disclosed, consistent with GASB Statement No. 33, that "revenues from [expenditure-driven] Federal and State grants are accrued when the expenditure is made," the $743,338 was not collected within the ninety day availability period that the Town disclosed was "used for revenue recognition for all . . . governmental fund revenues" other than property taxes. Further, the audit workpapers did not document consideration of an alternative availability period for expenditure-driven grants.

### **Transfers from the Ambulance Fund to the General Fund**

38. Between FY 2009 and FY 2014, the Town used transfers from the Ambulance Fund to overstate the balance of the General Fund. These interfund transfers ranged between $1,280,000 and $2,410,960 each year, with a cumulative impact on the General Fund balance of more than $12 million. During the audits, Consolo relied on a false representation from Town management that the Town's Ambulance Fund shared the same tax base with the General Fund.

39. Beginning during the FY 2011 audit, employees in the Town's finance department raised concerns to the audit engagement team relating to the propriety of such interfund transfers. Nevertheless, Consolo continued to rely on the Town official's representations without corroborating the composition of the tax bases for the Ambulance Fund and the General Fund, and O'Connor Davies' workpapers do not include documentation of the auditor's consideration of that matter.

40. In fact, the tax base from which the General Fund monies were raised excluded clergy residences owned by religious corporations, whereas the tax base from which the Ambulance Fund monies were raised included such properties. Therefore, the Ambulance Fund had a different tax base from the General Fund, and consistent with the state's general municipal law, consideration should have been given by the auditors whether to require the Town to record

8

these advances from the Ambulance Fund to the General Fund as loans (which require repayment with interest) rather than interfund transfers (which may be made without repayment).

41. Additionally, between FY 2010 and FY 2014, interfund receivables recorded in the General Fund as "due from" the Ambulance Fund increased the reported fund balance of the General Fund by amounts ranging between $450,000 and $1,424,609 each year. The interfund receivables were recorded because the transfers to the General Fund were in excess of the cash available in the Ambulance Fund. Consolo improperly did not obtain documentation to support these interfund receivables.

### Unrecorded Liabilities

42. Consolo failed to identify certain significant liabilities omitted from Ramapo's FY 2010 – FY 2014 financial statements by failing to perform appropriate audit procedures.

43. In particular, while auditing the RLDC's FY 2010 financial statements, the audit engagement team sent out a third-party confirmation request to attempt to obtain evidence regarding the amount owed by the RLDC to its outside legal counsel. The audit team did not receive a response and, in the absence of obtaining the third party confirmation, failed to perform alternative procedures to obtain sufficient appropriate audit evidence for the amount of liabilities reported by the RLDC.

44. In fact, the RLDC's FY 2010 financial statements, which were also incorporated into the Town's financial statements in summary form, omitted a liability in excess of $700,000 for fees owed to the outside legal counsel. Although such fees would likely have been capitalized as construction in progress such that reporting the liability would not have had an impact on the RLDC's reported net assets, the omission resulted in a misrepresentation of the RLDC's liquidity and overall financial condition.

45. In addition, from at least FY 2011 through FY 2014, the Town's financial statements failed to reflect a payable of at least $767,224, which was owed by the Town to an engineer involved in the construction of a minor league baseball stadium. Consolo failed to obtain sufficient audit evidence regarding the completeness of liabilities reported in the Town's financial statements.

### Fraud Concerns

46. On multiple occasions, Consolo failed to adequately investigate concerns regarding the propriety of the Town's accounting expressed by employees in the Town's finance department as well as other O'Connor Davies professionals. For example:

> a. In connection with the FY 2011 audit, an accountant in the Town's finance department complained to the audit engagement team about fraud involving the Town's financial statements, specifically citing the reporting of a sale of land from the Town to the RLDC. The employee also expressed concern regarding

9

      fraud risk stemming from "inappropriate transactions involving [the Town's governmental] funds." Consolo did not adequately investigate the employee's concerns.

    b. In connection with the FY 2012 audit, an audit manager informed Consolo that another accountant employed in the Town's finance department refused to sign a fraud questionnaire. Consolo failed to discuss the concerns with the accountant or adequately investigate her concerns.

    c. In connection with the FY 2013 audit, the same accountant disclosed in a fraud questionnaire that she had concerns regarding interfund transfers and an outstanding receivable. Consolo failed to discuss the concerns with the accountant or adequately investigate her concerns.

**O'Connor Davies Executive Committee**

47. In May 2013, O'Connor Davies senior management, consisting of a five-member executive committee, learned that the FBI executed a search warrant at Ramapo Town Hall and seized documents from the finance department, including correspondence with O'Connor Davies, relating to the Town's and the RLDC's financial statements.

48. Senior management was further informed that, in May 2013, the Commission requested that O'Connor Davies provide information relating to audits of the Town's financial statements, including documentation relating to the $3,080,000 receivable and to the calculation and reporting of deferred revenue.

49. O'Connor Davies also notified the Commission staff that it received a grand jury subpoena, dated May 14, 2013, requesting documents relating to its audits of the Town's and RLDC's financial statements since FY 2009.

50. In response to the revelation of a heightened fraud risk in connection with Ramapo's financial statements and the $3,080,000 receivable in particular, O'Connor Davies failed to take sufficient and appropriate steps to mitigate the risk of material misstatements in its audit reports. In particular, the Executive Committee determined, following a meeting with the Ramapo audit team, that O'Connor Davies would require the Town to classify the $3,080,000 receivable as "nonspendable." However, permitting continued recognition of the receivable resulted in an overstatement of the total balance of the General Fund. O'Connor Davies also did not implement enhanced quality control procedures for the Ramapo engagements and permitted Consolo to continue as engagement partner without additional supervisory procedures or oversight.

51. After O'Connor Davies senior management became aware of the law enforcement investigations relating to Ramapo's financial statements, the firm issued unmodified audit reports for the Town's and the RLDC's FY 2012 – FY 2014 financial statements, which reported inflated General Fund balances and continued to improperly reflect the Hamlets as an asset of the RLDC.

**E.   VIOLATIONS**

52.   As a result of the conduct described above, Consolo violated Section 17(a)(1) of the Securities Act, which prohibits any person from employing any device, scheme, or artifice to defraud in the offer or sale of securities.

53.   As a result of the conduct described above, Consolo and O'Connor Davies violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, which prohibit any person in the offer or sale of securities from obtaining money or property by means of any misstatement or omission of material fact and engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser of such securities.

54.   As a result of the conduct described above, Consolo violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of any security involving: a) the use of any device, scheme, or artifice to defraud; b) the making of material misrepresentations or omissions; and c) any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

55.   Section 4C of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice provide, in pertinent part, that the Commission may censure or deny, temporarily or permanently, the privilege of appearing or practicing before the Commission to any person who is found by the Commission to have engaged in improper professional conduct. Section 4C(b)(1) of the Exchange Act and Rule 102(e)(1)(iv)(A) define improper professional conduct" to include "intentional or knowing conduct, including reckless conduct, that results in a violation of applicable professional standards." Section 4C(b)(2) and Rule 102(e)(1)(iv)(B) define improper professional conduct to include the following two types of negligent conduct (1) a single instance of highly unreasonable conduct that results in a violation of applicable professional standards in circumstances in which an accountant knows, or should know, that heightened scrutiny is warranted; or (2) repeated instances of unreasonable conduct, each resulting in a violation of applicable professional standards, that indicate a lack of competence to practice before the Commission. Respondents' conduct failed to comply with the applicable professional auditing standards:

      a. GAAS requires an auditor to "obtain sufficient appropriate audit evidence . . . on which to base the auditor's opinion" (AU-C § 500.04/ AU § 326.01)[6] and to "design and perform audit procedures that are appropriate in the circumstances for the purpose of obtaining sufficient appropriate audit evidence." (AU-C § 500.06). Respondents failed to obtain sufficient appropriate audit evidence for certain assets reported in the General Fund's FY 2009 – FY 2014 financial statements, including a $3,080,000 receivable (FY 2009 – FY 2013), a

---

[6]   AU-C § 500 became effective for audits of fiscal years ending on or after December 15, 2012, superseding, but not changing in any significant respect, AU § 326.

11

    $314,000 receivable (FY 2010), a $743,338 receivable (FY 2012), and interfund balances between $450,000 and $1,424,609 reported as "due from" the Ambulance Fund (FY 2010 – FY 2014). Respondents similarly failed to obtain sufficient appropriate audit evidence for certain assets and liabilities reported in the RLDC's FY 2009 – FY 2014 financial statements.

  b. Under GAAS, auditors must also exercise appropriate professional judgment and professional skepticism. (AU-C § 200.08/ AU § 230.08).[7] Professional skepticism is defined as an attitude that includes a questioning mind and a critical assessment of audit evidence. (AU-C § 200.14/ AU § 230.07). In addition, AU-C § 200.17 requires auditors to "plan and perform an audit with professional skepticism, recognizing that circumstances may exist that cause the financial statements to be materially misstated." As discussed above, Respondents did not exercise the appropriate professional judgment when conducting the audit and issuing an opinion on the Town's and RLDC's financial statements for FY 2009 – FY 2014. The expressions of concern by Town accounting personnel, coupled with Respondents' knowledge of the criminal and civil investigations relating to the Town's financial statements, should have caused Respondents to place greater emphasis on obtaining sufficient appropriate audit evidence regarding General Fund assets. Respondents failed to perform additional audit procedures sufficient to address those risks.

  c. GAAS requires that an auditor should modify its opinion when it concludes that the financial statements as a whole are materially misstated or is unable to obtain sufficient appropriate audit evidence to conclude that they are free from material misstatement. (AU-C § 705.07).[8] Consolo approved the issuance of audit reports for FY 2009 – FY 2014 containing unmodified opinions. However, the Town's financial misstatements materially overstated the balance of its General Fund, and Respondents failed to obtain sufficient appropriate audit evidence for such balances. As such, Respondents should not have issued an audit report containing an unmodified opinion.

  d. GAAS requires that, in auditing financial statements, a firm must "establish and maintain effective quality control procedures to provide it with reasonable assurances that the firm and its personnel comply with professional standards and applicable legal and regulatory requirements and that reports issued by the

---

[7]  AU-C § 200 became effective for audits of fiscal years ending on or after December 15, 2012, superseding, but not substantially changing in pertinent part, AU § 230.

[8]  AU-C § 705 became effective for audits of fiscal years ending on or after December 15, 2012, superseding, but not changing in any significant respect, AU § 508.

firm are appropriate in the circumstances. (AU-C §§ 220.03; 220.24).[9] Although O'Connor Davies established a system of quality controls, as discussed above, the system failed to detect that the firm's personnel did not comply with certain professional standards in conducting the FY 2012 – FY 2014 audits of the Town and the RLDC.

56. As a result of the conduct described above, Consolo engaged in improper professional conduct under Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) as defined in Rule 102(e)(1)(iv)(A) and Rule 102(e)(1)(iv)(B) of the Commission's Rules of Practice.

57. As a result of the conduct described above, O'Connor Davies engaged in improper professional conduct under Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) as defined in Rule 102(e)(1)(iv)(B) of the Commission's Rules of Practice.

F.  UNDERTAKINGS

*Consolo*

58. <u>Municipal Audit Partner Ban.</u> Consolo undertakes that he shall not serve as the engagement partner or engagement quality control reviewer in connection with any municipal audit engagement for a period of five years from the entry of this Order.

59. Consolo undertakes that he shall certify annually on October 15, in writing, compliance with the undertaking set forth in paragraph 58 above. The certifications shall identify the undertaking and provide written evidence of compliance in the form of a narrative. The Commission staff may make reasonable requests for further evidence of compliance, and Consolo agrees to provide such evidence. The certifications and supporting material shall be submitted to Sanjay Wadhwa, Senior Associate Regional Director, Division of Enforcement, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, New York, NY 10281, with a copy to the Office of Chief Counsel of the Enforcement Division, by December 31 of each year through 2021.

60. <u>Cooperation.</u> Consolo undertakes that he shall cooperate fully with the Commission in any and all investigations, litigations, administrative or other proceedings relating to or arising from the matters described in this Order. In connection with such investigations, litigation, administrative or other proceedings, Consolo agrees to the following: (i) to produce, without service of a notice or subpoena, any and all documents and other materials or information as requested; (ii) to appear and testify without service of a notice or subpoena in such investigations, interviews, depositions, hearings and trials, at such times and places as reasonably requested; and (iii) to respond promptly to all inquiries.

---

[9]  AU-C § 220 became effective for audits of fiscal years ending on or after December 15, 2012.

13

*O'Connor Davies*

61.     O'Connor Davies Review.  Within 90 days after the entry of this Order, O'Connor Davies shall perform and complete a review and evaluation ("O'Connor Davies Review") of the sufficiency and adequacy of O'Connor Davies' quality controls regarding the following (hereinafter referred to as "O'Connor Davies' Policies"):

   a. the exercise of due professional care and professional skepticism;

   b. assessing the risk of fraud, including appropriately responding to identified fraud risks;

   c. evaluation of evidence obtained concerning matters that are the subject of written representations from management in order to consider the reliability of the representations made and whether reliance on management's representations is appropriate and justified;

   d. obtaining sufficient appropriate audit evidence;

   e. effective supervision by engagement partners and managers, including review of work performed by the engagement team;

   f. audit documentation, including risk assessment procedures and responses, significant findings and resulting actions, work paper sign-off, archiving, and dating;

   g. obtaining reasonable assurance that i) the engagement partner and other individuals assisting the engagement partner in supervising the engagement possess the competencies that are necessary and appropriate in the individual circumstances, and ii) work is assigned to personnel having the degree of technical training and proficiency required in the circumstances; and

   h. the effect of laws and regulations in an audit of financial statements.

The O'Connor Davies Review shall assess the foregoing areas to determine whether O'Connor Davies' Policies are adequate and sufficient to provide reasonable assurance of compliance with all relevant professional standards.

62.     O'Connor Davies Report.  Within 60 days of completing the O'Connor Davies Review, O'Connor Davies shall deliver to the Commission staff a detailed written report ("O'Connor Davies Report") summarizing its review and changes to O'Connor Davies' Policies, if any, to provide reasonable assurance of compliance with all relevant professional standards. The O'Connor Davies Report shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The

Commission staff may make reasonable requests for further evidence of compliance, and O'Connor Davies agrees to provide such evidence.

63. <u>Independent Consultant's Review.</u> O'Connor Davies has undertaken to retain, within 150 days after entry of this Order, an independent consultant ("Independent Consultant"), not unacceptable to the Commission staff. O'Connor Davies shall provide to the Commission staff a copy of the engagement letter detailing the scope of the Independent Consultant's responsibilities. The Independent Consultant's compensation and expenses shall be borne exclusively by O'Connor Davies. O'Connor Davies shall deliver to the Independent Consultant the O'Connor Davies Report at the same time as O'Connor Davies provides such report to the Commission staff as specified in paragraph 62 above. O'Connor Davies shall require that the Independent Consultant perform a review (the "IC Review") of O'Connor Davies' Policies to determine whether O'Connor Davies' Policies are adequate and sufficient to provide reasonable assurance of compliance with all relevant professional standards. O'Connor Davies shall cooperate fully with the Independent Consultant and shall provide reasonable access to firm personnel, information, and records as the Independent Consultant may reasonably request for the IC Review, subject to O'Connor Davies' right to withhold from disclosure any information or records protected by any applicable protection or privilege such as the attorney-client privilege or the attorney work product doctrine.

64. <u>Independent Consultant's Report.</u> After the IC Review is completed, but no later than ninety days after receiving the O'Connor Davies Report, the Independent Consultant shall issue a detailed written report (the "IC Report") to O'Connor Davies: (a) summarizing the IC Review; and (b) making recommendations, where appropriate, reasonably designed to ensure that O'Connor Davies' Policies are adequate and sufficient to provide reasonable assurance of compliance with all relevant professional standards. O'Connor Davies shall require the Independent Consultant to provide a copy of the IC Report to the Commission staff when the IC Report is issued.

65. O'Connor Davies shall adopt, as soon as practicable, all recommendations of the Independent Consultant in the IC Report.

66. <u>Certification by O'Connor Davies' Managing Partner.</u> Within sixty days of issuance of the IC Report, but no sooner than thirty days after a copy of the IC Report is provided to the Commission staff, O'Connor Davies' managing partner must certify to the Commission staff in writing that (i) O'Connor Davies has adopted and has implemented or will implement all recommendations of the Independent Consultant, if any; and (ii) the Independent Consultant agrees with O'Connor Davies' adoption and implementation of the recommendations. To the extent that O'Connor Davies has not implemented all recommendations of the Independent Consultant within sixty days of issuance of the IC Report, O'Connor Davies' managing partner must certify to the Commission staff in writing, no later than thirty days after their implementation, that (i) O'Connor Davies has adopted and has implemented all recommendations of the Independent Consultant; and (ii) the Independent Consultant agrees that the recommendations have been adequately adopted and implemented by O'Connor Davies. The certifications by O'Connor Davies' managing partner shall identify the undertakings, provide written evidence of compliance in the form of a narrative,

15

and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and O'Connor Davies agrees to provide such evidence.

67. To ensure the independence of the Independent Consultant, O'Connor Davies: (1): shall not have the authority to terminate the Independent Consultant or substitute another independent compliance consultant for the initial Independent Consultant, without the prior written approval of the Commission staff; and (2) shall compensate the Independent Consultant and persons engaged to assist the Independent Consultant for services rendered pursuant to this Order at their reasonable and customary rates.

68. O'Connor Davies shall require the Independent Consultant to enter into an agreement that provides that, for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with O'Connor Davies, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement shall also provide that the Independent Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Division of Enforcement, enter into any employment, consultant, attorney-client, auditing or other professional relationship with O'Connor Davies, or any of its present or former affiliates, directors, officers, employees or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

69. O'Connor Davies shall not be in, and shall not have an attorney-client relationship with the Independent Consultant and shall not seek to invoke the attorney-client privilege or any other doctrine or privilege to prevent the Independent Consultant from transmitting any information, reports, or documents to Commission staff.

70. <u>Training.</u> By September 30, 2017, O'Connor Davies shall require each audit professional then employed and that has been employed by O'Connor Davies for at least one year as of March 31, 2017 to complete successfully a minimum of 32 hours of audit-related training. At least 16 such hours shall be devoted, collectively, to the topics of (a) the importance of exercising due care and professional skepticism in evaluating audit evidence and (b) fraud prevention and detection training. In addition, at least 4 such hours shall be devoted to ethics and independence training.

71. <u>Notice of Order.</u> Within five (5) days of the entry of this Order, O'Connor Davies shall post prominently on the "Government Entity Audits and Compliance" and "Government and Public Sector Government Contracting" sections of its website a summary of this Order in a form and location acceptable to the Commission's staff, with hyperlinks to the entire Order. O'Connor Davies shall maintain these postings and hyperlinks on its website until the earlier of twelve (12) months from entry of this Order or the date of certification by O'Connor Davies' managing partner, pursuant to paragraph 66, that O'Connor Davies has adopted and has implemented all recommendations of the Independent Consultant.

72. By October 31, 2017, O'Connor Davies' managing partner shall certify, in writing, compliance with the undertakings set forth in paragraphs 67 – 71. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and O'Connor Davies agrees to provide such evidence.

73. For a period of five years from the date of this Order, O'Connor Davies shall not assign Consolo to serve as the engagement partner or engagement quality control reviewer on any municipal audit and shall ensure that any work performed by Consolo regarding a municipal audit is overseen by an engagement partner or engagement quality control reviewer.

74. All reports and certifications mentioned in these undertakings shall be submitted to Sanjay Wadhwa, Senior Associate Regional Director, Division of Enforcement, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, New York, NY 10281, with a copy to the Office of Chief Counsel of the Enforcement Division.

75. For good cause shown, the Commission staff may extend any of the procedural dates relating to the undertakings. Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered to be the last day.

76. <u>Cooperation.</u> O'Connor Davies undertakes that it shall cooperate fully with the Commission in any and all investigations, litigations, administrative or other proceedings relating to or arising from the matters described in this Order. In connection with such cooperation, O'Connor Davies shall: (i) produce, without service of a notice or subpoena, any and all documents and other materials information as requested; (ii) use its best efforts to cause its present and former employees to appear and testify without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested; (iii) use its best efforts to cause its present and former employees to be interviewed at such times and places as reasonably requested; and (iv) respond promptly to all inquiries.

77. In determining whether to accept the Offers, the Commission has considered Respondents' undertakings.

**IV.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED that:

*Consolo*

A.      Consolo shall cease and desist from committing or causing any violations and any future violations of Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder; and Section 17(a) of the Securities Act.

B.      Consolo is denied the privilege of appearing or practicing before the Commission as an accountant.

C.      Consolo shall comply with the undertaking enumerated in paragraph 58 above.

D.      Consolo shall, within 14 days of the entry of this Order, pay a civil money penalty of $75,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury in accordance with Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717. Payment must be made in one of the following ways:

    (1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

    (2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

    (3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

        Enterprise Services Center
        Accounts Receivable Branch
        HQ Bldg., Room 181, AMZ-341
        6500 South MacArthur Boulevard
        Oklahoma City, OK 73169

        Payments by check or money order must be accompanied by a cover letter identifying Domenick Consolo as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Sanjay Wadhwa, Senior Associate Regional Director, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, Suite 400, New York, New York 10281.

*O'Connor Davies*

E.      O'Connor Davies shall cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.

18

F. O'Connor Davies is censured.

G. O'Connor Davies shall comply with the undertakings enumerated in paragraphs 61 – 75 above.

H. O'Connor Davies shall pay disgorgement of $355,600, plus prejudgment interest thereon of $24,265.

I. O'Connor Davies shall pay a civil money penalty of $100,000.

J. O'Connor Davies shall make the payments required by Sections IV.H and IV.I to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury in accordance with Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717 and SEC Rule of Practice 600. Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying O'Connor Davies as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Sanjay Wadhwa, Senior Associate Regional Director, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, Suite 400, New York, New York 10281.

By the Commission.

Brent J. Fields
Secretary