# EXHIBIT 1

AMERICAN ARBITRATION ASSOCIATION

---------------------------------------------------------- X

EVERCARE CHOICE, INC.,        :   Case No. 01-22-0004-3406

          Claimant,   :

                 :

  -    Against -        :

                 :

PKF O'CONNOR DAVIES, LLP;      :

O'CONNOR DAVIES, LLP; O'CONNER DAVIES  :

MUNNS & DOBBINS, LLP; and Individuals THOMAS P.  :

KENNEDY; CHRISTOPHER J. McCARTHY; MICHAEL  :

J. SUAREZ; GARRETT M. HIGGINS; and JOHN DOES 1-10,  :

                 :

           Respondents.  X

----------------------------------------------------------

    On August 11, 2023, Claimant EverCare Choice, Inc. ("EverCare") moved to remand this arbitration to the United States District Court for the Southern District of New York, where Claimant had originally filed this claim. Claimant submitted a memorandum of law and two declarations, attaching many exhibits, in support of this motion. On August 25, Respondents PKF O'Connor Davies, LLP; O'Conner Davies Munns & Dobbins, LLP, Thomas P. Kennedy; Christopher J. McCarthy, Michael J. Suarez, Garrett M. Higgins and John Does 1-10 ("PKF"), responded to the motion by submitting a memorandum of law as well as a declaration attaching many exhibits. On September 6, 2023, Claimant submitted a Reply Brief in Support of Its Motion to Remand. For the reasons set forth below, the motion to remand is granted.

## I.   BRIEF FACTUAL BACKGROUND

On October 13, 2022, EverCare filed an 88-page, 428 paragraph, sprawling Statement of Claim against Respondents, alleging seven causes of action including claims of conspiracy to violate the federal Racketeering Influenced and Corrupt Organization Act ("RICO); violating RICO; common law fraud, breach of fiduciary duty, breach of contract, aiding and abetting a common law fraud claim and a breach of fiduciary duty claim against its former parent Elant, Inc. ("Elant"). The gravamen of the Demand is that Respondents "purposefully abdicated their professional audit duties and responsibilities, manipulated EverCare's annual audits, and concealed and obstructed government investigation into major Medicaid Fraudulent schemes, all at the behest of and in conjunction with... Elant, its former affiliates and certain directors and officers of both EverCare and Elant." Statement of Claim at ¶ 1. The following brief factual recitation is drawn solely from the Demand and presumed to be true at this stage of the proceeding.

EverCare was founded in or around 1999. From then until December 31, 2014, it was affiliated with Elant which was its "sole corporate member and active parent." *Id.* at ¶ 44. "EverCare manage a long-term care plan that provides health care services to Medicaid recipients in Orange, Rockland and Dutchess counties." *Id.* at ¶ 8. "The Elant Entities retained Respondents (or their predecessor entities) as their auditors in or about 2000." *Id.* at ¶ 39. Beginning in 2009, Elant and Elant

Leaders were subjected to an enforcement investigation for alleged illegal acts in violation of various Medicaid state regulations. *See id.* at ¶ 47. These investigations were ultimately resolved in December of 2015 with a Settlement Agreement settling certain civil claims against Elant and the Elant Leaders, including, *inter alia*, the submission of false claims to the State's Medicaid and Federal Medicare programs under the New York State False Claims Act. *See id.* at ¶¶ 64-65. On April 30, 2014, due, at least in part, to those investigations, the Elant Board of Directors removed Elant as the sole corporate member of EverCare, resulting in EverCare's independence from Elant and the creation of a new EverCare Board. *See id.* at ¶ 57. In May of 2014, the new EverCare Board met and passed a resolution removing Elant as EverCare's sole member and active parent. *See id.* at ¶¶ 58-59. EverCare eventually sued Elant in New York State Court. *See id.* at ¶ 5. That case was resolved with Elant's agreement to pay EverCare approximately $14 million. *See id.*

Respondents continued to serve as the auditors for EverCare after its separation from Elant. Respondents' obligations and the nature and scope of the services to be provided to EverCare were laid out in a series of engagement letters between Elant and Respondents from 2014 through and including the February 12, 2016, Engagement Letter with EverCare (fka Elant Choice, Inc.) ("Engagement Letters"). *See* Exs. A and Q to the Declaration of Peter B. Zlotnick, EverCare

counsel, dated September 6, 2023 ("Zlotnick Dec."). The Engagement Letter at issue here is dated February 12, 2016, and executed by Sylvia McTigue, President and CEO of EverCare and PKF O'Connor Davies, LLP on March 31, 2016. *See* Ex. Q to Zlotnick Dec. *See also* Ex. 22 to the Declaration of Peter J. Larkin in Opposition to Claimant's Motion to Remand this Arbitration to the District Court ("Larkin Dec."); Memorandum of Law in Support of [EverCare's] Motion to Remand ("Cl. Mem.") at p. 5.

## II.     PROCEDURAL BACKGROUND

EverCare first brought these claims in the United States District Court for the Southern District of New York. The action was filed by EverCare on April 1, 2020. An amended complaint was filed on July 10, 2020, and a second amended complaint on October 8, 2020. Defendants filed a motion to compel arbitration which was fully submitted on December 31, 2020. In an oral ruling dated January 5, 2021, the Court granted the motion and stayed the district court action pending mediation and arbitration. This arbitration was subsequently brought by EverCare on October 14, 2022, following a contractually required mediation.

## III.    THE DISTRICT COURT'S OPINION AND THE INSTANT MOTION

In its oral opinion granting the motion to compel arbitration, the Court made the following statement: "[R]egardless of the propriety of portions of the contract [between EverCare and Respondents] in light of the regulations cited by plaintiff, the arbitration clause still stands, and the challenge must go to an arbitrator for

consideration." *See* Exhibit T to Zlotnick Dec. at 8:24-9:4. The Court went on to opine as to what he found persuasive or did not, and what he would find or might find, but for the reasons set forth below, those statements are irrelevant and certainly not binding on the arbitrator.

It is well established that whether a claim is subject to arbitration is a decision for the court, not the arbitrator. *See generally First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 943 (1995). However, the U.S. Supreme Court has held that "parties can agree to arbitrate 'gateway' questions of 'arbitrability.'" *Rent-A-Center, West, Inc. v. Jackson,* 561 U.S. 63, 68-69 (2010). Such "delegation causes" are enforceable where "there is 'clea[r] and unmistakabl[e] evidence" that the parties intended to arbitrate arbitrability issues. *First Options,* 414 U.S. at 943-44 (quoting *AT&T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649 (1986)). The Second Circuit has long held that when the parties explicitly incorporate the rules that govern the arbitration – here the AAA rules of Accounting and Related Services – a court must determine whether the rules agreed to by the parties direct that the arbitrator shall determine whether a dispute is arbitrable. *See Contec Corp. v. Remote Solutions Co. Ltd.,* 398 F.3d 205, 208 (2d Cir. 2005) ("We have held that when, as here parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such

issues to an arbitrator.").  Eleven of the twelve federal circuits have reached the same conclusion as have courts in New York.

Here, Rule A-10 of the AAA rules agreed to by the parties specifically state that the arbitrator has the power to decide the question of arbitrability.  "The arbitrator shall have the power to rule on his or her own jurisdiction including any objections with respect to the existence, scope, or validity of a contract of the arbitration agreement *or to the arbitrability of any claim or counterclaim."* (Emphasis added).  Thus, the district judge did not determine arbitrability and recognized, correctly, that the issue of arbitrability was to be addressed by the arbitrator.

## IV.    THE ARBITRATION CLAUSE

The first disagreement among the parties is whether the arbitration clause should be deemed to be broad or narrow.  In the section titled "Dispute Resolution" the Engagement Letter states that "[a]ny claim or controversy ("dispute") *arising out of relating to this engagement*, the services provided thereunder, or any other services provided by or on behalf of the firm [PKF] . . . to Choice [EverCare] or at its request. . . ." shall be decided by arbitration administered by the American Arbitration Association under its Professional Accounting and Related Services Dispute Resolution Rules.  (Emphasis added).  Ex. Q to Zlotnick Dec.

The Demand reveals that EverCare is accusing Respondents of participating

in a "fraudulent scheme, providing active, contemporaneous strategic and financial advice" and seeking "to conceal this massive fraud in Elant's annual consolidated audited financial statements for 2013 and 2014 by burying them in a footnote and grossly mischaracterizing them as merely an 'inquiry.'" Demand at ¶ 60. Among many alleged fraudulent schemes set forth more fully below, the Demand alleges that Respondents helped Elant to procure a large mortgage from Wells Fargo by "preparing false and misleading financial statements." *Id.* at ¶ 74.

The Demand describes several alleged fraudulent schemes that Elant perpetrated on EverCare. At the end of each section describing a particular fraudulent scheme, EverCare accuses Respondents of preparing "falsified financial records" (paragraph 80); causing EverCare to file "false or misleading State Cost Reports" (paragraph 128); failing to report "in the audit" a sham lease at an over-market value, causing "false or purposefully misleading State Cost Reports to be filed on behalf of EverCare" (paragraph 151); "false financial statements and audits" prepared by Respondents in order to approve the spin-off of EverCare from Elant (paragraph 164); audited financial statements prepared by Respondents "and filed with State Regulators covering the Pre-Separation Period contain[ing] false and misleading errors and omissions of material fact." (Paragraph 257); despite being aware of "gross systemic problems, and in violation of GAAS and GAAP, Respondents persistently failed to note any of these material flaws in their audit

opinions or the notes to the financial statements contained in the AFSs that Respondents issued for years. . . ." (Paragraph 262).

Most of the claims describe activities that "arise out of or relate to" the duties described in the Engagement Letters. Such tasks include auditing EverCare's "statement of financial position" "additional procedures necessary to certify the supplemental information required by New York State Department of Health in the cost report." Exs. A and Q to Zlotnick Decl. The reports are prepared by EverCare but the audit renders an opinion on whether these "statements are presented fairly in all material respects, in conformity with accounting principles generally accepted in the United States. . . ." *Id.* It bears noting that the 2016 Agreement at issue here is limited to "services provided to EverCare or at its request." Thus, work done on behalf of any other entity and not at EverCare's request is not covered by the Dispute Resolution clause in the February 2016 Engagement letter.

However, some of the allegations incorporated in the claims describe activities that do not arise out of or relate to the tasks stated in the Engagement Letters.[1] The best example is found in paragraph 200 of the Demand which states:

---

[1] Respondents implicitly concede as much. *See* Respondents' Memorandum of Law in Opposition to Claimant's Motion to Remand the Arbitration to the United States District Court ("Resp. Mem.") at 12 summarizing (albeit disputing) claims that are "outside of the broad arbitration provision." Respondents then state the "when the far-fetched conspiracy allegations are set aside for a moment, what is left is a garden variety malpractice claim . . . [that] is exactly what the arbitration provision in the engagement letter was intended to cover." *Id.* Thus, if those

"[a]t all relevant times Respondents knew of and substantially participated in this massive fraud by, among other things, advising the Elant Board and Finance Committee (in person, at meetings, by email and over the telephone) how to conceal receipt of the settlement proceeds from the Universal Settlement and Restricted Funds, sell the Elant SNFs [Skilled Nursing Facilities], and how to separate EverCare from the Elant Entities." The details of each of these allegations are set forth in the Demand.

What is important here is to highlight those allegations that demonstrate that Respondents engaged in conduct that did not arise out of or relate to the tasks stated in the Engagement Letters.[2] The most dramatic allegation is that concerning the plan to separate Elant and EverCare. In furtherance of that plan the Elant Board held a Special Meeting on May 15, 2014, at which the Board Chair and the

---

allegations (RICO conspiracy and RICO substantive) are considered, they are not covered by the arbitration provision.

[2] The first alleged scheme – to fraudulently obtain a $23.5 million mortgage from Wells Fargo, insured by the Federal Housing Authority involved the alleged preparation of false and misleading financial statements. This activity is covered by the Engagement Letters. The second alleged scheme – Transfers of Cash from EverCare to Elant ("Inter-Company Transfers") again involved the preparation of Falsified Financial Records in their role as company auditors and is therefore activity covered by the Engagement Letters. The same is true of the next four alleged schemes – the transfer of losses from the Goshen Long Term Health Care Plan to Ever Care for zero dollars; Elant's charging of excessive rates to EverCare for administrative services in excess of that permitted by the New York State Department of Health; improper rate increases for Medicaid Reimbursement; and EverCare's payment of exorbitant rent for unusable office space in Fishkill, New York. The allegation with respect to these schemes was that Respondents were aware of these fraudulent activities but did not adjust the financial statements and required reports to reflect that knowledge.

CEO presented a plan for a strategic repositioning. *See id.* at ¶¶ 167-171. A key part of that plan was an offer by a private investor group to purchase the assets and liabilities of Elant SNFs for $10 million in case. But this offer was well below market value and Elant failed to conduct due diligence or a formal valuation of those assets and liabilities. *See id.* at ¶¶ 172-174. To convince the Board that Elant had no choice but to accept this offer, Elant Leaders concealed that the Elant SNFs were about to receive $18.5 million in settlement proceed as a portion of an $850 million settlement brought by 900 SNFs against the DOH. *See id.* at ¶ 175.[3]

The important point, for the purposes of this motion, is that Respondents represented EverCare in negotiating this settlement but "admitted to [EverCare] the existence and concealment of it from the [EverCare] Board." *Id.* at ¶ 176. The Demand goes on to plead that some of the funds from this sale ($5 million) were paid to a foundation rather than to the Elant entities. *See id.* at ¶ 182. Eventually, half of that sum found its way into two investment accounts to which Elant lacked access. *See id.* at ¶¶ 185-186. The Demand asserts that "Respondents" had caused these funds to be unlawfully taken from a restricted Endowment to the investment

---

[3] In a later meeting with the new CEO of EverCare, Respondents allegedly disclosed that they "had participated in causing the sale of the Elant SNFs assets to the Platschek investor group for a purchase price that failed to account in any manner whatsoever for the $18.5 million in Universal Settlement proceeds that the Elant SNFs were by then expected to receive." *Id.* at ¶ 225. Again, assuming this to be true, Respondents admitted their role in causing the sale of assets for a highly undervalued price to the investor group. This activity was not covered by the Engagement Letters.

accounts. *Id.* at ¶ 186. Assuming this to be true, such activity is not covered by the Engagement Letters.[4]

To return to the theme of this section, "broad" arbitration clauses refer to all disputes to arbitration, whereas "narrow" clauses limit arbitration to specific types of disputes. *See McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825, 832 (2d Cir. 1988). I conclude that the arbitration clause at issue is narrow for two reasons.[5] *First,* it only covers disputes that "arise out of or relate to" the services specified in the Engagement Letter – it does not cover *all* disputes that may arise between these parties. *Second,* the Model Audit Rule, which governs a managed care organization ("MCO")'s retention of an auditor provides that an "MCO may enter into an agreement with a CPA to have disputes relating to an audit resolved by mediation or arbitration." 10 NYCRR § 98-3.6(b). Thus, by regulation, the arbitration must be limited to disputes regarding the audit.

Nonetheless, this issue is not dispositive of the pending motion as the February 2016 Engagement Letter covers the period from April 15, 2015, forward.

---

[4] In its Memorandum of Law, Claimant also notes that the Engagement Letter's Dispute Resolution clause is also limited to services "provided to Choice [Evercare] or at its request . . . ." Obviously, the services provided to Elant were not provided to Evercare at its request. EverCare goes on to write that "Evercare's claims relate to Respondents' conspiring with third parties to harm Evercare" and therefore fall outside the scope of the Dispute Resolution provision. Cl. Mem. at p. 23.

[5] In a broad arbitration clause, the parties would agree "to submit to arbitration disputes 'of any nature or character' or simply 'any and all disputes.'" *Borecki v. Raymours Furniture Co., Inc.,* 2017 WL 5953172, at *2 (S.D.N.Y. Nov. 28, 2017)). While the facts in *Borecki* are easily distinguished from the instant case, the principle enunciated is still good law.

Respondents' activities prior to that date, while cognizable as part of the RICO claim's alleged pattern of racketeering activity, cannot be considered in determining whether the alleged conduct arose out of or related to *this engagement.*

## V. DOES THE 2016 ENGAGEMENT LETTER VIOLATE PUBLIC POLICY?

Claimant argues that the 2016 Engagement Letter violates public policy based on the terms contained in the section of the Letter titled "Liability." *See* Ex. Q to Zlotnick Dec. at p. 6. There are three portions of this section relief on by Claimant. The first paragraph states that "[a]ny and all claims by [EverCare] arising under this engagement must be commenced by [EverCare] within one year following the date on which" PFK delivers its report on the financial statement associated with this engagement. . . ." *Id.* The second paragraph limits PKF's maximum liability "relating to the services under this letter" to "three times the fees paid to the firm for the services or work product giving rise to liability, *except to the extent it is finally determined that such liability resulted from the willful or intentional misconduct or fraudulent behavior of the firm. In no event shall the firm be liable to [EverCare] . . . for any consequential, indirect, lost profit or similar damages." Id.* (emphases added). Finally, the third paragraph is an indemnification clause requiring EverCare to indemnify PKF for its time, expenses and attorneys' fees incurred in responding for testimony or documents by any government agency or a party in a litigation, "other than litigation or disputes

involving claims by EverCare against the firm." *Id.*

EverCare is an MCO and a sub-set of MCOs known as a Managed Long Term Care Plan ("MLTCP"). Effective November 10, 2015, the Department of Health ("DOH") issued a Notice of Adoption of a regulation titled "Audited Financial Statements for Managed Care Organizations, amending 10 NYCRR 98-1.16(c) and adding subpart 98-4 to Title 10 NYCRR. *See* Ex. B to Zlotnick B (NYS Register/November 10, 2015). The stated "purpose" of this regulation was to "extend audit and reporting standards to all managed care organizations . . . including MLTCPs." *Id.* The "Substance of final rule" contained in the Notice of Adoption states that the proposed regulation "is closely patterned upon . . . the National Association of Insurance Commissioners model audit rule ('NAIC model') . . . ." *Id.* The "Revised Regulatory Impact Statement" contained in the Notice of Adoption states that "the NAIC model . . . and the proposed amendments to Part 98 all require the regulated insurer to forbid its certified independent public accountant (CPA) from entering into an agreement of indemnity or release from liability." *Id.* The guidance on the NAIC Model states that "[t]he commissioner [of Insurance] shall not recognize a person or firm as a qualified independent certified public accountant if the person or firm . . . [h]as either directly or indirectly entered into an agreement of indemnity or release from liability (collectively referred to as indemnification) with respect to the audit of the

insurer."  NAIC MDL-205 § 7(A)(2).

On November 11, 2015, Ms. McTigue, EverCare's CEO, sent a copy of this Notice of Adoption to PKF (including Respondents Kennedy and McCarthy) noting the finalization of the model audit rule requirements.  *See id.* In the same email Ms. McTigue forwarded an email that added "the actual regulatory language is attached."  This email attached a document titled "Summary of Express Terms" regarding new subpart 98-3 Audited Financial Statements and Revision to 10 NYCRR 98-1.16(c).  *See* Ex. C to Zlotnick Dec.

Section 98-3.1 states: "The purpose of this Subpart is to apply audit and reporting standards upon managed care organizations (MCOs).  These standards are modeled on the standards imposed on public companies by the Sarbanes-Oxley Act of 2002." Ex. C to Zlotnick Dec. at EC_02178.  The definition of Indemnification found in Section 98-3.2(g) is: "an agreement of indemnity or a release from liability where the intent or effect is to shift *or limit in any manner* the potential liability of the CPA for failure to adhere to applicable auditing or professional standards, whether or not resulting in part from knowing of other misrepresentations made by the MCO or its representative."  *Id.*

Section 98-3.6(a)(2) states that "A MCO may utilize a CPA for the purposes specified in this Subpart provided that the CPA [h]as not either directly or indirectly entered into an agreement of indemnity or release from liability

(collectively referred to as *indemnification*) with respect to the audit of the MCO."
Given that the 2016 engagement letter limits the potential liability of PKF for
failing to adhere to applicable auditing or professional standards, by limiting its
potential liability to "three times the fees paid to the firm" for services or work
product" unless it is determined that such liability arose from intentional, willful or
fraudulent conduct, and by eliminating any recovery of "consequential, indirect,
lost profit or similar damages" the terms of the letter violate the Model Audit Rule
and the NAIC Model.

Section 98-3.11 of Title 10 of the NYCRR provides, in pertinent part, that
"[e]very MCO subject to this Subpart shall retain a CPA who agrees by written
contract with such MCO to comply with the provisions of this section and [section]
98-1.16. The contract must specify . . . (d) A representation that the CPA is in
compliance with the requirement of section 98-3.6 of this Subpart." Ex. C to
Zlotnick Dec. Section 98.11(b) also requires the CPA to acknowledge that it is
aware that the DOH will be relying on its audit findings. *See id.*

As noted above, section 98-3.6 forbids any limitation of liability that "*limits
in any manner* the potential liability of the CPA for failure to adhere to applicable
auditing or professional standards." The Engagement Letter was drafted by PKF.
It did not and could not have represented that it complied with the requirements of
section 98-3.6 given the limitation of liability clause included in the letter. In the

Notice of Adoption, the DOH stated that the amendments (which include Section 98-3) "will ensure that regulated companies engage in best practices related to auditor independence . . . ." Ex. B to Zlotnick Dec. at EC_00221. Importantly, the DOH also stated that the "NAIC model [discussed above] imposes additional rules patterned on the Sarbanes-Oxley Act of 2002." *Id.* at EC_002220.

While not entirely parallel to the regulation of publicly traded companies in the securities markets, on which the public relies, the need for independence of auditors in the health care industry is equally important. It is beyond cavil that the MCOs and the DOH, as well as the New York State Department of Financial Services, rely on the independence of the auditors.[6] As noted by the United States Supreme Court in the context of securities markets, "the independent auditor assumes a *public* responsibility transcending any employment relationship with the client." *United States v. Arthur Young & Co.,* 465 U.S. 805, 817-18 (1984). I conclude that the limitation of liability that shifted *or limited in any manner* the potential liability of the CPA for failure to adhere to applicable auditing or

---

[6] This conclusion is buttressed by PKF's March 31, 2016, Letter to EverCare's Board of Directors in which it specifically stated that "the superintendent [of the New York State Department of Financial Services will be relying on that information [the audited financial statements] in monitoring and regulating the statutory financial condition of [EverCare]." The Letter also stated that "we [PKF] are in compliance with the requirement of Section 7 of the NAIC's Model Rule (Regulation) regarding qualifications of independent certified public accountants." Ex. P to Zlotnick Dec. at EC_003017-003018. This section of the NAIC Model Rule is cited above at p. 13. Claimant erroneously asserted that this letter referenced the DOH and section 98-3.6. *See* Cl. Mem. at It did not reference either.

professional standards, violates the public policy of the State of New York.  This

shift of liability is apparent in the limitation as to the amount of damages (three

times the fee paid absent proof or willful misconduct or fraud) and the complete

bar on "indirect, consequential, lost profit or similar damages."[7] The Engagement

Letter also limits PKF's potential liability by requiring arbitration to settle disputes

arising "arising out of or relating to this Engagement" but prohibiting the arbitrator

from "award[ing] damages that are punitive in nature, or that are not measured by

the prevailing party's actual compensatory loss."  Ex. P to Zlotnick Dec. at p. 6.

This is yet another limitation of liability.  The Engagement Letter is thus void as

against public policy of the State of New York.

Respondents argue that the Liability section of the Engagement Letter

cannot void the Letter based on public policy because the Amendments adding

Section 98 are applicable to the MCO not to the CPA, noting that the DOH has no

regulatory jurisdiction over accounting firms.  *See* Resp. Mem. at. pp. 14-15.  I

disagree.  While it is true that the regulation governs MCOs, there are many

references (as set forth above) to the responsibilities of the CPA.  PKF was well-

aware of those responsibilities when it drafted the 2016 Engagement Letter.  It was

---

[7] It is worth noting that this exception does not apply to a failure of the firm to adhere to the rules governing auditing standards.  Thus, if the Claimant cannot prove willful or intentional misconduct or fraudulent behavior, the limitation of liability would still shift liability for garden variety negligence or malpractice in preparing the audit.  This limitation of liability is not permitted under the governing rules and regulations.

also well-aware of the new regulations and of the NAIC Model Rule, and yet violated its commitment to those responsibilities by limiting its liability to EverCare in violation of express requirements. The new Part 98 has a section titled "Qualifications of CPA." This section provides that *the CPA* may not "directly or indirectly enter[] into an agreement of indemnity or release from liability (collectively referred to as *indemnification* [a defined term] with respect to the audit of the MCO." Zlotnick Ex. C. at EC_002186 (citing 98-3.6(a)(2)). PKF's March 31, 2016, letter acknowledged that it had complied with those responsibilities when, in fact, it had not.

The first and third paragraphs of the Liability section of the 2016 Engagement Letter do not violate either the Model Audit Rule or the NAIC Model Rule. The shortening of the Statute of Limitations for EverCare to bring a claim against PKF is not addressed in either and is not prohibited. *See* Resp. Mem. at p. 19 (citing cases).[8] The third paragraph requiring EverCare to indemnify PKF for expenses and fees incurred in responding to third-party subpoenas or actions is not a limitation of liability that shifts PKF's potential liability to EverCare. Third-party requests for documents or testimony concerning EverCare do not involve

---

[8] In its Reply Memorandum in Further Support of Claimant's Motion to Remand, Claimant argues that the shortening of the statute of limitations is nonetheless an impermissible limitation of liability because it limits the time for bringing claims of fraud as well as garden variety negligence or malpractice. I disagree. While it does impose a *time* limitation on Claimant's right to sue its auditor, it does not limit the scope of that liability in any way – either by the type of causes of action that can be brought or permissible remedies.

potential liability on the part of PKF and therefore do not threaten EverCare with becoming responsible for PKF's liability.

## VI.     CLAIMANT'S REMAINING ARGUMENTS IN SUPPORT OF REMAND

### A.     Unconscionability

Claimant's remaining arguments do not merit extensive discussion.  I begin by addressing Claimant's argument that the 2016 Engagement Letter is unconscionable.  *See* Cl. Mem. at pp. 15-19.  This claim is based on both substantive and procedural grounds.  With respect to substantive unconscionability, Claimant asserts that the terms of the Engagement Letter unreasonably favor PKF. These terms include: (1) the shortening of the statute of limitations; (2) limiting PKF's liability to three times the fee paid (approximately $100,000); (3) releasing PKF from any consequential, indirect, lost profit or other similar damages claims; and (4) limiting EverCare's rights to discovery and remedies in the context of arbitration as required by the dispute resolution clause.  None of these terms are substantively unconscionable.  I have already addressed the first three grounds in detail above, which found that while grounds two and three violated New York's public policy ground one did not.  The only remaining ground is discovery limitations – but permits the arbitrator to permit discovery upon a "showing of substantial need by the party seeking discovery."  Ex. P to Zlotnick Dec. at p. 6. This is not uncommon in arbitration and indeed the AAA Rules presume that

discovery will be very limited other than in "exceptional cases." Claimant's substantive unconscionability argument fails.

Claimant's procedural unconscionability argument is based on the assertion that Ms. McTigue lacked a meaningful choice as to whether to sign the Engagement Letter and was essentially forced to sign because the letter was only presented to her two days before the audit was due to be filed. A failure to file could result in monetary penalties, decertification, and dissolution of EverCare by state regulators. This claim rings hollow, however, in that this Engagement Letter was identical to those previously signed by Ms. McTigue when she was not under similar time pressure. There is nothing in the 2016 Letter that was not in the earlier Engagement Letters. While it is true that she had little time to review the terms of the 2016 Letter, she was completely familiar with its terms and did find time to question the amount of the fees, to suggest edits to the letter (via email from her Executive Assistant), and to write a PFK partner regarding an issue in past audits during the few days she had to review and sign the 2016 Agreement. *See generally* Resp. Mem. at 16-18 (citing testimony and cases); *See also* Larkin Dec. at Exs. 1-4, 7 and 17. Finally, she always had the option of requesting an adjournment of the filing date if she really believed that she needed more time to review the two-page Engagement Letter before agreeing to its terms. The Engagement Letter is not unconscionable.

## B.    The AAA Rules Governing This Arbitration

EverCare's next argument is that the Engagement Letter identifies the wrong engagement partner at PKF and incorporates AAA rules that are no longer in effect.  EverCare makes the latter argument only for the purpose of supporting its claim that the arbitration clause was intended to be narrow as the rules specifically address disputes over "how accounting services are performed."  As I have already found that the clause is narrow not broad, nothing further need be said regarding the change in rules.  Moreover, the rules that replaced the now archived Professional Accounting and Related Services Dispute Resolution Rules are identical to those rules in all material respects.  There are no substantive differences.  Similarly, the identification of the incorrect engagement partner is not a material error that could invalidate the agreement.  The appropriate and qualified person was substituted as the engagement partner.  No harm resulted from this error.

## C.    Effective Vindication

EverCare's final argument is that the terms of the Engagement Letter – in particular its limitation on available remedies – effectively prevents it from vindicating its statutory rights.  The Supreme Court has recognized the doctrine of effective vindication exists to "prevent 'prospective waiver of a party's right to pursue statutory remedies.'" *American Express Co., v. Italian Colors Rest.,* 570

U.S. 228, 236 (2013) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 637 n.19 (1985)).  While the Court twice agreed that the doctrine exists, it did not invoke it in either of those cases.  However, here, the limitations on damages would prevent Claimant from effectively vindicating its right to fully pursue its RICO claim – i.e., to fulfill RICO's remedial and deterrent function.[9]

## VII.   SEVERABILITY

A final point that must be addressed is that of severability.  The district judge noted, in *dicta*, that should he conclude that the indemnity provision violates the regulation, he would "sever any unenforceable portion of the engagement letters and enforce the arbitration clauses."  *See* Ex. T to Zlotnick Dec. at 8:19-21.  However, the Engagement Letter does not have a severability clause.  Claimant cites two cases that address severability.  The first, a New York state court case, held that a contract that did not contain a severability clause was one entire nonseverable agreement.  *See F&K Supply Inc. v. Willowbrook Dev. Co.,* 732 N.Y.S. 2d 734, 738 (3d Dep't 2001) (holding that whether a contract is entire of

---

[9] Claimant argues that it is prevented from effectively vindicating its rights under RICO in four ways (1) no automatic award of attorneys' fees should it prevail; (2) no punitive damages or consequential, indirect lost profit or similar damages; (3) no award of equitable relief; (4) limitation on discovery absent a showing of substantial need.  *See* Cl. Mem. at p. 27.  Because the arbitrator has the power to award attorneys' fees and allow discovery those two grounds do not prevent the effective vindication of a statutory right.  As to the third ground, the Demand does not seek non-monetary or equitable relief.  In short, once again, it is only the second ground – the limitation on available remedies that effectively prevent the effective vindication of Claimant's rights under RICO.

severable is a question of intention of the parties and the best place to look for proof of intent is the language of the contract).  The second case is from a federal district court in Utah.  In *Grigsby v. Income Property USA, LLC,* 2018 WL 4621766 (D. Utah Sept. 26, 2018), the Court first held that the burden of proof as to severability is on the party making a motion to dismiss – in that case a motion in the district court to compel arbitration.  There, the party seeking to compel arbitration failed to prove that the contract's requirement that each party bear its own attorney's fees prevented the plaintiff from vindicating its statutory rights under RICO if compelled to arbitrate.  Defendant argues that this clause in the contract could be severed such that the court should nonetheless compel arbitration.  The Court disagreed.  It began by finding that the question of severability is governed by state law.  It then noted that in Utah whether a contract is severable depends on "the intent of the parties at the time they entered into the contract."  The Court then looked to the "four corners of the contract, other contemporaneous writing concerning the subject matter, and then to any extrinsic parol evidence.  *See id.*  In *Grigsby,* the Court noted that the contract did not mention severability, nor did the parties submit any extrinsic proof of intent concerning severability.  I, too, conclude, that Claimant has borne its burden of proving that the Engagement Letter is one entire document and no clause is severable.

While there is some precedent for the concept, under certain circumstances, that if one portion of a contract is void as against public policy, that portion can be severed allowing the arbitration agreement to survive. Despite having the opportunity to respond to Claimant's argument (and citations) regarding severability, Respondents did not address this issue in their opposition nor provided any support for this concept or its applicability to the present case. Nonetheless, even if I were to recognize that possibility, it would not allow this arbitration agreement to survive, as the impermissible limitation of liability imposed by PKF is found in the dispute resolution clause as well as in the section titled "Liability." As noted above, the Dispute Resolution section states that "[t]he arbitrator shall not have authority to award damages that are punitive in nature or that are not measured by the prevailing party's actual compensatory loss." For the reasons set forth above, this is an impermissible limitation on PKF's potential liability.

## VIII.    MEDIATION AS A PRE-CONDITION TO ARBITRATION

By submitting a declaration from Troy Dahlberg, a forensic accountant retained by EverCare to assist during the mediation among the parties, a required pre-condition to this arbitration, EverCare attempts to show that Respondents did not mediate in good faith. Respondents object to any consideration of this declaration, and the thirteen exhibits attached to it, as a breach of the confidential

nature of the mediation.  I agree.  I decline to consider EverCare's charge that the

mediation was not conducted in good faith.  The mediation occurred; it was not

successful; and this arbitration was filed.  That is all that needs to be said.  This is

not a ground for remanding this claim to the district court.

**IX.     CONCLUSION**

       For the reasons set forth above, Claimant's motion to remand this
Arbitration to the United States District Court is granted.

       The administrative fees and expenses of the American Arbitration
Association totaling $17,000.00 shall be borne as incurred and the compensation
of the arbitrator totaling $37,887.50 shall be borne as incurred.

So Ordered:

s/Shira A. Scheindlin

Shira A. Scheindlin, Arbitrator

Dated: New York, New York
       November 20, 2023